```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                    ---OOO---
 4    SHELDON LOCKETT; MICHELLE
      DAVIS; AND CLYDE DAVIS,
 5
                   PLAINTIFFS,
 6
                   VS.            NO. 18-CV-5838-PJW
 7
      COUNTY OF LOS ANGELES, A
 8    PUBLIC ENTITY; LOS ANGELES
      COUNTY SHERIFF'S DEPARTMENT,
 9    A LAW ENFORCEMENT AGENCY;
      SHERIFF JIM MCDONNELL;
10    MIZRAIN ORREGO, A DEPUTY LOS
      ANGELES COUNTY SHERIFF; AND
11    DOES 1 THROUGH 100,
      INCLUSIVE,
12
                   DEFENDANTS.
13    _____/
14
15
16         REMOTE VIDEOTAPED DEPOSITION OF
17                 MIZRAIN ORREGO
18         _____
19              FRIDAY, MAY 8, 2020
20
21
22    JOB NO. 4082830
23    REPORTED BY:
24    HOLLY THUMAN, CSR NO. 6834, RMR, CRR
25    PAGES 1-236
```

Page 1

```
 1                            --O0O--
 2           REMOTE VIDEOTAPED DEPOSITION OF MIZRAIN ORREGO,
 3      TAKEN BY THE PLAINTIFFS, WITH THE WITNESS LOCATED AT
 4      HURRELL CANTRALL LLP, 300 S. GRAND AVENUE, SUITE 1300,
 5      LOS ANGELES, CALIFORNIA 90071, COMMENCING AT
 6      10:23 A.M., ON FRIDAY, MAY 8, 2020, BEFORE ME,
 7      HOLLY THUMAN, CSR 6834, RMR, CRR.
 8                            --O0O--
 9
10                        APPEARANCES
11    FOR THE PLAINTIFFS:
12         THE SWEENEY FIRM
           315 SOUTH BEVERLY DRIVE, SUITE 305
13         BEVERLY HILLS, CALIFORNIA 90212
           BY:  JOHN E. SWEENEY, ATTORNEY AT LAW
14              JES@THESWEENEYFIRM.COM
15
16         GLICKMAN & GLICKMAN, A LAW CORPORATION
           9460 WILSHIRE BOULEVARD, SUITE 330
17         BEVERLY HILLS, CALIFORNIA 90212
18         BY:  STEVEN C. GLICKMAN, ATTORNEY AT LAW
19              SCG@GLICKMAN-LAW.COM
20
      FOR DEFENDANT COUNTY OF LOS ANGELES:
21         IVIE, MCNEILL & WYATT
           444 S. FLOWER STREET, 18TH FLOOR
22         LOS ANGELES, CALIFORNIA 90071
           BY:  JACK F. ALTURA, ATTORNEY AT LAW
23              JALTURA@IMWLAW.COM
24              RICKEY IVIE, ATTORNEY AT LAW
25              RIVIE@IMWLAW.COM
```

                                                          Page  2

```
 1    which prompted you to arrest eventually Sheldon        11:12:24

 2    Lockett happened in a Tree Top Piru neighborhood.      11:12:34

 3    Correct?                                               11:12:38

 4          Well, you knew that.                             11:12:40

 5    A.   Sorry --                                          11:12:41

 6    Q.   You didn't have to reason that.                   11:12:42

 7          You knew the shooting that eventually led        11:12:44

 8    to the arrest of Sheldon Lockett occurred in a         11:12:47

 9    Tree Top Piru neighborhood.  Correct?                  11:12:49

10    A.   Yes.                                              11:12:52

11    Q.   And you knew that the rival gang was the          11:12:53

12    Neighborhood Piru.  Correct?                           11:12:58

13    A.   One of many, yes.                                 11:13:01

14    Q.   Yeah.  But the Neighborhood Piru gang is          11:13:02

15    where you took off to investigate.  Correct?           11:13:07

16    A.   Yes.                                              11:13:13

17    Q.   And so you were -- in your mind, you              11:13:16

18    thought that this was a gang-on-gang drive-by          11:13:19

19    shooting, didn't you?                                  11:13:23

20    A.   I -- I did not know that it was a gang            11:13:28

21    shooting; however, based on the location and --        11:13:31

22    based on the location and the incident, the            11:13:39

23    description of the incident, I believed that it        11:13:43

24    could be related to gang violence.                     11:13:45

25    Q.   Yeah.  Yeah.  And that's why you went over        11:13:48
```

Page 35



1    there; that's why you went over.  You heard the          11:13:50

2    patch call, dispatch -- the patch call, and you          11:13:55

3    went over to the Neighborhood Piru area.  Correct?       11:13:58

4        A.  Yes.                                             11:14:04



Page 37



Page 38



Page 39



Personal Court Reporters, A Veritext Company
818-988-1900



Page 48



Page 49



Page 50



Page 51



Page 61

| | | |
|---|---|---|
| 1 | one second.  Excuse me one second. | 14:08:18 |
| 2 | (Dog barking) | 14:08:20 |
| 3 | MR. GLICKMAN:  I would just like the | 14:08:32 |
| 4 | record to reflect that my cat has not interrupted | 14:08:33 |
| 5 | the proceedings once. | 14:08:35 |
| 6 | MR. SWEENEY:  Sorry about that.  Okay. | 14:08:36 |
| 7 | ████ | 14:09:07 |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | 14:09:07 |
| 18 | Q.  Okay.  Directing your attention to | 14:09:09 |
| 19 | January 15, 2016. | 14:09:14 |
| 20 | You had an occasion to hear a dispatch | 14:09:20 |
| 21 | call regarding a 664/187.  Is that correct? | 14:09:25 |
| 22 | A.  A 245 GSV, I believe, sir.  Yeah.  Assault | 14:09:40 |
| 23 | with deadly weapon, gunshot victim. | 14:09:45 |
| 24 | Q.  Okay.  All right. | 14:09:48 |
| 25 | So where were you when you got that call | 14:09:51 |

Page 112

| | | |
|---|---|---|
| 1 | or heard that call? | 14:09:53 |
| 2 | A.   I was patrolling Compton, sir. | 14:09:54 |
| 3 | Q.   What part of Compton? | 14:09:59 |
| 4 | A.   I don't recall, sir. | 14:10:02 |
| 5 | Q.   And who was driving? | 14:10:05 |
| 6 | A.   I don't recall, sir. | 14:10:08 |
| 7 | Q.   Who was your partner? | 14:10:12 |
| 8 | A.   Deputy Aldama, sir. | 14:10:14 |
| 9 | Q.   And what did you do in reaction to that | 14:10:17 |
| 10 | call? | 14:10:19 |
| 11 | A.   We heard enough units were going to assist | 14:10:23 |
| 12 | the handling unit with the victim and locking down | 14:10:27 |
| 13 | the -- the gunshot victim location. | 14:10:32 |
| 14 | So we wanted to -- since they had enough | 14:10:37 |
| 15 | deputies on scene, we thought it was a good, | 14:10:42 |
| 16 | proactive idea to go and look for -- you know, just | 14:10:46 |
| 17 | patrol around the rival -- the active rivals of | 14:10:51 |
| 18 | that gang, that particular gang that's in that area | 14:10:57 |
| 19 | where the shooting occurred. | 14:11:00 |
| 20 | Q.   And you and Samuel Aldama talked about | 14:11:01 |
| 21 | that.  Correct? | 14:11:04 |
| 22 | A.   I don't -- I don't -- I don't recall if we | 14:11:08 |
| 23 | talked about it. | 14:11:10 |
| 24 | Q.   Well, you said, "We decided to go to | 14:11:11 |
| 25 | the" -- that was a decision that you and | 14:11:16 |

Page 113

```
 1    Deputy Aldama made.  Correct?                    14:11:20

 2        A.  Yes.  However, I don't recall how the    14:11:22

 3    decision was made.  I mean, yes, we -- ultimately, 14:11:24

 4    yes, that's what we did.                          14:11:28

 5        Q.  Yeah.  Because you wanted to apprehend any 14:11:30

 6    possible suspect.  Correct?                       14:11:37

 7        A.  Yes.                                      14:11:40

 8        Q.  And so you went to the rival gang         14:11:43

 9    territory, as we established earlier, and the     14:11:51

10    shooting was in Tree Top Piru territory.          14:11:55

11            You went to the Neighborhood Piru         14:11:59

12    territory.  Correct?                              14:12:02

13        A.  Correct, sir.                             14:12:03

14        Q.  And you went over there specifically      14:12:05

15    looking for a possible suspect to that shooting.  14:12:09

16    Correct?                                          14:12:16

17        A.  Yes -- no, not really, sir.               14:12:17

18        Q.  Well, what did you go over there for?  You 14:12:21

19    already said that you went over there to possibly 14:12:23

20    look for a suspect.                               14:12:26

21        A.  Well, that was -- yeah, that's -- I mean, 14:12:28

22    that's the reason -- that's what took us to the   14:12:30

23    area.  However, if --                             14:12:33

24        Q.  Okay.  Okay.                              14:12:34

25            MR. ALTURA:  This is Jack Altura.         14:12:40

                                                    Page 114
```

| | | |
|---|---|---|
| 1 | Was the witness done with his answer?  It | 14:12:42 |
| 2 | seemed like he had more to say. | 14:12:44 |
| 3 | MR. SWEENEY:  Now, don't try to coach him, | 14:12:46 |
| 4 | Mr. Altura.  He put his hands up and said yes. | 14:12:47 |
| 5 | That was it. | 14:12:51 |
| 6 | MR. ALTURA:  You interrupted him, | 14:12:53 |
| 7 | Mr. Sweeney, from the way I can see it. | 14:12:54 |
| 8 | MR. SWEENEY:  I interrupted him because he | 14:12:57 |
| 9 | put his hand up like this and put it down.  Next | 14:12:58 |
| 10 | question. | 14:13:01 |
| 11 | MR. ALTURA:  I must have missed that | 14:13:02 |
| 12 | gesture. | 14:13:05 |
| 13 | BY MR. SWEENEY: | 14:13:06 |
| 14 | Q.  Well, let me ask:  Did you have anything | 14:13:06 |
| 15 | more to say? | 14:13:09 |
| 16 | A.  Yes, sir, I did. | 14:13:09 |
| 17 | Q.  Well, I'll get to -- in response to the | 14:13:10 |
| 18 | question I asked? | 14:13:12 |
| 19 | A.  Yes, sir. | 14:13:13 |
| 20 | We went to the particular area based on | 14:13:14 |
| 21 | looking for a possible suspect.  But if a rape | 14:13:18 |
| 22 | victim was going to wave us in the middle of the | 14:13:21 |
| 23 | street, we were not going to neglect helping that | 14:13:24 |
| 24 | rape victim just to go catch a shooting suspect. | 14:13:28 |
| 25 | So even though that took us to that area, | 14:13:31 |

Page 115

```
 1    we weren't specifically looking for the gun -- for          14:13:34

 2    the shooter of -- the GSV.  We weren't there --             14:13:38

 3    that's what took us to the area, but that's not             14:13:44

 4    exactly what we were doing.                                 14:13:46

 5         Q.  Oh, God.                                           14:13:49

 6             What were you exactly doing, then?                 14:13:49

 7         A.  Patrolling the neighborhood.                       14:13:53

 8         Q.  For the suspect.  Correct?                         14:13:55

 9             You can't separate the two, sir.  You've           14:14:00

10    already said you heard the radio call, and you              14:14:02

11    decided to go to the rival gang area.                       14:14:04

12             MR. ALTURA:  This is Jack Altura.                  14:14:09

13             I'll object to that testimony by counsel.          14:14:10

14             MR. HURRELL:  Yeah.  Is there a question,          14:14:13

15    John?                                                       14:14:14

16             MR. SWEENEY:  Yeah.                                14:14:14

17    BY MR. SWEENEY:                                             14:14:14

18         Q.  The question is:  You went to that area to         14:14:15

19    search for a suspect to the shooting.  Correct?            14:14:19

20         A.  Yes, sir.                                          14:14:25

21         Q.  Okay.  All right.  And so you had heard            14:14:26

22    that gunshots were involved.  Correct?                     14:14:30

23         A.  Yes, sir.                                          14:14:36

24         Q.  And your -- that heightened your anxiety,          14:14:38

25    didn't it?                                                  14:14:43
```

Page 116

```
 1        A.  My awareness, sir.                        14:14:46

 2        Q.  Yes.  Because certainly, if a suspect had  14:14:48

 3   a gun, you didn't want to get shot.  Correct?      14:14:53

 4   That's natural.                                     14:14:57

 5        MR. HURRELL:  Well, I don't understand the     14:15:00

 6   question, John.  It's vague and ambiguous.          14:15:01

 7   BY MR. SWEENEY:                                      14:15:03

 8        Q.  You didn't want to get shot by any          14:15:03

 9   possible suspect.  Correct?                          14:15:06

10        A.  I don't think anybody wants to get shot,    14:15:15

11   sir.                                                 14:15:17

12        Q.  Of course not.  Of course not.             14:15:17

13        And so your awareness was raised, and this     14:15:21

14   was not just a dog bite call.  It was much more      14:15:25

15   serious.  Correct?                                   14:15:31

16        A.  Yes, sir.                                   14:15:32

17        Q.  And how did you roll over that you -- you   14:15:43

18   rolled over to the Neighborhood Piru territory very  14:15:45

19   quickly, didn't you?                                 14:15:49

20        A.  I don't recall, sir.                        14:15:53

21        Q.  How far is the -- the two turfs apart?     14:15:58

22        A.  Probably less than a mile, sir.            14:16:08

23        Q.  And so you -- one second.                  14:16:11

24        And so you make your way over to Spruce        14:16:42

25   Street.  Is that correct?                           14:16:45
```

Page 117

| | | |
|---|---|---|
| 1 | A.   Yes, sir. | 14:16:49 |
| 2 | Q.   And you see some people standing on the | 14:16:51 |
| 3 | lawn at 1213 West Spruce Street.   Correct? | 14:16:57 |
| 4 | A.   I believe so, sir, yes. | 14:17:02 |
| 5 | MR. SWEENEY:  So, Mr. Glickman, can we | 14:17:10 |
| 6 | pull up the Google Maps photograph of 1213 West | 14:17:12 |
| 7 | Spruce Street?  And it's -- | 14:17:17 |
| 8 | MR. GLICKMAN:  Did you want the recording | 14:17:22 |
| 9 | of the original call that they heard? | 14:17:23 |
| 10 | MR. SWEENEY:  Yeah, yeah, I'll get to | 14:17:25 |
| 11 | that, but I want to get here first. | 14:17:27 |
| 12 | MR. GLICKMAN:  Okay.  Give me a second. | 14:17:29 |
| 13 | MR. SWEENEY:  Thanks for the coaching, | 14:17:35 |
| 14 | Mr. Glickman. | 14:17:40 |
| 15 | MR. GLICKMAN:  So this will be Exhibit 62. | 14:18:10 |
| 16 | (Deposition Exhibit 62 was marked for | 14:18:13 |
| 17 | identification.) | 14:18:14 |
| 18 | MR. SWEENEY:  Okay.  Can you blow it up | 14:18:16 |
| 19 | just a little bit?  Okay. | 14:18:25 |
| 20 | Q.   So there -- can you point -- you said they | 14:18:32 |
| 21 | were on the lawn? | 14:18:35 |
| 22 | Where on the lawn were they? | 14:18:36 |
| 23 | A.   Honestly, sir, I don't -- I believe it was | 14:18:38 |
| 24 | the blue house.  They were by the sidewalk area. | 14:18:40 |
| 25 | Q.   Okay.  When you say "the sidewalk area," | 14:18:49 |

Page 118

| | | |
|---|---|---|
| 1 | you mean -- I see a cursor going up the -- up the | 14:18:51 |
| 2 | path up to the house? | 14:18:57 |
| 3 | A.   The public -- public sidewalk, sir. | 14:18:59 |
| 4 | Q.   Oh, the public sidewalk.  Okay.  Okay. | 14:19:02 |
| 5 | Is there any way you can tell us where | 14:19:06 |
| 6 | they were standing by looking at this picture? | 14:19:09 |
| 7 | A.   They were, I believe, on the -- I believe | 14:19:14 |
| 8 | they were on the south side of the sidewalk, right | 14:19:17 |
| 9 | there. | 14:19:21 |
| 10 | Q.   Can you -- | 14:19:23 |
| 11 | MR. SWEENEY:  Mr. Glickman, you have the | 14:19:25 |
| 12 | cursor.  Can you move it to -- shall we move it up, | 14:19:27 |
| 13 | back down, or -- | 14:19:31 |
| 14 | THE WITNESS:  To the right, please.  And | 14:19:33 |
| 15 | then down. | 14:19:34 |
| 16 | They were around that area right there, | 14:19:35 |
| 17 | yep.  Around there. | 14:19:38 |
| 18 | BY MR. SWEENEY: | 14:19:38 |
| 19 | Q.   Okay.  So for the record, if we're looking | 14:19:39 |
| 20 | at the photograph straight on, there is a walkway | 14:19:42 |
| 21 | that walks -- that leads up to the front door. | 14:19:45 |
| 22 | They were to the right of that, and they were on | 14:19:49 |
| 23 | the concrete sidewalk or the grass? | 14:19:51 |
| 24 | A.   I don't recall -- recall that. | 14:19:55 |
| 25 | Q.   Okay.  All right.  But somewhere around | 14:19:58 |

Page 119

```
 1    the person.  I mean, that's one of the reasons why        14:27:24

 2    we went, but we were multitasking.                        14:27:26

 3          Besides being reactive to calls for                 14:27:29

 4    service, we were looking for the suspect.  We were,       14:27:31

 5    you know, patrolling the area.  Not necessarily           14:27:34

 6    only put the blinders on, and let's go look for the       14:27:37

 7    suspect; we have to get the suspect.                      14:27:41

 8          Is that clear?                                      14:27:44

 9       Q.  No, it's not clear, but I'm going to               14:27:46

10    object to that response as being nonresponsive, and       14:27:50

11    I will move the court to strike it.                       14:27:54

12          Okay.  So --                                        14:28:00

13          MR. ALTURA:  This is Jack Altura.                   14:28:02

14          That actually seemed very responsive to             14:28:03

15    me, and so I would oppose that motion.                    14:28:05

16          MR. SWEENEY:  I asked him:  So you were             14:28:08

17    looking for the -- a male, black, in his 20s, with        14:28:09

18    a blue beanie and a silver or gray Pontiac.               14:28:16

19          And the answer could have been given in             14:28:20

20    yes or no.  Okay.                                         14:28:23

21       Q.  So when you pulled up to 1213 Spruce               14:28:29

22    Street, you saw a group of people standing on the         14:28:38

23    lawn or near the sidewalk where you described.            14:28:44

24          How many -- how big was the group?                  14:28:50

25       A.  I believe it was two males and one female.         14:28:54
```

                                                    Page 123

```
 1        Q.  What were they doing?                      14:29:03

 2        A.  I believe they were outside, talking,      14:29:05

 3   drinking out of a silver can.                       14:29:08

 4        Q.  They were all drinking out of a silver     14:29:12

 5   can?                                                14:29:15

 6        A.  I don't recall the female was, but         14:29:16

 7   definitely the two males were.                      14:29:18

 8        Q.  They were drinking out of a silver can.    14:29:21

 9            The same silver can or different silver    14:29:24

10   cans?                                               14:29:27

11        A.  Different, sir.                            14:29:27

12        Q.  And did you stop your vehicle?             14:29:31

13        A.  Yes, sir.                                  14:29:37

14        Q.  You don't recall who was driving.          14:29:38

15   Correct?                                            14:29:40

16        A.  I don't.  I don't, sir.                    14:29:41

17        Q.  Why did you stop your vehicle?             14:29:43

18        A.  The beverage appeared to be an alcoholic   14:29:48

19   beverage, so we wanted to just make -- make         14:29:51

20   contact.                                            14:29:54

21        Q.  So you rolled over to this -- this rival   14:29:56

22   gang area to look for the suspect; yet you get out  14:30:02

23   of the car to contact somebody for having           14:30:09

24   alcohol -- possibly having an alcoholic beverage.   14:30:14

25            Is that your testimony?                    14:30:19
```

Page 124

```
 1              MR. HURRELL:  It's argumentative.        14:30:20

 2              THE WITNESS:  Yes.                        14:30:24

 3      BY MR. SWEENEY:                                   14:30:25

 4          Q.  Is that the only reason why you got out of  14:30:27

 5      the car?                                          14:30:29

 6          A.  What was the reason?                      14:30:32

 7              I'm sorry, can you repeat that again?     14:30:33

 8          Q.  Was that the only reason you got out of   14:30:35

 9      the car?                                          14:30:37

10          A.  What -- what was the reason?  The --      14:30:39

11          Q.  That you just stated.                     14:30:42

12          A.  That they were drinking out of a silver   14:30:45

13      can that appeared to be an alcoholic beverage?    14:30:48

14          Q.  Yes.  That's the only reason you got out  14:30:51

15      of the car?                                       14:30:53

16          A.  At that time, yes.                        14:30:53

17          Q.  You didn't -- did you -- strike that.     14:30:55

18              You got out of the car.  You drew your    14:31:03

19      guns.  You drew your gun and pointed your gun at  14:31:08

20      somebody who was drinking alcohol out of a can.   14:31:11

21              MR. HURRELL:  That assumes that fact not  14:31:17

22      established, that they drew their gun -- or he drew  14:31:19

23      his gun.  He hasn't testified to that so far.     14:31:23

24              MR. ALTURA:  And Jack Altura for the      14:31:26

25      County.                                           14:31:28
```

Page 125

```
 1    BY MR. SWEENEY:                                        14:40:06

 2        Q.  So what was your intention in getting out      14:40:14

 3    of the car when you saw them drinking alcoholic        14:40:19

 4    beverages, as you said?                                14:40:20

 5        A.  Well, drinking an alcoholic beverage in a      14:40:25

 6    public place is a violation of Compton Municipal       14:40:27

 7    Code.  So that was my legal standing to -- to stop.    14:40:30

 8            It doesn't mean they were going to jail,       14:40:34

 9    but that gives me legal standing to make contact       14:40:36

10    with the people.                                       14:40:39

11        Q.  Okay.  And, I mean, you can try to talk to     14:40:41

12    anybody.  Correct?  If I'm walking through the         14:40:48

13    streets of Compton, you can stop me and try to talk    14:40:53

14    to me.  Correct?  I can walk away, but you can try.    14:40:56

15    Correct?                                               14:40:58

16        A.  Correct, sir.                                  14:40:59

17        Q.  So you were going to question them about       14:41:02

18    drinking alcohol in public.  Is that right?            14:41:08

19        A.  If I was going to question them?               14:41:14

20        Q.  Yeah.  That was your purpose, you said, in     14:41:17

21    getting out of the car?                                14:41:23

22        A.  That was my legal standing to be there.        14:41:24

23    It was more of a consensual encounter at this time.    14:41:29

24        Q.  It was your legal standing.  But the           14:41:33

25    reason why you were there was to get the -- the        14:41:34
```

Page 132

```
 1    answer.                                              14:55:45

 2            MR. SWEENEY:  He answered already.           14:55:47

 3            THE COURT REPORTER:  This is the reporter.   14:55:59

 4    No answer reflected in the record to that question.  14:55:59

 5    BY MR. SWEENEY:                                      14:56:01

 6        Q.  Okay.  Please answer.                        14:56:02

 7        A.  "Relaxed" meaning, you know, we didn't       14:56:03

 8    have the guns out or -- I mean, you know, it was     14:56:04

 9    just -- it was just a contact.                       14:56:06

10        Q.  Who was it who approached Mr. Lockett?       14:56:16

11            Was it you or Mr. Aldama, Deputy Aldama?     14:56:19

12        A.  Deputy Aldama.                               14:56:25

13        Q.  Do you know if he said anything to           14:56:27

14    Mr. Lockett?                                         14:56:29

15        A.  Yes.  I believe he said, "Are you on         14:56:32

16    probation or parole?"                                14:56:35

17        Q.  Was there any response by Mr. Lockett?       14:56:40

18        A.  Yes.  I saw Mr. Lockett start to walk at a   14:56:42

19    fast pace eastbound away from Deputy Aldama.         14:56:46

20        Q.  Okay.                                        14:56:51

21            MR. SWEENEY:  And can we pull up             14:56:52

22    Exhibit 60 -- one second.                            14:56:56

23            MR. GLICKMAN:  What are you looking for?     14:57:05

24            MR. SWEENEY:  62.                            14:57:07

25        Q.  You said "eastbound," "started walking       14:57:15
```

Page 144

| | | |
|---|---|---|
| 1 | eastbound"? | 14:57:17 |
| 2 | MR. GLICKMAN:  I have -- would a map help? | 14:57:19 |
| 3 | MR. SWEENEY:  Yeah, the Google map. | 14:57:22 |
| 4 | MR. GLICKMAN:  Yeah, so here's -- I have | 14:57:24 |
| 5 | the Google map here. | 14:57:25 |
| 6 | MR. SWEENEY:  62. | 14:57:27 |
| 7 | MR. GLICKMAN:  And so we have a -- this | 14:57:30 |
| 8 | hasn't been marked yet, so this will be Exhibit 66. | 14:57:31 |
| 9 | MR. SWEENEY:  Okay. | 14:57:35 |
| 10 | (Deposition Exhibit 66 was marked for | 14:57:36 |
| 11 | identification.) | 14:57:37 |
| 12 | MR. SWEENEY:  I wanted to show 62, but | 14:57:38 |
| 13 | that's okay.  This is better.  This is better. | 14:57:40 |
| 14 | Okay. | 14:57:42 |
| 15 | Q.  You see this -- it's pinned at -- with a | 14:57:44 |
| 16 | red pin at 1213 West Spruce. | 14:57:50 |
| 17 | Do you see that, Mr. Orrego? | 14:57:54 |
| 18 | A.  Yes. | 14:57:58 |
| 19 | Q.  Okay.  What direction did Mr. Lockett | 14:57:59 |
| 20 | start walking in? | 14:58:03 |
| 21 | A.  Eastbound. | 14:58:08 |
| 22 | Q.  And what -- | 14:58:09 |
| 23 | MR. SWEENEY:  And Mr. Glickman, can you | 14:58:15 |
| 24 | put the cursor going eastbound? | 14:58:16 |
| 25 | Q.  Is that the direction, sir? | 14:58:20 |

Page 145

```
 1        A.  Yes, sir.                              14:58:21

 2        Q.  Was he walking at that point, Mr. Lockett?  14:58:22

 3        A.  There began -- the males began to        14:58:27

 4   disassociate themselves from one another, and --   14:58:29

 5   yes.  And then he, Mr. Lockett, started basically   14:58:35

 6   walking away from the other male and away from      14:58:38

 7   Deputy Aldama.                                      14:58:44

 8        Q.  Okay.  What happened next?               14:58:47

 9        A.  Mr. Lockett turned around east and then   14:58:55

10   took off running, pulled out a weapon from his      14:58:58

11   waistband.                                          14:59:03

12           And then after that, he left northbound on  14:59:03

13   Tajauta toward Rosecrans.                           14:59:08

14        Q.  You said he took off running, and he      14:59:11

15   pulled a gun out of his waistband.  Correct?       14:59:13

16        A.  Correct, sir.                            14:59:17

17        Q.  So his back was to you when he pulled out  14:59:17

18   this gun.  Correct?                                14:59:20

19        A.  Yes, sir.                                14:59:21

20        Q.  Now, did you actually see the gun, sir?   14:59:36

21        A.  Yes, sir.                                14:59:39

22        Q.  As a matter of fact, in the stop and chase  14:59:43

23   of Dante Taylor, which you are familiar with, you   14:59:51

24   said that he had a gun.  Same thing.  Correct?     14:59:56

25        A.  Correct, sir.                            15:00:00
```

Page 146

```
 1        Q.   And that he pulled it out of his          15:00:01

 2   waistband.   Correct?                               15:00:03

 3        A.   Correct, sir.                             15:00:04

 4        Q.   As a matter of fact, as we learned in your  15:00:06

 5   deposition that I took of you in that case out in   15:00:09

 6   Long Beach, that you said that when you fired the   15:00:13

 7   fatal shot at Dante Taylor, he was pointing a gun   15:00:18

 8   right at you, and you were relatively close; you    15:00:23

 9   saw this gun, you shot, and he dropped right there. 15:00:26

10        Do you recall that testimony?                  15:00:32

11        A.   I don't recall me testifying it like that. 15:00:35

12        Q.   Oh.   We have it, and we have it on video. 15:00:39

13        But anyway, there was no gun found next to     15:00:44

14   the body of Dante Taylor, was there?                15:00:46

15        MR. HURRELL:   You're talking about the        15:00:52

16   Taylor case.   Correct?                             15:00:53

17        MR. SWEENEY:   Yes.   Yes.                      15:00:54

18        THE WITNESS:   No, sir.                         15:00:59

19   BY MR. SWEENEY:                                      15:01:02

20        Q.   All right.   Let's get back to this case. 15:01:02

21        In the Taylor case, you, of course, made a     15:01:06

22   417 broadcast, didn't you?                          15:01:11

23        A.   Yes, sir.                                 15:01:15

24        Q.   In this case, you made a 417 broadcast,   15:01:17

25   didn't you?                                         15:01:22
```

                                                    Page 147

| | | |
|---|---|---|
| 1 | A.  Yes, sir. | 15:01:22 |
| 2 | Q.  You knew that a 417 broadcast would evoke | 15:01:25 |
| 3 | a rapid and serious response from other fellow | 15:01:37 |
| 4 | deputies, didn't you? | 15:01:41 |
| 5 | A.  Yes, sir. | 15:01:44 |
| 6 | MR. ALTURA:  This is Jack Altura, and I'll | 15:01:46 |
| 7 | make a belated objection that that's vague and | 15:01:48 |
| 8 | ambiguous. | 15:01:51 |
| 9 | MR. SWEENEY:  Okay. | 15:01:53 |
| 10 | MR. ALTURA:  The question is vague and | 15:01:54 |
| 11 | ambiguous. | 15:01:54 |
| 12 | BY MR. SWEENEY: | 15:01:55 |
| 13 | Q.  What's your answer? | 15:01:55 |
| 14 | MR. HURRELL:  He answered yes. | 15:02:01 |
| 15 | BY MR. SWEENEY: | 15:02:02 |
| 16 | Q.  I'm sorry.  What was the answer? | 15:02:02 |
| 17 | MR. HURRELL:  He said yes, John. | 15:02:05 |
| 18 | MR. SWEENEY:  Oh, okay.  Thank you. | 15:02:06 |
| 19 | THE COURT REPORTER:  And this is the | 15:02:14 |
| 20 | reporter.  That is in the record. | 15:02:15 |
| 21 | MR. SWEENEY:  Okay.  Thank you. | 15:02:17 |
| 22 | Q.  Can you describe the gun, sir? | 15:02:28 |
| 23 | A.  It was a black handgun, sir. | 15:02:31 |
| 24 | Q.  Automatic, semiautomatic, or a revolver? | 15:02:36 |
| 25 | A.  It looked like a semiautomatic, sir. | 15:02:41 |

Page 148

| | | |
|---|---|---|
| 1 | Q. Did you give chase of Mr. Lockett? | 15:02:43 |
| 2 | A. I followed on foot, yes. | 15:02:48 |
| 3 | Q. Were you running? | 15:02:53 |
| 4 | A. I was jogging in order to keep a | 15:02:56 |
| 5 | containment. | 15:02:58 |
| 6 | Q. You were jogging by yourself. Correct? | 15:02:59 |
| 7 | A. Deputy Aldama, I believe, was paralleling | 15:03:04 |
| 8 | me in the vehicle. | 15:03:05 |
| 9 | Q. He eventually caught up with you. But | 15:03:11 |
| 10 | when you took off running after Mr. Lockett, he | 15:03:14 |
| 11 | wasn't paralleling you, was he? | 15:03:17 |
| 12 | A. He was still -- he was near the area, sir. | 15:03:19 |
| 13 | Very close. | 15:03:22 |
| 14 | Q. Isn't that a violation of sheriff pursuit | 15:03:23 |
| 15 | policy for you to take off before your partner? | 15:03:26 |
| 16 | A. No, sir. | 15:03:31 |
| 17 | Q. Can -- no? | 15:03:32 |
| 18 | MR. ALTURA: This is Jack Altura. | 15:03:37 |
| 19 | I'll object that that calls for expert | 15:03:38 |
| 20 | opinion. | 15:03:40 |
| 21 | MR. SWEENEY: Well, Mr. Orrego is an | 15:03:48 |
| 22 | expert in this area. | 15:03:50 |
| 23 | Q. As a matter of fact, you were disciplined | 15:03:53 |
| 24 | for violating the Sheriff's foot-pursuit policy | 15:03:55 |
| 25 | just six months later when you shot and killed | 15:03:58 |

Page 149

```
 1    on Rosecrans and Nestor?                          15:51:05

 2        A.  Correct, sir.                             15:51:07

 3        Q.  And he proceeded to -- southbound to      15:51:09

 4    Spruce?                                           15:51:12

 5        A.  I -- I don't remember how he got to       15:51:14

 6    Spruce, and I don't know where the vehicle was,   15:51:18

 7    where our patrol vehicle was, but it was in the   15:51:21

 8    area between Rosecrans and Spruce on Nestor Street. 15:51:24

 9    And that's approximately maybe, I will say,       15:51:29

10    20 yards from street to street.                   15:51:30

11         So he was somewhere, keeping a containment   15:51:33

12    spot in those two corners.                        15:51:35

13        Q.  Okay.  And at some point, other deputies  15:51:37

14    arrived.  Is that correct?                        15:51:47

15        A.  That's correct, sir.                      15:51:48

16        Q.  How long after you two set up your        15:51:49

17    containment did the first set of deputies arrive? 15:51:51

18        A.  I don't recall the time, sir.             15:51:59

19        Q.  One minute, two minutes, three minutes?   15:52:01

20        A.  Less than five minutes, I'll say.         15:52:05

21        Q.  Okay.  Because you had put your 417 on    15:52:08

22    the -- you had requested the patch.  Correct?     15:52:11

23        A.  Correct, sir.                             15:52:14

24        Q.  And that means that all deputies in       15:52:15

25    Compton can hear your call for help.  Correct?    15:52:19
```

                                            Page 174

| | | |
|---|---|---|
| 1 | A.  Yes.  Yes, sir. | 15:52:22 |
| 2 | Q.  Okay.  So who was it who found where | 15:52:23 |
| 3 | Lockett was located? | 15:52:29 |
| 4 | A.  While holding our containment spots, | 15:52:33 |
| 5 | Deputy Aldama and I heard a metal screen door being | 15:52:36 |
| 6 | attempted to be opened, like forcefully be pulled | 15:52:40 |
| 7 | open. | 15:52:45 |
| 8 | At this time, you know, we -- it sounded | 15:52:46 |
| 9 | like somebody was trying to break into a home. | 15:52:49 |
| 10 | And at this time, Deputy Aldama and I, we | 15:52:52 |
| 11 | kind of looked over the fence that was there, and | 15:52:55 |
| 12 | we saw suspect Lockett violently pulling on this | 15:52:58 |
| 13 | door and trying to get in the house. | 15:53:06 |
| 14 | Q.  You looked over the wall.  Can you -- | 15:53:08 |
| 15 | MR. SWEENEY:  Mr. Glickman, can you please | 15:53:11 |
| 16 | pull up the exhibit showing the patio? | 15:53:12 |
| 17 | Q.  Now, while he's pulling that up, can you | 15:53:40 |
| 18 | actually look over the courtyard and see him | 15:53:43 |
| 19 | pulling on the door? | 15:53:46 |
| 20 | A.  Yes, sir, I believe so. | 15:53:49 |
| 21 | MR. GLICKMAN:  For the record, I have | 15:53:54 |
| 22 | what's Bates-stamped 173, and so we'll mark that | 15:53:54 |
| 23 | now as Exhibit 69. | 15:53:57 |
| 24 | (Deposition Exhibit 69 was marked for | 15:54:00 |
| 25 | identification.) | 15:54:01 |

Page 175

```
 1              MR. SWEENEY:  One second.              15:54:03

 2       Q.  Did you put in your police report that you  15:54:04

 3  saw Mr. Lockett pulling on the screen door?       15:54:07

 4       A.  I don't recall -- I don't recall me doing  15:54:18

 5  that, writing that.  I don't recall, sir.        15:54:20

 6       Q.  Okay.  But you saw it?                    15:54:21

 7       A.  I heard it.  That's -- definitely, I heard  15:54:23

 8  it, and -- yes, sir --                            15:54:25

 9       Q.  You said you saw him.                     15:54:27

10       A.  Well, based on the radio traffic that was  15:54:29

11  taken at the time of, yes, I said, "We're holding  15:54:33

12  the suspect at gunpoint," and I explained where it  15:54:37

13  was.                                              15:54:40

14          So for that reason, it leads me to believe  15:54:41

15  that at some point during us listening or hearing  15:54:44

16  the noises to the point that we had a visual on   15:54:47

17  him, I had to have seen him through the fence.    15:54:51

18       Q.  Okay.  One second.                        15:54:54

19          How tall are you?                          15:55:00

20       A.  Five-eight, sir.                          15:55:02

21       Q.  How tall is Samuel Aldama?                15:55:04

22       A.  I believe about -- approximately -- I'm   15:55:08

23  not sure, sir, but if I had to guess, I'll say    15:55:10

24  five-nine.                                        15:55:13

25       Q.  About your height.  Correct?             15:55:15
```

Page 176

```
 1              MR. ALTURA:  I'll just object -- this is        16:11:04

 2   Jack Altura -- that that misstates prior testimony         16:11:05

 3   that Mr. Aldama, Deputy Aldama, admitted to                16:11:07

 4   slugging Mr. Lockett.                                      16:11:11

 5         I have not been aware of any such                    16:11:12

 6   testimony on the part of Mr. -- or Deputy Aldama.          16:11:14

 7              MR. SWEENEY:  Okay.                              16:11:17

 8      Q.  What did Deputy Feria do?                            16:11:19

 9          What did you see him do?                             16:11:21

10      A.  Feria, I believe I instructed him to use            16:11:25

11   his OC spray, sir.                                          16:11:27

12      Q.  You instructed him?                                  16:11:30

13      A.  Well, I instructed -- when I made the               16:11:31

14   arrest team, I told him, "Hey, Aldama is going to          16:11:33

15   place handcuffs."  Anything happens, because it was        16:11:37

16   a close quarter, I told Deputy Feria to -- he was          16:11:41

17   going to use OC spray if necessary.                         16:11:45

18          And the Taser, I instructed Deputy                  16:11:48

19   Embleton, because he had a Taser, if necessary.            16:11:50

20          It's not "We're going to jump, and this is          16:11:54

21   what we're going to do."  The suspect actions              16:11:57

22   dictate what we do, sir.                                    16:11:59

23      Q.  But it was you who was the officer who was          16:12:01

24   giving the instructions to the other officers.            16:12:05

25   Correct?                                                    16:12:07

                                                    Page 191
```

```
 1          MR. HURRELL:  You misspoke, John.              16:55:13

 2          THE WITNESS:  You said "throughout the         16:55:15

 3     arrest."                                            16:55:16

 4     BY MR. SWEENEY:                                     16:55:17

 5          Q.  I'm sorry.  Throughout the investigation.  16:55:18

 6          A.  I believe that that's a question that you  16:55:20

 7     need to ask Aldama because I'm not sure -- to me,   16:55:21

 8     "throughout the investigation" can be from point -- 16:55:24

 9     from the time the suspect gets -- you know, you     16:55:27

10     have contact with the suspect to the time that the  16:55:31

11     detective -- you know, the case gets turned over to 16:55:35

12     detectives, you know.                               16:55:38

13          So I -- it could be anywhere from five         16:55:40

14     minutes to a full month of --                       16:55:42

15          Q.  Okay.  So at the time -- you said the       16:55:44

16     starting point theoretically he could be talking    16:55:47

17     about is from the time of the contact.              16:55:51

18          At the time of the contact, did you feel       16:55:54

19     that he fit the suspect of the shooting's           16:55:58

20     description?                                        16:56:01

21          A.  Yes, sir.                                  16:56:03

22          Q.  Thank you.  All right.                     16:56:05

23          You had limited information that we just       16:56:14

24     heard an hour or so ago that was broadcast over the 16:56:17

25     dispatch; that is, black, male, blue beanie, silver 16:56:21
```

                                                    Page 219

```
 1      Pontiac.                                          16:56:33

 2              What in those -- in that description fit  16:56:38

 3      the suspect, or fit Mr. Lockett?                  16:56:43

 4         A.  Well, sir, I think that you're forgetting  16:56:49

 5      our initial contact was not over anything related 16:56:53

 6      to the 245, you know, other than that's the reason 16:56:56

 7      why we were in that area, you know.               16:57:01

 8              And "throughout the investigation,"       16:57:07

 9      meaning okay, now we arrested the guy that we saw 16:57:08

10      holding a gun, we have him detained, and then     16:57:12

11      the -- the victim gets brought, and then she      16:57:18

12      positively identifies Mr. Lockett as the suspect of 16:57:21

13      the shooting, that's -- you know, that's the      16:57:26

14      totality of that, of his arrest.  That is the     16:57:30

15      reason why we arrested him.                       16:57:34

16         Q.  Thank you.                                 16:57:37

17              MR. SWEENEY:  If we go on to your actual  16:57:40

18      report -- can we go to page 1 of 2 of Mr. Orrego's 16:57:43

19      report; put it up there?                          16:57:48

20              MR. GLICKMAN:  I'm looking at it, but you 16:58:00

21      guys don't see it.                                16:58:01

22              MR. SWEENEY:  What's that?                16:58:03

23              MR. GLICKMAN:  I was looking at it, but I 16:58:05

24      didn't have it on screen share.                   16:58:07

25      //
```

Page 220

```
 1                          --o0o--

 2          I declare under penalty of perjury that the

 3     foregoing is true and correct.  Subscribed at

 4     _____, California, this ____ day of

 5     _____ 2020.

 6

 7                         _____

 8                         MIZRAIN ORREGO

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 235

```
 1               CERTIFICATE OF REPORTER

 2        I, HOLLY THUMAN, a Certified Shorthand Reporter,

 3   hereby certify that the witness in the foregoing

 4   deposition was by me duly sworn to tell the truth, the

 5   whole truth, and nothing but the truth in the

 6   within-entitled cause; that said deposition was taken

 7   down in shorthand by me, a disinterested person, at the

 8   time and place therein stated; and that the testimony

 9   of said witness was thereafter reduced to typewriting,

10   by computer, under my direction and supervision;

11        That before completion of the deposition review of

12   the transcript [] was [X] was not requested/offered.

13   If requested, any changes made by the deponent (and

14   provided to the reporter) during the period allowed are

15   appended hereto.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties thereto.

21

22   DATED: May 13, 2020

23

24

25        HOLLY THUMAN, CSR
```

Page  236

Personal Court Reporters, A Veritext Company
818-988-1900