```
            UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF CALIFORNIA


 SHELDON LOCKETT; MICHELLE          ) Case No.
 DAVIS; and CLYDE DAVIS,            ) 18-CV-5838-PJW
                                    )
      Plaintiffs,                   )
                                    )
           vs.                      )
                                    )
 COUNTY OF LOS ANGELES, a public    )
 entity; LOS ANGELES COUNTY         )
 SHERIFF'S DEPARTMENT, a law        )
 enforcement agency; SHERIFF JIM    )
 McDONNELL; MIZRAIN ORREGO, a       )
 Deputy Los Angeles County          )
 Sheriff; SAMUEL ALDAMA, a          )
 Deputy Los Angeles County          )
 Sheriff; and DOES 1 through        )
 100, inclusive,                    )
                                    )
      Defendants.                   )
 _____    )
```

VIDEOTAPED DEPOSITION OF DEPUTY AUSTREBERTO GONZALEZ
Volume I
Via Videoconference
Tuesday, August 11, 2020

Reported by:
Gideon Choi
CSR No. 13258

*Exhibit 27 -- redacted Because of size limitations, submitted in two parts. This is part 1 of 2*

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2      FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4  SHELDON LOCKETT; MICHELLE    ) Case No.
    DAVIS; and CLYDE DAVIS,      ) 18-CV-5838-PJW
 5                               )
        Plaintiffs,              )
 6                               )
          vs.                    )
 7                               )
    COUNTY OF LOS ANGELES, a public )
 8  entity; LOS ANGELES COUNTY   )
    SHERIFF'S DEPARTMENT, a law  )
 9  enforcement agency; SHERIFF JIM )
    McDONNELL; MIZRAIN ORREGO, a )
10  Deputy Los Angeles County    )
    Sheriff; SAMUEL ALDAMA, a    )
11  Deputy Los Angeles County    )
    Sheriff; and DOES 1 through  )
12  100, inclusive,              )
                                 )
13      Defendants.              )
    _____)
14
15
16      Videotaped deposition of DEPUTY AUSTREBERTO
17  GONZALEZ, Volume I, taken on behalf of
18  Plaintiff, via videoconference, beginning at
19  10:12 a.m. and ending at 6:07 p.m., on Tuesday,
20  August 11, 2020, before Gideon Choi, Certified
21  Shorthand Reporter No. 13258.
22
23
24
25
                                                  Page 2
```

```
 1              APPEARANCES
 2
 3  For the Plaintiff, SHELDON LOCKETT:
 4    GLICKMAN & GLICKMAN
      BY: STEVEN C. GLICKMAN, ESQ.  (Appearing via
 5    videoconference)
      9460 Wilshire Boulevard
 6    Suite 830
      Los Angeles, CA 90212
 7    Telephone: (310) 273-0829
      E-mail: Scg@glickman-law.com
 8
      THE SWEENEY FIRM
 9    BY: JOHN SWEENEY, ESQ.  (Appearing via
      videoconference)
10    315 S. Beverly Drive
      Suite 305
11    Beverly Hills, CA 90212
      Telephone: (310) 277-9595
12    E-mail: Jes@thesweeneyfirm.com
13
    For the Defendant, COUNTY OF LOS ANGELES, LOS ANGELES
14  COUNTY SHERIFF'S DEPARTMENT, and SHERIFF JIM McDONNELL:
      IVIE, McNEILL & WYATT
15    BY: JACK ALTURA, ESQ.  (Appearing via
      videoconference)
16    BY: RICKEY IVIE, ESQ.  (Appearing via
      videoconference)
17    444 South Flower Street
      Suite 1800
18    Los Angeles, CA 90071
19    Telephone: (213) 489-0023
      E-mail: jaltura@imwlaw.com
20    E-mail: RIVIE@IMWLAW.COM
21
22
23
24
25       (Continued...)
                                                  Page 3
```

```
 1         APPEARANCES (Continued...)
 2
 3  For the Deponent, AUSTREBERTO GONZALEZ:
 4    ROMERO LAW APC
      BY: ALAN J. ROMERO, ESQ.  (Appearing via
 5    videoconference)
      80 South Lake Avenue
 6    Suite 880
      Pasadena, CA 91101
 7    Telephone: (626) 396-9900
      E-mail: Ajr@romerolaw.com
 8
 9  For the Defendant, SAMUEL ALDAMA:
10    SEKI NISHIMURA & WATASE
      BY: GILBERT NISHIMURA, ESQ.  (Appearing via
11    videoconference)
      BY: ANDREW PONGRACZ, ESQ.  (Appearing via
12    videoconference)
      600 Wilshire Boulevard
13    Suite 1250
      Los Angeles, CA 90017
14    Telephone: (213) 481-2869
      E-mail: apongracz@snw-law.com
15    E-mail: gnishimura@snw-law.com
16
    Also Present:
17
      KIM SMITH (Videographer)  (appearing via
18    videoconference)
      RICHARD HSUEH, ESQ.  (Appearing via
19    videoconference)
      MILLICENT ROLON, ESQ.  (Appearing via
20    videoconference)
      DEPUTY ESMERALDA LOPEZ (appearing via
21    videoconference)
22
23
24
25
                                                  Page 4
```

```
 1                    I N D E X
 2
 3  Witness: DEPUTY AUSTREBERTO GONZALEZ
 4  Examinations                              Page
 5   By Mr. Sweeney                            10
 6   By Mr. Ivie                              146
 7
 8              E X H I B I T S
 9  Plaintiff's     Description               Page
10  Exhibit 105   Copy of 11-page document     12
                  entitled "Claims for Damages to
11                Person or Property"
    Exhibit 106   Copy of three-page document  27
12                entitled "M shift In-service,
                  Compton" dated 1/15/2016
13  Exhibit 107   Copy of document entitled    36
                  "Exhibit A Acknowledgment and
14                Agreement to be Bound" signed
                  by Austreberto Gonzalez
15  Exhibit 108   Copy of document entitled    36
                  "Exhibit A Acknowledgment and
16                Agreement to be Bound" signed
                  by Alan Romero
17  Exhibit 109   Copy of color photograph     90
18  Exhibit 110   Copy of video clip (Retained by  140
                  counsel and not attached to the
19                transcript)
20
21        INFORMATION REQUESTED
22        Page     Line
23          None.
24
25       (Continued...)
                                                  Page 5
```

2 (Pages 2 - 5)

### Page 10

```
 1         EXAMINATION                  10:17:03
 2  BY MR. SWEENEY:                     10:17:03
 3  Q  Okay. All right. Good morning,   10:17:05
 4  Deputy ▮▮▮▮. Would you please state and spell your  10:17:08
 5  name for the record?                10:17:12
 6  A  Yes. Good morning. My name is ▮▮▮▮  10:17:13
 7  ▮▮▮▮, ▮▮▮▮▮▮▮▮; ▮▮▮▮,               10:17:18
 8  ▮▮▮▮▮▮▮.                            10:17:26
 9  Q  Thank you.                       10:17:28
10    MR. SWEENEY: He's frozen again. Mr. ▮▮▮, let's  10:17:31
11  see what we can do to unfreeze --   10:17:34
12    MR. ROMERO: Sure. I'm going to rejoin. Bear with  10:17:37
13  me. Ten seconds.                    10:17:44
14    MR. SWEENEY: Okay.                10:17:45
15    THE VIDEOGRAPHER: Can we go off the record just for  10:18:03
16  a minute so I can re-place him on the video, please?  10:18:07
17    MR. SWEENEY: Sure.                10:18:10
18    THE VIDEOGRAPHER: Thank you. This marks the end of  10:18:11
19  Media No. 1. The time is 10:18, and we are off the  10:18:18
20  record.                             10:18:21
21    (Recess taken from 10:18 a.m. to 10:23 a.m.)  10:23:19
22    THE VIDEOGRAPHER: This marks the beginning of  10:23:19
23  Media No. 2. The time is 10:23, and we are on the  10:23:22
24  record.                             10:23:25
25    MR. SWEENEY: Thank you.           10:23:25
```

### Page 11

```
 1  BY MR. SWEENEY:                     10:23:25
 2  Q  Deputy ▮▮▮▮, my name is John Sweeney, along  10:23:28
 3  with Steve Glickman, who's also here to represent a  10:23:34
 4  young man by the name of Sheldon Lockett in a case  10:23:37
 5  against Los Angeles County and Los Angeles County  10:23:41
 6  Sheriff's Department.               10:23:41
 7    First of all, I just want to say thank you for  10:23:46
 8  coming forward. Thank you for what you're doing. I  10:23:50
 9  grew up in this city, in this county, and I know that  10:23:57
10  the vast majority of Los Angeles County Sheriff's  10:24:03
11  Deputies are good people like yourself, and I applaud  10:24:07
12  you for attempting to right an apparent wrong.  10:24:10
13    Deputy, let's start with your background. How  10:24:19
14  long have you been a Deputy Sheriff?  10:24:24
15  A  I became a Deputy Sheriff in November -- well,  10:24:27
16  March of 2008.                      10:24:30
17  Q  2008?                            10:24:32
18  A  12 years.                        10:24:35
19  Q  Okay. And what is your date of birth by the  10:24:37
20  way?                                10:24:39
21  A  July 29, 1978.                   10:24:39
22  Q  Okay. And is 2008 when you graduated from the  10:24:43
23  academy?                            10:24:51
24  A  Yes, sir.                        10:24:52
25  Q  Okay. In looking at what I want to mark as  10:24:52
```

### Page 12

```
 1  Exhibit 105, it's the Claim for Damages to Person and  10:24:59
 2  Property filed with the County of Los Angeles  10:25:08
 3  Board of Supervisors on June 23rd, 2003. You've seen  10:25:11
 4  this document before, haven't you?  10:25:18
 5  A  Yes, sir.                        10:25:20
 6  Q  Okay. And your lawyer filed it for you; is that  10:25:21
 7  correct?                            10:25:30
 8  A  Correct.                         10:25:30
 9  Q  And did you give him all the facts contained  10:25:31
10  therein to put in that document?    10:25:36
11  A  Yes, I did.                      10:25:42
12  Q  Were you truthful?               10:25:43
13  A  Yes, sir.                        10:25:44
14    MR. SWEENEY: Okay. So can you take that down, Mr.  10:25:47
15  Glickman, please? Thank you.        10:25:51
16  BY MR. SWEENEY:                     10:25:54
17  Q  I notice there on Page 1 of 10, you say that  10:25:54
18  you're a former Marine Corps combat veteran; is that  10:26:04
19  correct?                            10:26:10
20  A  Correct.                         10:26:10
21  Q  When did you join the Corps?     10:26:12
22  A  January 1999.                    10:26:15
23  Q  Where did you do your basic training?  10:26:17
24  A  My basic training was in Camp Pendleton,  10:26:24
25  California.                         10:26:28
```

### Page 13

```
 1  Q  And how long did you serve in the United States  10:26:29
 2  Marine Corps?                       10:26:34
 3  A  Close to five years. About four years and  10:26:34
 4  nine months.                        10:26:38
 5  Q  And I notice in the claim that you were a  10:26:38
 6  decorated combat veteran. Can you elaborate on that,  10:26:45
 7  sir?                                10:26:50
 8  A  Well, I have unit awards for good conduct, a  10:26:51
 9  good conduct medal, sea service deployment times three,  10:27:01
10  Iraqi Freedom Operation, Enduring Freedom Operation, and  10:27:13
11  Navy unit commendation, among others that we received as  10:27:21
12  a unit.                             10:27:25
13  Q  Okay. And were you honorably discharged?  10:27:25
14  A  Yes, I was.                      10:27:32
15  Q  And what did you do after you were discharged  10:27:33
16  from the Corps?                     10:27:39
17  A  I worked for a loan mortgage office for a couple  10:27:40
18  of years, and then from there I worked for DirecTV and  10:27:54
19  that was it. I had those two jobs before I joined the  10:28:02
20  Sheriff's Department.               10:28:06
21  Q  Okay. How long was it between the time that you  10:28:06
22  were honorably discharged to the time that you entered  10:28:10
23  the academy?                        10:28:14
24  A  About four years approximately.  10:28:17
25  Q  Okay. And then in those four years, you  10:28:20
```

**Page 14**

```
 1  occupied your work time with the jobs you just testified    10:28:25
 2  about; is that correct?                                     10:28:28
 3  A   That's correct.                                         10:28:29
 4  Q   Okay.  Now, I noticed in your claim, you also           10:28:30
 5  say that you are decorated with a Meritorious Conduct       10:28:35
 6  Silver Medal in 2018 for the Los Angeles Sheriff's          10:28:45
 7  Department; is that correct?                                10:28:52
 8  A   Yes, sir.                                               10:28:52
 9  Q   Tell us you about that.                                 10:28:53
10  A   Well, we received that award when we responded          10:28:57
11  to a call that came out responding to a gunshot wound       10:29:04
12  victim.  As I was leaving the station, the call gets        10:29:07
13  upgraded -- or not upgraded, but information gets           10:29:14
14  upgraded letting us know that the victim is a               10:29:18
15  four-year-old child.                                        10:29:23
16      I rushed to the scene which was in the                  10:29:25
17  unincorporated area of East Rancho Dominguez.  When I       10:29:29
18  arrived, a sister unit, two deputies were already on        10:29:33
19  scene, and one deputy was speaking to the mother, and       10:29:37
20  the other deputy was speaking to a witness.  I went to      10:29:41
21  check on the victim, who was inside a pickup truck in       10:29:46
22  the back seat and, you know, I noticed blood around his     10:29:50
23  head.                                                       10:29:57
24      And then I saw him breathing which at the               10:29:58
25  moment, you know, I figured he's still alive, and I told    10:30:02
```

**Page 15**

```
 1  my partner, ███████, that we should rush the                10:30:05
 2  victim to the hospital because we didn't know how long      10:30:13
 3  the paramedics would be to arrive on scene.  And that's     10:30:19
 4  what we did.  ███████ drove the vehicle.  I                 10:30:25
 5  grabbed the victim from the back seat, cradled him, and     10:30:29
 6  with the assistance of our dispatch and our arrow, we       10:30:33
 7  were able to get the victim to the hospital, you know,      10:30:37
 8  rather quick.                                               10:30:42
 9  Q   Thank you, sir, for your service.                       10:30:44
10      And were you awarded that medal of valor by one         10:30:50
11  of your superiors or was it the Sheriff?  Who was award     10:30:56
12  presented to you by?                                        10:31:01
13  A   The Sheriff.                                            10:31:01
14  Q   And who was the Sheriff at that time?                   10:31:02
15  A   Sheriff ███████ at the time.                            10:31:06
16  Q   Okay.  All right.  Let's talk about your                10:31:08
17  assignments when you left the academy.                      10:31:15
18      You are POST-trained; is that correct?                  10:31:17
19  A   Correct, sir.                                           10:31:18
20  Q   And you took courses in ethics in policing and          10:31:19
21  all of that at the academy, didn't you?                     10:31:26
22  A   Yes, sir.                                               10:31:27
23  Q   All right.  And do you take those courses and           10:31:28
24  the oath that you took when you became a Deputy Sheriff     10:31:36
25  seriously?                                                  10:31:41
```

**Page 16**

```
 1  A   Yes.                                                    10:31:42
 2  Q   And you took the oath to uphold the principles          10:31:43
 3  of the Los Angeles County Sheriff's office, didn't you?     10:31:51
 4  A   Yes, sir.                                               10:31:54
 5  Q   All right.  What was your first assignment after        10:31:55
 6  you graduated from the academy?                             10:31:58
 7  A   After I graduated from the academy, I was               10:31:59
 8  assigned to Central Civil West Courthouse in the            10:32:03
 9  Court Services Central Bureau, and I was there for          10:32:09
10  approximately until about 2012.  And then from there, I     10:32:12
11  transferred to Eastlake Court in East Los Angeles where     10:32:20
12  I remained until about two-thousand -- well, 2015,          10:32:25
13  January of 2015, when I was then -- I went to my patrol     10:32:31
14  assignment in Compton.                                      10:32:38
15  Q   Did you ever work custody in the jails?                 10:32:39
16  A   No.  Lock-up at East L.A. Court.                        10:32:42
17  Q   And the Central West, that's the one on Chateau;        10:32:50
18  is that correct?                                            10:32:55
19  A   Yes, yes, that was just a civil courthouse.             10:32:55
20  Q   Right.  The big mirrored building --                    10:33:01
21  A   Yes.                                                    10:33:04
22  Q   -- correct?                                             10:33:05
23  A   Yes.                                                    10:33:05
24  Q   All right.  And so when did you start your              10:33:06
25  assignment?  What year did you start your assignment in     10:33:09
```

**Page 17**

```
 1  Compton?                                                    10:33:13
 2  A   January 2015.                                           10:33:14
 3  Q   Okay.  And who was your training deputy, field          10:33:19
 4  training deputy at that time?                               10:33:26
 5  A   I had two.  My first training officer was               10:33:29
 6  Deputy ███████, who I remained with                         10:33:36
 7  approximately four months, and from there -- or from        10:33:40
 8  him, I had Deputy ███████, Training Officer ███████         10:33:48
 9  ███████ for the remaining two months of my training.        10:33:52
10      THE VIDEOGRAPHER:  Excuse me.  This is the              10:33:57
11  videographer.  The witness keeps freezing.  Do you want     10:33:59
12  to continue this way or is there -- do you want to try      10:34:02
13  to fix the problem?                                         10:34:05
14      MR. SWEENEY:  I mean, he's moving now.  It's not        10:34:08
15  bothering me.  I can hear him.                              10:34:12
16      Mr. ███████ do you think it's okay or what do           10:34:18
17  you think?                                                  10:34:25
18      MR. ROMERO:  I'm not sure what's going on.  It's a      10:34:25
19  brand new laptop, and I reinstalled Windows freshly a       10:34:27
20  week ago, so it may be an issue with the software.  I       10:34:29
21  think we should probably push through.                      10:34:33
22      THE VIDEOGRAPHER:  It could also just be the Wi-Fi,     10:34:35
23  but if you're okay with it, we can continue on.             10:34:38
24      MR. ROMERO:  The Wi-Fi is working on the other          10:34:41
25  devices so we'll do our best here.                          10:34:43
```

## Page 18

```
1    MR. SWEENEY: Thank you, Mr. ▓▓▓.        10:34:48
2  BY MR. SWEENEY:                              10:34:50
3    Q  So how long have you been at this point in time  10:34:51
4  at your assignment in Compton?                10:34:58
5    A  To when to what date?                   10:35:02
6    Q  From the time you started to this date, I   10:35:05
7  understand, is it five and a half years?      10:35:07
8    A  Approximately.                           10:35:10
9    Q  Okay. And tell me of all of your promotions in  10:35:13
10 that five and a half years at the County?     10:35:21
11   A  Well, the promotion I had was to training  10:35:28
12 officer and that occurred in -- I believe it was October  10:35:33
13 of 2019.                                      10:35:38
14   Q  You became a training officer?           10:35:40
15   A  Correct.                                 10:35:44
16   Q  Okay. Now, before I go any further, I'll ask  10:35:44
17 you questions about Compton station. You filed this  10:35:55
18 claim -- you have a daughter who has some medical  10:36:01
19 issues; is that correct?                     10:36:11
20   A  Correct.                                 10:36:12
21   Q  And without going into the medical issues, did  10:36:13
22 she need any special care?                    10:36:19
23   A  Yes. Yes, she did. She needed specific, you  10:36:24
24 know, attention -- shots before meals, special meals  10:36:33
25 prepared, blood sugar check seven times, ten times a  10:36:40
```

## Page 19

```
1  day, things of that nature.                   10:36:46
2    Q  Okay. And your daughter's condition factored  10:36:48
3  into your filing this claim against the       10:36:54
4  County of Los Angeles; is that true?          10:37:00
5    A  Yes.                                     10:37:01
6    Q  Okay. We'll talk about that in a second.  10:37:02
7       During your five and a half years at the County,  10:37:11
8  did you feel that you've gotten to know your fellow  10:37:15
9  deputies pretty well?                         10:37:18
10   A  Most of them, most of the station.       10:37:19
11   Q  Okay. Is there any deputy that you haven't met  10:37:24
12 that you know of?                             10:37:31
13   A  Well, we get new trainees, you know, every  10:37:32
14 couple of months. You know, I think it would be fair to  10:37:39
15 say I don't know them. They're new, you know,  10:37:44
16 additions to the station, but outside of that, I know  10:37:48
17 everybody at the station.                     10:37:52
18   Q  Okay. When you arrived at the station from your  10:37:55
19 time at East L.A., who was the captain?       10:38:03
20   A  It was Captain ▓▓▓▓▓.                    10:38:11
21   Q  Okay. Were you ever there when a Captain by the  10:38:15
22 name of ▓▓▓▓▓▓▓ was there?                    10:38:19
23   A  No.                                      10:38:22
24   Q  Do you know who ▓▓▓▓▓▓▓▓▓▓ is?           10:38:24
25   A  Yes. I believe he was the Captain before  10:38:28
```

## Page 20

```
1  Captain ▓▓▓▓▓ at Compton station.             10:38:32
2    Q  Do you know why he left his position --   10:38:35
3    A  No.                                      10:38:41
4    Q  -- as Captain?                           10:38:41
5    A  No.                                      10:38:42
6    Q  Okay. In your claim, Deputy ▓▓▓▓▓▓, you say  10:38:43
7  that Compton or CPT -- "CPT" stands for Compton;  10:38:50
8  correct?                                      10:38:57
9    A  Correct.                                 10:38:57
10   Q  "Has been permeated by a violent deputy gang  10:38:57
11 which calls itself The Executioners." How do you know  10:39:02
12 this gang calls itself The Executioners?      10:39:06
13   A  Common knowledge at the station.         10:39:10
14   Q  Had you heard any of the members of the gang  10:39:14
15 referred to themselves as The Executioners?   10:39:17
16   A  No.                                      10:39:21
17   Q  So is it pretty well known at the station that  10:39:22
18 The Executioners or this gang of deputies called  10:39:28
19 themselves The Executioners?                  10:39:32
20   MR. IVIE: Objection. This is Rickey Ivie. Excuse  10:39:36
21 me. Objection. This is Rickey Ivie. It's leading;  10:39:38
22 suggestive.                                   10:39:39
23   MR. SWEENEY: You can answer.                10:39:41
24   THE WITNESS: Yes.                           10:39:44
25   MR. SWEENEY: Okay.                          10:39:47
```

## Page 21

```
1    MR. ROMERO: And I'm sorry, Counsel. If I can  10:39:49
2  interrupt for one moment just to let my client know,  10:39:53
3  sometimes you'll hear some objections. I apologize for  10:39:54
4  not letting you know ahead of time. Unless I  10:39:57
5  specifically instruct you not to answer, please feel  10:40:00
6  free to respond to all the questions asked. Is that  10:40:02
7  okay?                                         10:40:05
8    THE WITNESS: Yes.                           10:40:06
9    MR. ROMERO: Thank you.                      10:40:07
10 BY MR. SWEENEY:                               10:40:08
11   Q  You termed this Executioner group a "violent  10:40:08
12 deputy gang". Why do you say that?            10:40:14
13   A  Well, one of their members assaulted another  10:40:15
14 deputy and, you know, I think that makes them violent.  10:40:23
15   MR. IVIE: Objection to the response as      10:40:33
16 nonresponsive. Also, no foundation.           10:40:35
17 BY MR. SWEENEY:                               10:40:39
18   Q  Okay. Did you actually see a deputy assault  10:40:39
19 another deputy?                               10:40:43
20   A  No.                                      10:40:45
21   Q  Okay. Where did you hear about that?     10:40:45
22   A  Deputy ▓▓▓▓▓▓ told me he had been assaulted by  10:40:50
23 Deputy ▓▓▓▓▓▓.                                10:40:56
24   Q  I'm sorry. The deputy who was assaulted was  10:40:57
25 named what?                                   10:41:02
```

6 (Pages 18 - 21)

**Page 22**

1  A  ▓▓▓▓▓▓▓.                                    10:41:03
2  Q  Got it. And did he tell you when this assault   10:41:06
3  occurred?                                         10:41:09
4  A  Yes.                                           10:41:09
5  Q  When was that?                                 10:41:11
6  A  It was the first week of February. I can't     10:41:13
7  remember the exact date.                          10:41:20
8  Q  Of what year?                                  10:41:23
9  A  Of this present year.                          10:41:25
10 Q  Okay. In 2020?                                 10:41:26
11 A  Correct.                                       10:41:31
12 Q  What did Deputy ▓▓▓▓▓ say happened?            10:41:31
13 A  He told me that Deputy ▓▓▓▓▓ had gone up to    10:41:38
14 him, and they both went to the back of the parking lot  10:41:43
15 to the Heritage House where Deputy ▓▓▓▓▓ fought   10:41:48
16 Deputy ▓▓▓▓▓, took him down to the ground, and   10:41:57
17 continued assaulting him.                         10:42:00
18 Q  And did Deputy ▓▓▓▓▓ tell you why              10:42:01
19 Deputy ▓▓▓▓▓ assaulted him?                      10:42:09
20 A  Yes, he did tell me.                           10:42:11
21 Q  And what did he tell you?                      10:42:12
22 A  He told me that because Deputy ▓▓▓▓▓ did not   10:42:14
23 like him because Deputy ▓▓▓▓▓ had injured another 10:42:17
24 deputy, Deputy ▓▓▓▓▓, in a traffic collision. And,  10:42:26
25 also, he didn't like him because Deputy ▓▓▓▓▓ wasn't  10:42:30

**Page 23**

1  able to apprehend a suspect with a gun who had ran from   10:42:35
2  him and his partner.                              10:42:40
3  Q  You froze. I'm sorry. What with him and his    10:42:41
4  partner?                                          10:42:46
5  A  And also because Deputy ▓▓▓▓▓ was unable to    10:42:46
6  apprehend a suspect that had ran from him and his  10:42:51
7  partner who was carrying a gun.                   10:42:55
8  Q  Okay. Did Deputy ▓▓▓▓▓ tell you that            10:42:57
9  ▓▓▓▓▓ thought that it was an affront to his unit   10:43:03
10 deputies for not being able to apprehend the suspect?   10:43:08
11 MR. IVIE: Objection; the question is leading and   10:43:14
12 suggestive.                                       10:43:17
13 THE WITNESS: Can you repeat the question?         10:43:17
14 BY MR. SWEENEY:                                   10:43:19
15 Q  Sure. I'm just wondering why ▓▓▓▓▓ felt        10:43:20
16 that, if you know, felt that ▓▓▓▓▓ did something  10:43:23
17 wrong by not being able to apprehend the suspect?  10:43:31
18 MR. IVIE: Objection; leading; suggestive; also calls  10:43:35
19 for speculation on the part of the witness.       10:43:37
20 BY MR. SWEENEY:                                   10:43:40
21 Q  What did he tell you?                          10:43:40
22 A  I mean, I wouldn't know, you know, if that     10:43:41
23 justified such action.                            10:43:45
24 Q  Okay. Is Deputy ▓▓▓▓▓ a member of              10:43:49
25 The Executioners?                                 10:43:57

**Page 24**

1  MR. IVIE: Objection; lacks foundation; calls for   10:43:58
2  speculation and conjecture on the part of the witness.   10:44:01
3  THE WITNESS: Yes, common knowledge at the station is   10:44:03
4  that he is an Executioner.                        10:44:06
5  MR. SWEENEY: Okay.                                10:44:08
6  MR. IVIE: Objection; move to strike the witness's   10:44:10
7  answer as nonresponsive.                          10:44:13
8  BY MR. SWEENEY:                                   10:44:15
9  Q  When you say "common knowledge", do you mean   10:44:16
10 that everyone knows?                              10:44:19
11 A  At the station, everybody knows that ▓▓▓▓▓    10:44:21
12 is inked.                                         10:44:24
13 MR. IVIE: Objection; leading; suggestive.         10:44:27
14 BY MR. SWEENEY:                                   10:44:29
15 Q  When you say "inked", what does that mean?     10:44:29
16 A  That he is part --                             10:44:32
17 MR. IVIE: Hold on one second, Counsel. Hold on one  10:44:35
18 second. And the response lacks foundation.        10:44:38
19 BY MR. SWEENEY:                                   10:44:42
20 Q  What did does the word "inked" mean?           10:44:43
21 A  That he is part of The Executioners.           10:44:45
22 Q  Okay. Does it mean that -- what does inked     10:44:48
23 mean?                                             10:44:54
24 A  Having the tattoo of The Executioners Compton.  10:44:54
25 Q  Have you ever seen the tattoo of               10:45:03

**Page 25**

1  The Executioners in your time there at the Compton   10:45:06
2  station?                                          10:45:10
3  A  Yes.                                           10:45:10
4  Q  On how many occasions approximately?           10:45:10
5  A  About a dozen times.                           10:45:16
6  Q  Okay. Let me go back because I forgot to state   10:45:22
7  that you are under oath and you have to tell the truth   10:45:29
8  and that I don't want you to guess at anything, but I am   10:45:32
9  entitled to your best testimony.                  10:45:37
10    So you said how many times that you've seen this   10:45:38
11 tattoo?                                           10:45:44
12 A  On anybody in specific or just like total times   10:45:44
13 on deputies?                                      10:45:51
14 Q  Yes.                                           10:45:52
15 A  Yes to which part?                             10:45:57
16 Q  I'm sorry?                                     10:46:00
17 A  Total in all deputies?                         10:46:01
18 Q  Yes, your best estimate, how many times --     10:46:04
19 A  About a dozen times. About, you know, a good   10:46:07
20 dozen times, fifteen times.                       10:46:09
21 Q  Okay. And tell me every deputy that you've seen   10:46:11
22 this tattoo on?                                   10:46:17
23 A  That I remember, Deputy ▓▓▓▓▓ Deputy --        10:46:20
24 Q  Hold on one second. Deputy who?                10:46:29
25 A  ▓▓▓▓▓.                                         10:46:31

```
 1   Q   Spell it, please?                    10:46:33
 2   A   ███████.                             10:46:34
 3   Q   Okay.                                10:46:37
 4   A   Deputy ███████, ███████████.         10:46:40
 5   Q   Hold on a second. Okay.              10:46:47
 6   A   Deputy ███████, ███████████.         10:46:52
 7   Q   Uh-huh.                              10:47:01
 8   A   Deputy ███████, ███████████.         10:47:05
 9   Q   Uh-huh.                              10:47:14
10   A   Deputy ███████, ███████████.         10:47:15
11       MR. IVIE: Excuse me, Counsel. Can I just ask if the   10:47:34
12   witness knows what ███████ first name is? It's a          10:47:37
13   common last name so --                                    10:47:42
14       MR. SWEENEY: Sure.                   10:47:44
15       MR. IVIE: -- there may be more than that one.         10:47:44
16       THE WITNESS: ███████████.            10:47:50
17       MR. SWEENEY: Okay.                   10:47:53
18       THE VIDEOGRAPHER: This is the videographer. Can we    10:47:55
19   go off the record for one minute, please?                 10:47:57
20       MR. SWEENEY: Sure.                   10:48:00
21       THE VIDEOGRAPHER: Thank you.         10:48:01
22       This marks the end of Media No. 2. The time is        10:48:04
23   10:48, and we are off the record.        10:48:08
24       (Recess taken from 10:48 a.m. to 10:59 a.m.)    10:59:15
25       THE VIDEOGRAPHER: This marks the beginning of  10:59:15
                                                     Page 26
```

```
 1   Media No. 3. The time is 10:59, and we are on the    10:59:18
 2   record.                                              10:59:21
 3   BY MR. SWEENEY:                                      10:59:21
 4   Q   Okay. Deputy, we had left off with               10:59:22
 5   Deputy ███████ in your naming of the inked          10:59:27
 6   members of The Executioners gang. Let me put up --   10:59:32
 7       MR. IVIE: Again, Counsel, we object that there's no   10:59:37
 8   foundation that any of these individuals are members of   10:59:40
 9   any gang.                                            10:59:46
10       MR. SWEENEY: Okay. Thank you, Mr. Ivie.          10:59:49
11   BY MR. SWEENEY:                                      10:59:52
12   Q   Let's put up you Exhibit 106, the shift          10:59:52
13   in-service document dated January 15th, 2016. Do you  11:00:00
14   see the document, Deputy?                            11:00:08
15   A   Yes, sir.                                        11:00:12
16   Q   Okay. And can you -- there are some names with   11:00:12
17   circles around the names. Who circled those names?   11:00:28
18   A   I did.                                           11:00:32
19   Q   Okay. And the first one is ███████; do you       11:00:33
20   see that?                                            11:00:45
21   A   Yes.                                             11:00:46
22       MR. IVIE: Excuse me, Counsel. Can this be marked or   11:00:47
23   has it already been marked?                          11:00:51
24       MR. SWEENEY: We marked it, Mr. Ivie. It's 106.   11:00:53
25       MR. IVIE: 106. Okay.                             11:00:57
                                                     Page 27
```

```
 1   BY MR. SWEENEY:                                      11:00:59
 2   Q   Now, it says Mr. ███████ is -- works dispatch;   11:00:59
 3   is that correct?                                     11:01:08
 4   A   Well, I think he worked dispatch that day. I     11:01:08
 5   don't think he was a watch deputy or assigned to     11:01:16
 6   dispatch, but a lot of times some deputies from the  11:01:19
 7   field, if there is not enough people in dispatch,    11:01:22
 8   they'll pull somebody from the field to fill in in   11:01:25
 9   dispatch.                                            11:01:30
10   Q   What is Deputy ███████ first name?               11:01:30
11   A   I don't remember.                                11:01:35
12   Q   Okay. But his first initial is "O"?              11:01:37
13   A   Yes.                                             11:01:41
14   Q   Okay. How do you know that he is a member of     11:01:41
15   The Executioners gang?                               11:01:45
16   A   Well, I've seen the matching tattoo.             11:01:48
17   Q   Where is the tattoo?                             11:01:51
18       MR. IVIE: Objection. Counsel, the question lacks   11:01:54
19   foundation.                                          11:01:57
20       MR. SWEENEY: Hold on, Deputy ███████. Mr. Ivie,  11:02:01
21   why don't we just say, so you don't have to interrupt me   11:02:07
22   every time, that we have a standing objection that his    11:02:09
23   knowledge of who or who is not a gang member lacks        11:02:12
24   foundation? Why don't we agree with that? Want to    11:02:17
25   stipulate to that?                                   11:02:24
                                                     Page 28
```

```
 1       MR. IVIE: I will stipulate to that.              11:02:24
 2       MR. SWEENEY: Okay. Thank you, Mr. Ivie.          11:02:26
 3   BY MR. SWEENEY:                                      11:02:28
 4   Q   So you have seen Deputy Aldama's tattoo; is that   11:02:28
 5   correct?                                             11:02:33
 6   A   Yes.                                             11:02:33
 7   Q   And where have you seen it on his body?          11:02:34
 8   A   On his right calf.                               11:02:37
 9   Q   Okay. Of all the tattoos --                      11:02:40
10       MR. GLICKMAN: Mr. Sweeney, can I just interrupt for   11:02:43
11   a second? That stipulation -- you were referring to a    11:02:45
12   stipulation that Mr. Ivie has a running objection;   11:02:49
13   right?                                               11:02:52
14       MR. SWEENEY: Yes.                                11:02:52
15       MR. GLICKMAN: You weren't stipulating that there was   11:02:53
16   no foundation, just that --                          11:02:55
17       MR. SWEENEY: No, no, no, no. I think I made -- if I   11:03:00
18   didn't make it clear, thank you for clearing that up.    11:03:01
19   I'm laying a foundation as I go along. This is a gang,   11:03:04
20   but his objection is that there is no foundation that   11:03:08
21   this is a gang.                                      11:03:12
22       MR. IVIE: There's no foundation that this person,   11:03:14
23   this deputy, is in a gang. That may be his belief, but   11:03:16
24   there's certainly no foundation for that that you've   11:03:23
25   laid at this point.                                  11:03:26
                                                     Page 29
```

## Page 30

```
 1  BY MR. SWEENEY:                              11:03:26
 2    Q  Okay.  And you said his tattoo is on his right    11:03:28
 3  calf; is that correct?                        11:03:33
 4    A  Yes.                                      11:03:33
 5    Q  Have you found that all the deputies that you    11:03:35
 6  have seen ink on, there's a tattoo in the same spot?   11:03:41
 7    A  Yes.                                      11:03:47
 8    Q  Is it substantially similar?              11:03:48
 9    A  Yes.                                      11:03:52
10    Q  Have you talked to any of the deputies about the   11:03:52
11  type of group this Executioners is?           11:04:01
12    A  Of that group?                            11:04:04
13    Q  Yes.                                      11:04:09
14    A  No.                                       11:04:10
15       MR. IVIE:  Lacks foundation and that's leading and   11:04:11
16  suggestive, Counsel.                          11:04:13
17       MR. SWEENEY:  You can answer.             11:04:16
18       THE WITNESS:  No, not with them.          11:04:18
19  BY MR. SWEENEY:                               11:04:21
20    Q  Okay.  Moving on to D. ____, that's the next   11:04:21
21  name you circled, had you seen ink on this deputy?   11:04:30
22    A  No.                                       11:04:37
23    Q  Okay.  How do you know that he is a member of   11:04:37
24  The Executioners?                             11:04:40
25       MR. IVIE:  Objection.  Hold on.  Excuse me, Counsel.   11:04:43
```

## Page 31

```
 1  Objection.  I don't recall any testimony from this   11:04:46
 2  witness that any of these people who he circled are, in   11:04:51
 3  his mind, part of The Executioners.  If you asked it, I   11:04:57
 4  missed it.  I don't --                        11:05:02
 5  BY MR. SWEENEY:                               11:05:02
 6    Q  Okay.  How do you know that Deputy ____ is a   11:05:06
 7  member of The Executioners?                   11:05:11
 8       MR. IVIE:  Again, objection, Counsel.  Lacks   11:05:13
 9  foundation.  As far as I recall the record, he never   11:05:15
10  said that this deputy was a member or that he had a   11:05:17
11  belief that this deputy was a member of anything.   11:05:20
12       MR. GLICKMAN:  Well, I think, Mr. Ivie, he said he   11:05:23
13  circled all the names or all the names circled are   11:05:27
14  members of The Executioners.                  11:05:31
15       MR. IVIE:  I did not hear that testimony.   11:05:31
16       MR. NISHIMURA:  I did not hear it either.   11:05:34
17  BY MR. SWEENEY:                               11:05:37
18    Q  All right.  All these names that you circled,   11:05:37
19  are they members of The Executioners gang?    11:05:40
20       MR. IVIE:  I'll object.  Again, it's lacking   11:05:42
21  foundation.                                   11:05:44
22       MR. SWEENEY:  You've already objected, Mr. Ivie.   11:05:45
23  Thank you.                                    11:05:47
24       MR. IVIE:  Well, it's leading and suggestive.  You're   11:05:47
25  not -- you can ask the witness, it seems to me, why he   11:05:49
```

## Page 32

```
 1  circled these names, but you just started, it seems to   11:05:55
 2  me, at a conclusory point.                    11:06:00
 3       I lost video.                             11:06:05
 4       MR. SWEENEY:  Thank you, Mr. Ivie.        11:06:06
 5       MR. IVIE:  I've lost the video.  Has anybody else   11:06:08
 6  lost the video?                               11:06:11
 7       MR. SWEENEY:  No.  There's a document on the screen,   11:06:13
 8  Mr. Ivie.                                     11:06:15
 9       MR. IVIE:  No, I don't see the document.  No, that's   11:06:17
10  what I'm saying.  I lost the video.  Has anybody else   11:06:20
11  lost the video?                               11:06:23
12       MR. SWEENEY:  We all can see it.          11:06:24
13       MR. IVIE:  Mine says "Veritext Remote Deposition   11:06:26
14  Solutions".  It says "working remotely".  That's what   11:06:30
15  mine says.                                    11:06:33
16       MR. SWEENEY:  I can see it.               11:06:35
17       MR. IVIE:  Now I can see it.              11:06:37
18  BY MR. SWEENEY:                               11:06:39
19    Q  Okay.  All right.  We had left off at     11:06:39
20  Deputy Aviles.  How do you know that he is a member of   11:06:46
21  this gang that you termed or called The Executioners?   11:06:51
22       MR. IVIE:  So, again, leading; suggestive; no   11:06:57
23  foundation.                                   11:06:59
24       THE WITNESS:  I circled it because it is common   11:06:59
25  knowledge that Aviles is part of that group.  11:07:03
```

## Page 33

```
 1  BY MR. SWEENEY:                               11:07:09
 2    Q  Okay.  And then you, on this sheet,       11:07:09
 3  Exhibit 106, you next named Deputy Aldama, comma, S.  Is   11:07:15
 4  this Samuel Aldama?                           11:07:24
 5    A  Yes.                                      11:07:26
 6    Q  Okay.  Have you seen a tattoo on          11:07:26
 7  Deputy Samuel Aldama?                         11:07:31
 8    A  Yes.                                      11:07:32
 9    Q  Where is that tattoo?                     11:07:32
10    A  On his right calf.                        11:07:35
11    Q  How is it that you were able to view the tattoo   11:07:37
12  on his right calf?                            11:07:47
13    A  At the station in the parking lot, either coming   11:07:49
14  to work or leaving work and they're in civilian attire,   11:07:55
15  a lot of times they'll be wearing shorts in the middle   11:08:03
16  of the winter, you know, and people can see their   11:08:06
17  tattoos.                                      11:08:10
18    Q  If you know, is the -- if you know the answer to   11:08:13
19  this.  I don't want you to speculate.  Is it a source of   11:08:18
20  pride around the Compton station to have this tattoo for   11:08:24
21  those who are tattooed?                       11:08:29
22       MR. IVIE:  Objection; leading; suggestive; no   11:08:30
23  foundation.                                   11:08:32
24       MR. NISHIMURA:  Also, vague and ambiguous.   11:08:34
25       THE WITNESS:  I believe it is based on, like I said   11:08:36
```

```
 1  before, it will be 50 degrees outside in the middle of    11:08:40
 2  winter and you see members of this group wearing shorts.  11:08:45
 3  Everybody else is wearing, you know, pants and layers     11:08:49
 4  of, you know, cold weather gear, and they're walking      11:08:53
 5  around in shorts so people can see that tattoo.  I think  11:08:57
 6  that's pride.                                             11:09:01
 7  BY MR. SWEENEY:                                           11:09:02
 8    Q  Thank you.  How well do you know                     11:09:04
 9  Deputy Samuel Aldama?                                     11:09:12
10    A  I think I know him fairly well.  We're not           11:09:13
11  friends.  You know, we worked together at the station     11:09:19
12  for a short number of years.                              11:09:23
13    Q  Okay.  And do you know when he acquired this         11:09:28
14  tattoo?                                                   11:09:30
15    A  Approximately after he was involved in a             11:09:31
16  shooting, him and his partner, Deputy ▮▮▮▮.               11:09:38
17    MR. IVIE:  Objection; lacks foundation.                 11:09:44
18  BY MR. SWEENEY:                                           11:09:47
19    Q  How do you know he got that tattoo after that        11:09:49
20  shooting?                                                 11:09:52
21    A  It was, you know, common knowledge there was a       11:09:53
22  party they had.  I don't know if he got the tattoo there  11:09:58
23  or after the party, but I know it was after the           11:10:03
24  shooting.  It was common knowledge at the station.        11:10:07
25    Q  Okay.  Tell me about this party.  Do these           11:10:09
                                                              Page 34
```

```
 1  people who are inked, have you heard that they have       11:10:15
 2  parties celebrating their induction into this group?      11:10:18
 3    MR. IVIE:  Objection; leading; suggestive.              11:10:23
 4    THE WITNESS:  I don't know if it's inducting these      11:10:24
 5  members, but I know they do have -- there are parties     11:10:27
 6  after, you know, after a shooting.  They call them 998    11:10:31
 7  parties.  You know, some people say it's to celebrate     11:10:36
 8  that, you know, the deputy's alive, and others believe    11:10:42
 9  it's, you know, to celebrate that, you know, they're      11:10:45
10  going to be inking somebody.                              11:10:48
11  BY MR. SWEENEY:                                           11:10:50
12    Q  What does "998" mean?                                11:10:52
13    A  It's a deputy-involved shooting.                     11:10:54
14    Q  Have you ever seen a tattoo with 998 on it?          11:10:56
15    A  No.                                                  11:11:04
16    Q  Have you -- in the three -- strike that.             11:11:04
17       The deputies where you have actually seen the        11:11:14
18  tattoo, have you seen any numbers on the stock of the     11:11:17
19  rifle of the tattoo?                                      11:11:22
20    A  I don't quite remember having looked at it.  I       11:11:24
21  mean, I haven't seen those tattoos that up close to be    11:11:26
22  able to identify a number.  I know that there's the       11:11:29
23  number "28" that belongs to the station.                  11:11:35
24    MR. SWEENEY:  Okay.  Mr. Glickman, can you put up the   11:11:38
25  confidentiality protective order and can we mark it as    11:11:48
                                                              Page 35
```

```
 1  Exhibit 107?                                              11:11:51
 2    MR. GLICKMAN:  You just want the acknowledgment of      11:12:02
 3  the protective order; right?                              11:12:04
 4    MR. SWEENEY:  Yes.                                      11:12:06
 5    MR. GLICKMAN:  So we'll have -- 107 will be             11:12:07
 6  Deputy ▮▮▮▮ acknowledgment, and then 108 we can           11:12:10
 7  have as Mr. Romero's acknowledgment.  You want me to put  11:12:14
 8  those up?                                                 11:12:20
 9    MR. SWEENEY:  Yes, please.                              11:12:21
10    MR. GLICKMAN:  Just a second.  I have Exhibit 107 now   11:12:25
11  which is Deputy ▮▮▮▮ signed acknowledgment.               11:12:52
12  BY MR. SWEENEY:                                           11:12:56
13    Q  Deputy ▮▮▮▮, you realize that everything             11:12:57
14  that you talk about here is confidential and you can't    11:13:00
15  go back out and repeat it; you understand that, don't     11:13:04
16  you?                                                      11:13:08
17    A  Yes, I do.                                           11:13:08
18    Q  And is that your signature on the document           11:13:09
19  entitled "Acknowledgment and Agreement to be Bound"?      11:13:15
20    A  Yes, that is my signature at the bottom.             11:13:19
21    Q  And you went over it with your lawyer this           11:13:21
22  morning?                                                  11:13:25
23    A  Yes.                                                 11:13:26
24    Q  Thank you.                                           11:13:26
25    MR. SWEENEY:  And there's another part of the           11:13:29
                                                              Page 36
```

```
 1  exhibit, is there?                                        11:13:34
 2    MR. GLICKMAN:  There's -- we have also one from         11:13:36
 3  signed by Mr. Romero and so that's on the screen now.     11:13:40
 4  So that's marked as Exhibit 108.  It's on the screen      11:14:01
 5  now.                                                      11:14:05
 6    MR. SWEENEY:  Okay.  And that is signed, apparently,    11:14:05
 7  by Attorney Alan Romero; is that correct, Mr. Romero?     11:14:10
 8    MR. ROMERO:  Yes.                                       11:14:16
 9    MR. SWEENEY:  All right.  You can take that down,       11:14:18
10  Mr. Glickman.  And let's go back to my questioning of --  11:14:20
11  you don't need to put the exhibit back up yet.  106,      11:14:24
12  don't put that back up yet.                               11:14:31
13  BY MR. SWEENEY:                                           11:14:33
14    Q  Let me ask you, we were talking about 998            11:14:33
15  parties.                                                  11:14:37
16    MR. IVIE:  Objection; that's leading and suggestive,    11:14:41
17  Counsel.                                                  11:14:43
18  BY MR. SWEENEY:                                           11:14:43
19    Q  You mentioned that there are parties after a         11:14:46
20  deputy involved in a shooting; is that correct?           11:14:54
21    A  They call them 998 debriefs.                         11:14:58
22    Q  998 debriefs, you said?                              11:15:01
23    A  Yes.                                                 11:15:05
24    Q  Now, is it a celebratory type of party if            11:15:05
25  someone shoots and kills someone?                         11:15:12
                                                              Page 37
```

10 (Pages 34 - 37)

### Page 38

1  MR. IVIE: Objection; leading; suggestive.  11:15:14
2  THE WITNESS: Well, you know, I mean, to me, if they  11:15:15
3  go to a bar and, you know, they're having drinks, you  11:15:18
4  know, it's hard not to call it a party. I know they  11:15:23
5  call it a debrief, but that makes it -- I've never been  11:15:27
6  to one. I've never been invited to one, but I know they  11:15:33
7  take place at, you know, venues -- I mean, not venues,  11:15:38
8  but a bar type, places of that nature.  11:15:41
9  BY MR. SWEENEY:  11:15:48
10  Q  Okay. And do you know who organizes these  11:15:48
11  parties?  11:15:53
12  A  No.  11:15:54
13  Q  Have you ever known a member of The Executioners  11:15:56
14  to attend a party in celebration of shooting a citizen?  11:16:07
15  A  Have I ever heard any of these members say that?  11:16:13
16  Q  Yes.  11:16:17
17  A  No.  11:16:19
18  Q  Okay. Well, how do you know that there are  11:16:19
19  parties to celebrate shootings of persons?  11:16:24
20  MR. IVIE: Okay. So objection, Counsel. That is not  11:16:32
21  the witness's testimony. Leading and suggestive.  11:16:34
22  Further, the question's been asked and answered insofar  11:16:38
23  as the witness's knowledge -- he says he only has common  11:16:41
24  knowledge, whatever that means.  11:16:45
25  ///  11:16:46

### Page 39

1  BY MR. SWEENEY:  11:16:46
2  Q  What is your knowledge based on, sir?  11:16:47
3  A  My knowledge is that after a shooting, there is  11:16:49
4  998 debriefs. People get invited, certain people, not  11:16:54
5  everybody at the station. They go to a bar, they have  11:17:00
6  drinks, they celebrate together, and oftentimes the  11:17:04
7  deputy and the partner will get inked afterwards.  11:17:12
8  Q  Okay. And have you found that these inkings are  11:17:14
9  like a reward for doing the shooting?  11:17:21
10  MR. IVIE: Objection; leading; suggestive.  11:17:31
11  MR. NISHIMURA: Lacks foundation.  11:17:33
12  THE WITNESS: Well, I mean, yes. What else can you  11:17:35
13  call it? I think it is some type of reward. A lot of  11:17:38
14  deputies, we call them prospects because, you know,  11:17:44
15  they're hurting and they're want that. They acknowledge  11:17:47
16  they're chasing ink which is, you know, that they want  11:17:50
17  to get inked. And so call it coincidence. I mean, you  11:17:53
18  know, they get inked oftentimes after a shooting.  11:17:59
19  BY MR. SWEENEY:  11:18:04
20  Q  You said or you used the term "chasing ink"; is  11:18:05
21  that what you said?  11:18:09
22  A  Yes.  11:18:09
23  Q  So with this gang, it's your testimony that  11:18:10
24  prospects are encouraged to do shootings or violent acts  11:18:21
25  in order to get inked?  11:18:27

### Page 40

1  MR. IVIE: Objection; leading; suggestive; no  11:18:29
2  foundation.  11:18:31
3  THE WITNESS: It is my knowledge that by common  11:18:34
4  practice with the group, that if you quote/unquote  11:18:40
5  "work", if you're cooking, if you are involved in a  11:18:45
6  shooting, I mean, like I said, history will show that  11:18:52
7  they get inked. So we call it ink chasers because  11:18:56
8  they're out there trying to show the rest of the  11:19:00
9  members, the rest of the inked members that, you know,  11:19:04
10  they're worthy of that tattoo.  11:19:07
11  BY MR. SWEENEY:  11:19:09
12  Q  Have you heard anyone say or do you have any  11:19:11
13  knowledge -- strike that.  11:19:14
14      Do you have any knowledge that Deputy Aldama was  11:19:14
15  chasing ink when he did his shooting of a citizen?  11:19:21
16  MR. IVIE: Objection; leading; suggestive; and no  11:19:26
17  foundation.  11:19:28
18  MR. SWEENEY: You can answer.  11:19:34
19  THE WITNESS: Could you repeat the question? I'm  11:19:35
20  sorry.  11:19:36
21  BY MR. SWEENEY:  11:19:37
22  Q  Sure. Do you have any knowledge that  11:19:37
23  Deputy Aldama was, as you said, chasing ink when he shot  11:19:40
24  a citizen?  11:19:46
25  MR. IVIE: Leading; no foundation.  11:19:47

### Page 41

1  MR. SWEENEY: Let me finish the question, Mr. Ivie.  11:19:50
2  MR. SWEENEY: Did you understand the question,  11:19:55
3  Mr. Romero?  11:19:57
4  MR. IVIE: Well, I thought you weren't finished. How  11:19:58
5  can he answer if you weren't finished? Oh, you made a  11:20:00
6  mistake. You were finished. Okay. Go ahead. He can  11:20:04
7  answer.  11:20:06
8  MR. SWEENEY: Mr. Ivie, do you want to get the judge  11:20:07
9  on the line?  11:20:10
10  MR. IVIE: If you want to.  11:20:10
11  MR. SWEENEY: Because let me just say this, Mr. Ivie.  11:20:11
12  MR. IVIE: Yes.  11:20:16
13  MR. SWEENEY: You are on the wrong side of history  11:20:16
14  here. You lied to us for two years, you and counsel,  11:20:19
15  about the existence of this gang, and you still do it.  11:20:23
16  You know, I can't believe -- there is a limit to what a  11:20:27
17  lawyer should do in representing his client, and you  11:20:32
18  guys are far past that limit, what you all have done in  11:20:35
19  this case.  11:20:42
20  MR. IVIE: So, Counsel, what I don't appreciate is  11:20:42
21  you saying I lied to you, which I didn't lie to you  11:20:45
22  about anything. There's certainly no need to. So, you  11:20:48
23  know, the other thing I don't appreciate is I don't need  11:20:51
24  you to lecture to me. What I need you to do is conduct  11:20:55
25  a deposition. If you want to call the judge, call the  11:20:59

### Page 42

```
 1  judge.                                          11:21:01
 2      MR. SWEENEY: I don't need to call the judge.   11:21:01
 3      MR. IVIE: What's your question? You were finished   11:21:03
 4  with your question because you asked the witness to   11:21:07
 5  answer it.                                      11:21:10
 6      MR. SWEENEY: Please, Mr. Ivie. You're looking very   11:21:11
 7  bad on this.                                    11:21:13
 8      MR. IVIE: Okay. Well, Counsel, I think you look   11:21:14
 9  bad.                                            11:21:16
10      MR. SWEENEY: I knew you were going to pull this.   11:21:16
11  You were going to try to disrupt things because that's   11:21:18
12  what you do because --                          11:21:21
13      MR. IVIE: I'm not the one lecturing you. I'm not   11:21:22
14  the one lecturing you. You're taking it upon yourself   11:21:26
15  to lecture me. Why don't you just focus on your   11:21:29
16  deposition?                                     11:21:32
17      MR. SWEENEY: Why don't you focus on listening to the   11:21:33
18  deposition instead of trying to disrupt which is your   11:21:35
19  style. All right. Let's move on.                11:21:38
20      MR. IVIE: Counsel, the only person that's being   11:21:40
21  disruptive is you. You're the one that raised your   11:21:43
22  voice and said that you weren't finished with your   11:21:46
23  question.                                       11:21:48
24      MR. SWEENEY: No, no, no. You're the one who is   11:21:49
25  disrupting things, and anybody with an ounce of sense   11:21:51
```

### Page 43

```
 1  can see that.                                   11:21:55
 2      MR. IVIE: Okay, Counsel.                    11:21:55
 3      BY MR. SWEENEY:                             11:21:58
 4   Q  All right. So do you have any knowledge,    11:21:59
 5  Deputy ▓▓▓, that Deputy Aldama was chasing ink when   11:22:09
 6  he shot the citizen that he shot?               11:22:17
 7      MR. IVIE: Okay. Leading and suggestive.     11:22:20
 8  Objection.                                      11:22:23
 9      THE WITNESS: I don't know if specifically that   11:22:23
10  shooting, you know -- I mean, I don't have knowledge   11:22:27
11  specifically of that shooting. I know he was chasing   11:22:31
12  ink, him and his partner, Deputy ▓▓▓, based on what I   11:22:34
13  saw -- taking calls from inked members and, you know,   11:22:39
14  getting on emergent radio frequency because they had a   11:22:47
15  guy with a gun. And it was happening almost every week,   11:22:53
16  twice a week, and that level of luck, if you want to   11:22:57
17  call it, finding so many guns or that level of work   11:23:04
18  showed me that yes, absolutely they were both chasing   11:23:10
19  ink.                                            11:23:13
20      Aldama is a great cop. He's, you know, a great   11:23:16
21  guy. Unfortunately, I think he channeled that energy in   11:23:20
22  the wrong path. That is my opinion. So to answer your   11:23:25
23  question, yes, he was chasing ink.              11:23:30
24      BY MR. SWEENEY:                             11:23:31
25   Q  All right. And that was what you observed?   11:23:32
```

### Page 44

```
 1  That wasn't your opinion, that's what you observed; is   11:23:35
 2  that correct?                                   11:23:37
 3   A  Yes, I observed --                          11:23:37
 4      MR. IVIE: Objection; calling for a conclusion on the   11:23:40
 5  part of the witness.                            11:23:48
 6      BY MR. SWEENEY:                             11:23:51
 7   Q  You can answer, Deputy.                     11:23:51
 8   A  What was the question? I'm sorry.           11:23:54
 9   Q  Yeah. What you saw Deputy Aldama and ▓▓▓    11:23:56
10  doing led you to believe that they were chasing ink; is   11:24:03
11  that correct?                                   11:24:08
12   A  Yes.                                        11:24:08
13   Q  In what year was that that we're talking about   11:24:09
14  where they were chasing ink?                    11:24:14
15   A  It was around the end of 2015, beginning of   11:24:16
16  2016.                                           11:24:22
17   Q  I'm sorry. 2015 and '16, is that what you said?   11:24:22
18   A  Approximately. They got off training two months   11:24:29
19  before I did. I got off training around the end of July   11:24:34
20  or mid-July, and they -- I believe they both got off   11:24:38
21  training at the same time which was a couple of months   11:24:43
22  before I did.                                   11:24:46
23   Q  Okay. And were they chasing ink from 2015 into   11:24:47
24  2016 and into 2017?                             11:24:52
25      MR. IVIE: Objection; no foundation.         11:24:56
```

### Page 45

```
 1      THE WITNESS: Yes.                           11:24:58
 2      MR. IVIE: Speculation on the part of the witness.   11:24:59
 3      BY MR. SWEENEY:                             11:25:02
 4   Q  Is that a yes?                             11:25:02
 5   A  Yes.                                        11:25:02
 6   Q  Okay. And do you recall when in -- in what   11:25:03
 7  year, what month and what year that you learned that   11:25:11
 8  Deputy Aldama had gotten ink?                   11:25:16
 9   A  I don't remember that they -- I'm sorry.    11:25:18
10   Q  Was it in 2017, your best estimate?         11:25:23
11      MR. IVIE: Objection.                        11:25:29
12      THE WITNESS: I know it was after the shooting they   11:25:29
13  were involved in.                               11:25:31
14      MR. IVIE: Excuse me, Mr. ▓▓▓. I'm making an   11:25:32
15  objection. Please wait before you answer the question   11:25:35
16  and let me finish making my objection; okay?    11:25:38
17      THE WITNESS: No problem, sir.               11:25:40
18      MR. IVIE: Thank you.                        11:25:42
19      So objection; calling for speculation and   11:25:43
20  conjecture on the part of the witness.          11:25:46
21      BY MR. SWEENEY:                             11:25:49
22   Q  You don't recall the year, but you recall that   11:25:49
23  they got the ink after the shooting they were involved   11:25:53
24  in?                                             11:25:55
25      MR. IVIE: Objection; leading; suggestive.   11:25:56
```

```
 1  in other words, is there a shot caller, is there         11:33:06
 2  associates or --                                         11:33:10
 3  A   Oh, somewhat, yes.                                   11:33:11
 4  Q   Okay.  And tell me about the hierarchy.  Who's       11:33:14
 5  at the top?  What's that person called or the terms?     11:33:21
 6  A   Shot caller.                                         11:33:27
 7  Q   And what does a shot caller do?                      11:33:28
 8  A   Well, I mean, he's in charge.  He's, you know --     11:33:32
 9  I mean, I haven't -- well, not any gang.  I mean, he's   11:33:40
10  the one that makes the decisions, you know, for the      11:33:44
11  gang.                                                    11:33:47
12  Q   Okay.  And what's the next level in the              11:33:47
13  hierarchy of a gang?                                     11:33:52
14  A   I mean --                                            11:33:57
15  Q   If you know and if you understand.                   11:33:59
16  A   I understand, you know, it's called master of        11:34:02
17  arms, you know, the second in command, that type, I      11:34:07
18  mean, as far as I know.                                  11:34:11
19  Q   I mean, are there rank and file members or just      11:34:15
20  associates?                                              11:34:18
21      MR. IVIE:  Objection; leading; suggestive.           11:34:19
22      THE WITNESS:  Yes.                                   11:34:21
23  BY MR. SWEENEY:                                          11:34:26
24  Q   Okay.  Now, you patrolled the area of Compton        11:34:27
25  and you know of the existence of gangs; correct?         11:34:37
                                                                Page 50
```

```
 1  A   Correct.                                             11:34:40
 2  Q   And you already termed what you termed               11:34:43
 3  The Executioners as a gang and you told us why you       11:34:50
 4  termed them a gang.  Do The Executioners have a shot     11:34:54
 5  caller?                                                  11:35:00
 6  A   Yes.                                                 11:35:00
 7      MR. IVIE:  Objection.  Lacks foundation.             11:35:01
 8  BY MR. SWEENEY:                                          11:35:03
 9  Q   Who is -- your answer was yes?                       11:35:04
10  A   Yes.                                                 11:35:07
11  Q   Who is the shot caller?                              11:35:08
12      MR. IVIE:  Objection; lacks foundation.              11:35:11
13      THE WITNESS:  ██████.                                11:35:12
14  BY MR. SWEENEY:                                          11:35:17
15  Q   Can you spell that, please?                          11:35:17
16  A   ██████; ██████████████                               11:35:18
17  Q   How do you know that he's the shot caller for        11:35:30
18  The Executioners gang?                                   11:35:32
19  A   Common knowledge and then the way the members        11:35:33
20  and prospects circle around him at the station, whether  11:35:38
21  it's the parking lot or the gas pumps, you know,         11:35:43
22  everybody shows -- when I say everybody, everybody in    11:35:47
23  that group shows some level of respect to him.  It's     11:35:51
24  very -- it's very obvious that, you know, from what I    11:35:55
25  had seen, that he is the shot caller, and the common     11:36:01
                                                                Page 51
```

```
 1  knowledge at station is that ██████ is the shot          11:36:04
 2  caller for that group.                                   11:36:08
 3  Q   Okay.  Do you know how many gang members there       11:36:10
 4  are?                                                     11:36:17
 5  A   At Compton station --                                11:36:17
 6      MR. IVIE:  Objection; no foundation.                 11:36:20
 7      MR. SWEENEY:  You can answer.                        11:36:24
 8      THE WITNESS:  For the station, at the station for    11:36:26
 9  this group, I would say approximately 15.                11:36:29
10  BY MR. SWEENEY:                                          11:36:32
11  Q   And how do you know that?                            11:36:36
12  A   Just based on, you know, the deputies that are       11:36:37
13  from this group I see at the station at, you know -- you 11:36:44
14  know, in the in-service or when they take time off and,  11:36:50
15  you know, you start counting how many of them, you know, 11:36:55
16  are members, and they all get the same day off which is  11:36:59
17  very, very unusual and hard to do, you kind of put two   11:37:04
18  and two together, and it's obvious to see how many       11:37:09
19  approximately members of this group are at the           11:37:14
20  station.                                                 11:37:19
21  Q   I was going to talk about this later, but let's      11:37:19
22  talk about it now since you mentioned it.                11:37:22
23      Are Executioners gang members given preferential     11:37:25
24  assignments?                                             11:37:29
25      MR. IVIE:  Objection; leading; suggestive; no        11:37:30
                                                                Page 52
```

```
 1  foundation.                                              11:37:32
 2      THE WITNESS:  Assignments and scheduling             11:37:32
 3  preferences, yes.                                        11:37:39
 4  BY MR. SWEENEY:                                          11:37:40
 5  Q   How do you know that?                                11:37:40
 6  A   Because I've seen it.                                11:37:41
 7  Q   Okay.  So had you seen the persons that you know     11:37:43
 8  are Executioners being given this preferential           11:37:50
 9  treatment?                                               11:37:54
10  A   Yes.  From time to time, you will see about          11:37:54
11  eight members and another four or five prospects be able 11:37:58
12  to take a Saturday on p.m.'s off which, in result,       11:38:02
13  causes for day shift to be drafted because there's not   11:38:08
14  enough bodies for p.m.'s to work.  So we do see that     11:38:13
15  because it affects the deputies who are working the day  11:38:17
16  shift because if they start -- if they approve eight     11:38:20
17  variances, eight, you know, deputies to be off that day  11:38:25
18  and then somebody else calls in or two people call in    11:38:30
19  sick, then they're going to draft from day shift, and    11:38:33
20  day shift was always affected by that when these days    11:38:36
21  were -- when, like, a Saturday on p.m.'s or Fridays on   11:38:40
22  p.m.'s was authorized for them to take off.              11:38:43
23  Q   Okay.  You talked about prospects.  What are         11:38:46
24  prospects?                                               11:38:55
25  A   Prospects are the ink chasers.  We call them ink     11:38:55
                                                                Page 53
```

14 (Pages 50 - 53)

## Page 54

```
1  chasers.  He's chasing ink.  That's what a prospect is.    11:39:01
2    Q   Are the prospects encouraged to commit crimes by    11:39:06
3  beating up people or shooting people in order to get       11:39:14
4  their ink?                                                 11:39:17
5    MR. IVIE:  Objection; leading and suggestive.            11:39:18
6    THE WITNESS:  I don't know if they are encouraged to     11:39:20
7  do so.  What I know is that there is a motivation to get   11:39:24
8  the job done or to get that gun or, you know, to take      11:39:30
9  that person to jail, in my opinion, at whatever cost.      11:39:35
10 BY MR. SWEENEY:                                            11:39:40
11   Q   Okay.  We'll get to that in a second.  How many      11:39:42
12 prospects are there, let's say, in the year 2020?          11:39:45
13   A   Give me a second.  It's hard to tell.  I would       11:39:55
14 have to see names of, you know, deputies at the station    11:40:12
15 and, you know -- but the least that I can count off the    11:40:16
16 top of my head, roughly about six.  And that's just off    11:40:22
17 the top of my head.                                        11:40:26
18   Q   Okay.  And is that your best estimate of the         11:40:27
19 number of prospects?                                       11:40:30
20   A   Right now, it is.                                    11:40:31
21   Q   Okay.  Well, you say in your Exhibit 105, your       11:40:33
22 claim, that there are 20 prospects at any -- at the time   11:40:41
23 that you filed this claim; is that correct?                11:40:48
24   A   Give me a second.                                    11:40:50
25   Q   If you want to take a moment off the record --       11:40:56
```

## Page 55

```
1    A   Can I take a moment off the record?                  11:40:58
2    MR. SWEENEY:  Sure.                                      11:41:00
3    MR. IVIE:  There's a question pending.                   11:41:02
4    MR. SWEENEY:  Five-minute break.                         11:41:04
5    MR. NISHIMURA:  There's a question pending.  I'd like    11:41:07
6  to the witness to answer the question.                     11:41:09
7    MR. IVIE:  I join in that objection, Counsel.            11:41:11
8  There's a question pending.  It is inappropriate for a     11:41:12
9  witness to adjourn the deposition at a time a question     11:41:14
10 is pending.                                                11:41:17
11   MR. SWEENEY:  Thank you, Mr. Ivie.                       11:41:17
12 BY MR. SWEENEY:                                            11:41:17
13   Q   Can you answer the question?                         11:41:19
14   A   If that's what's in my claim, then yes.              11:41:20
15   MR. SWEENEY:  Let's take a break.                        11:41:25
16   THE VIDEOGRAPHER:  This marks the end of Media No. 3.    11:41:27
17 The time is 11:41 a.m., and we are off the record.         11:41:30
18     (Recess taken from 11:41 a.m. to 11:53 a.m.)           11:53:55
19   THE VIDEOGRAPHER:  Okay.  This marks the beginning of    11:53:55
20 Media Unit No. 4.  The time is 11:53, and we are on the    11:53:59
21 record.                                                    11:54:02
22 BY MR. SWEENEY:                                            11:54:02
23   Q   Deputy ▮▮▮▮▮, have you known this gang to be         11:54:05
24 a secretive group?                                         11:54:14
25   MR. IVIE:  Objection; vague; ambiguous; calls for        11:54:18
```

## Page 56

```
1  speculation and conjecture.                                11:54:23
2    THE WITNESS:  Well, outside of displaying their          11:54:24
3  tattoo, I mean, they keep it pretty -- pretty              11:54:29
4  discreet.                                                  11:54:35
5  BY MR. SWEENEY:                                            11:54:35
6    Q   And when did you hear that this group existed        11:54:36
7  within the Sheriff's -- the Compton station?               11:54:47
8    A   It was after the Aldama incident -- well, his        11:54:52
9  deposition that occurred, I want to say, a couple of       11:54:59
10 years ago.                                                 11:55:03
11   Q   So in May of 2018?                                   11:55:03
12   A   I think around there, yes.                           11:55:07
13   Q   Okay.  Let's continue on.  What I want to do is      11:55:09
14 I want to finish Exhibit 106.                              11:55:17
15   MR. SWEENEY:  Mr. Glickman, we had stopped with          11:55:25
16 Deputy ▮▮▮▮▮.                                              11:55:33
17   MR. NISHIMURA:  Mr. Sweeney, have you given further      11:55:33
18 thought to my request to designate the transcript as       11:55:36
19 confidential?                                              11:55:39
20   MR. SWEENEY:  I agreed with what Mr. Romero said, but    11:55:46
21 let me think about it.  Well, we're going to take a        11:55:49
22 lunch break at some point so I'll think about it in        11:55:53
23 depth, and I'll let you know.                              11:55:58
24   MR. IVIE:  Since you mentioned it, Counsel, what time    11:56:00
25 are you thinking about for a lunch break?                  11:56:04
```

## Page 57

```
1    MR. SWEENEY:  Well, let's ask the court reporter.        11:56:06
2    THE COURT REPORTER:  I'm agreeable to any time.          11:56:12
3    MR. SWEENEY:  Do you need one -- why don't we say go     11:56:17
4  to 12:30, is that okay, and take a half hour break?        11:56:21
5    MR. IVIE:  That's what I was thinking about, Counsel.    11:56:26
6  Can we make it 45 minutes?                                 11:56:29
7    MR. SWEENEY:  For lunch?  Sure.                          11:56:31
8    MR. IVIE:  Okay.  We'll do it at 12:30 and come back     11:56:33
9  at 1:15.                                                   11:56:36
10   MR. SWEENEY:  You got it.                                11:56:37
11   MR. IVIE:  All right.                                    11:56:38
12 BY MR. SWEENEY:                                            11:56:39
13   Q   So we were talking about Deputy ▮▮▮▮▮, and you       11:56:42
14 said that he's a member of The Executioners; is that       11:56:48
15 correct?                                                   11:56:52
16   A   Yes.                                                 11:56:52
17   Q   Moving down to ▮▮▮▮▮, do you know his                11:56:54
18 first name?                                                11:57:05
19   A   I think it's ▮▮▮▮▮.                                  11:57:06
20   Q   And is he a member of the Executioners?              11:57:08
21   A   Yes.                                                 11:57:13
22   Q   How do you know that?                                11:57:13
23   A   Common knowledge.                                    11:57:14
24   Q   Have you seen his tattoo?                            11:57:17
25   A   I believe I did.  I saw a tattoo on his right        11:57:19
```

**Page 62**

```
 1   MR. IVIE: Again, objection; leading and suggestive;    12:03:08
 2  no foundation.                                          12:03:13
 3     THE WITNESS: I'm sorry. You said something?          12:03:14
 4   MR. IVIE: I said objection; no foundation; leading     12:03:15
 5  and suggestive.                                         12:03:17
 6     MR. SWEENEY: Okay. You can answer.                   12:03:21
 7     THE WITNESS: For example, like, on tattoos?          12:03:22
 8  BY MR. SWEENEY:                                         12:03:24
 9   Q  On tattoos or in letters using numbers.             12:03:24
10   A  Yes, to identify themselves.                        12:03:29
11   Q  Okay. Have you ever seen anyone in a gang --        12:03:33
12  let's talk about a gang first -- in general, using      12:03:41
13  numbers on a keypad of a telephone that corresponds with 12:03:47
14  an initial, for example, let's say the 3 is number 8 on 12:03:56
15  a keypad; have you ever seen that?                      12:04:06
16     MR. IVIE: Objection; leading; suggestive.            12:04:08
17     MR. SWEENEY: Hold on one second. Hold on one         12:04:12
18  second.                                                 12:04:20
19  BY MR. SWEENEY:                                         12:04:20
20   Q  Sorry about that. Your answer was -- have you       12:04:54
21  seen that coding used?                                  12:05:01
22   A  Well, like you mentioned a keypad to a              12:05:04
23  telephone, you know, I know there is numbers and letters 12:05:10
24  associated with each number. If that's what you mean, I 12:05:13
25  mean, yes.                                              12:05:16
```

**Page 63**

```
 1   Q  Okay. Have you seen a number -- strike that.        12:05:16
 2      Did you know there is a number on the tattoo of     12:05:21
 3  Deputy Aldama?                                          12:05:26
 4     MR. IVIE: Objection; leading; suggestive.            12:05:29
 5     THE WITNESS: I believe that there's a number 28.     12:05:31
 6  BY MR. SWEENEY:                                         12:05:36
 7   Q  Okay. And that stands for the Sheriff's 28          12:05:36
 8  substation; correct?                                    12:05:43
 9   A  For the Sheriff's, 28 is the number given to our    12:05:44
10  -- to Compton station.                                  12:05:49
11   Q  Does the number 38 mean anything to you on the      12:05:51
12  keypad?                                                 12:05:55
13   A  Number 38, three, eight?                            12:05:59
14   Q  Yes.                                                12:06:02
15   A  On a keypad, no.                                    12:06:04
16   Q  Okay. How about on a tattoo?                        12:06:07
17   A  38 would indicate to me that that would be -- on    12:06:10
18  a tattoo, that that was the 38th person to have that    12:06:18
19  tattoo.                                                 12:06:22
20   Q  So let me fine tune the question. Do you            12:06:23
21  believe that the number 38 on a Executioners tattoo     12:06:26
22  would mean what you just said?                          12:06:33
23     MR. IVIE: Objection; leading and suggestive --       12:06:35
24     THE WITNESS: Yes.                                    12:06:35
25     MR. IVIE: Excuse me. Leading and suggestive; no      12:06:37
```

**Page 64**

```
 1  foundation.                                             12:06:39
 2  BY MR. SWEENEY:                                         12:06:41
 3   Q  Your answer?                                        12:06:42
 4   A  Yes, that is my opinion.                            12:06:42
 5   Q  Okay. Well, you know, I want you to give me         12:06:44
 6  your answer based on the knowledge that you have and    12:06:53
 7  learned through interacting with these gang members at  12:07:03
 8  the station.                                            12:07:07
 9     MR. IVIE: Objection; no foundation; calls for        12:07:08
10  speculation and conjecture; it's leading and suggestive. 12:07:10
11     MR. ROMERO: And I instruct the deponent, my client, 12:07:15
12  to answer to the extent he knows or understands.        12:07:18
13      Go ahead, if you know.                              12:07:22
14     THE WITNESS: A number on a tattoo, it could          12:07:22
15  indicate to me that this is the person's either the     12:07:25
16  street where he does his activities or where he belongs 12:07:29
17  or that he's the 38th person to acquire that tattoo.    12:07:32
18  BY MR. SWEENEY:                                         12:07:40
19   Q  Okay. Can anybody who -- if you know, can           12:07:40
20  anybody who just wants to get a tattoo, can they get    12:07:47
21  that Executioners tattoo without being invited in?      12:07:51
22     MR. IVIE: Objection; lacks foundation.               12:07:56
23     THE WITNESS: No, not that I know, no.                12:07:59
24  BY MR. SWEENEY:                                         12:08:03
25   Q  You have to earn your ink, have you heard that      12:08:04
```

**Page 65**

```
 1  before?                                                 12:08:07
 2   A  Yes.                                                12:08:07
 3   Q  Can you get a tattoo, an Executioners tattoo,       12:08:08
 4  just by wanting to have sympathy for one of the members 12:08:19
 5  or be close to one of the members?                      12:08:24
 6     MR. IVIE: Objection; lacks foundation.               12:08:26
 7     THE WITNESS: That's not their practice.              12:08:30
 8  BY MR. SWEENEY:                                         12:08:32
 9   Q  Okay. All right. Let me move on. You write in       12:08:33
10  your claim: "The Executioner operate at CP station with 12:08:41
11  impunity," which means without fear of getting in       12:08:48
12  trouble basically. Is that true?                        12:08:51
13   A  Yes.                                                12:08:56
14     MR. IVIE: Objection; lacks foundation.               12:08:57
15  BY MR. SWEENEY:                                         12:08:59
16   Q  Why do you say that?                                12:09:00
17   A  Because of the number of incidents that I've        12:09:01
18  heard of at the station, and there's no -- there are no 12:09:05
19  consequences from the department or from supervisors.   12:09:10
20   Q  Okay. Can you just name one example of that?        12:09:13
21   A  Well, like J▓▓▓▓▓▓▓ threatening the acting          12:09:18
22  captain to begin a work slowdown if the scheduling      12:09:30
23  deputy wasn't removed and replaced by one of the        12:09:34
24  Executioners members. You know, that occurred and       12:09:39
25  nothing happened other than to transfer Deputy ▓▓▓ to   12:09:45
```

**Page 66**

1 another station for a couple of months, and then he 12:09:49
2 comes back, which in my time with the department, that 12:09:52
3 has never happened. Once you are transferred from the 12:09:56
4 station because you did something wrong, you don't ever 12:09:59
5 come back. 12:10:02
6   Q   So would you say that the Executioners 12:10:03
7 influenced the policy at the station? 12:10:07
8      MR. IVIE: Objection. 12:10:09
9      THE WITNESS: Absolutely. 12:10:11
10     MR. IVIE: Objection; leading and suggestive; lacks 12:10:11
11 foundation. 12:10:14
12 BY MR. SWEENEY: 12:10:15
13   Q   Do the Executioners influence the actions of the 12:10:15
14 captain of the station? 12:10:25
15     MR. IVIE: Objection; leading and suggestive; no 12:10:27
16 foundation to this witness's knowledge. 12:10:30
17     THE WITNESS: Yes. 12:10:34
18 BY MR. SWEENEY: 12:10:35
19   Q   Okay. You go on to say: "Its members, the 12:10:35
20 Executioner members using violence against other 12:10:43
21 deputies and members of the public in order to increase 12:10:47
22 their standing within the criminal organization." Tell 12:10:51
23 us what you mean by that. 12:10:55
24   A   Can you read that again? I'm sorry. 12:10:58
25   Q   Sure. "The Executioners operate at CPT with 12:11:00

**Page 67**

1 impunity." We talked about that. "Its members using 12:11:05
2 violence against other deputies and members of the 12:11:09
3 public in order to increase their standing within the 12:11:11
4 criminal organization." What is meant by that? 12:11:15
5   A   Oftentimes -- and we talked about the incident 12:11:24
6 with or the assault with Deputy ▮▮▮▮▮▮▮, that 12:11:26
7 oftentimes when it involves force or, you know, trying 12:11:33
8 to get a gun, a lot of times without -- and, again, this 12:11:40
9 is common knowledge where they'll say they see a person 12:11:46
10 running with a gun, but then there's never a gun 12:11:50
11 recovered, but then, you know, there's also -- in order 12:11:53
12 to apprehend that suspect, there's force involved. 12:11:56
13   Q   Stop right there. Can you stop right there? 12:12:02
14 I'm going to ask you a question about that. 12:12:05
15      So you've seen members of The Executioners gang 12:12:07
16 falsely state that someone is running with a gun; you've 12:12:13
17 seen that? 12:12:16
18     MR. IVIE: Objection; no foundation so the question 12:12:17
19 is leading and suggestive. 12:12:20
20     MR. SWEENEY: You can answer. 12:12:21
21     THE WITNESS: Yes. 12:12:25
22 BY MR. SWEENEY: 12:12:27
23   Q   Tell me when you've seen that. 12:12:27
24   A   There was an incident with Deputy ▮▮▮▮. I 12:12:29
25 believe Deputy ▮▮▮▮ was there and Deputy ▮▮▮▮ 12:12:39

**Page 68**

1 where there was a person who ran with a gun, and then 12:12:44
2 they -- oftentimes what they do is -- and we call it, 12:12:48
3 the rest of the deputies, we call it, you know, a ghost 12:12:52
4 gun or a ghost 417 because there was never a gun. 12:12:55
5      But in order to get all the deputies to come and 12:13:01
6 contain, they'll put out, "Hey, I saw a person with a 12:13:05
7 gun run from me in whatever direction," and they'll 12:13:09
8 start coordinating because, you know, a lot of times 12:13:15
9 they either have a hunch or they have information that 12:13:19
10 that person has a gun, but in reality they've never seen 12:13:24
11 the gun. And then at the end when their containments 12:13:27
12 are set up, you know, the gun is never recovered. You 12:13:31
13 know, they'll call it a day and say, "Thank you for 12:13:34
14 rolling. We're going to call it," and a gun was never 12:13:37
15 recovered. And there have been instances -- 12:13:39
16   Q   Can I stop you there? Is that a common practice 12:13:42
17 of the Executioners to call in a ghost gun? 12:13:47
18     MR. IVIE: Objection; lacks foundation; calls for 12:13:50
19 speculation and conjecture on the part of the witness. 12:13:53
20     MR. SWEENEY: You can answer. 12:13:55
21     THE WITNESS: Yes. 12:13:57
22     MR. SWEENEY: Thank you. 12:13:59
23     MR. IVIE: Leading and suggestive. 12:14:00
24 BY MR. SWEENEY: 12:14:02
25   Q   And so reports have to be generated when they 12:14:06

**Page 69**

1 arrest someone for this, as you call it, ghost gun 12:14:12
2 report; correct? 12:14:19
3   A   Depending. If there is a suspect arrested, then 12:14:20
4 yes. If there's force involved, then yes. 12:14:27
5   Q   Have you seen or heard where the Executioners 12:14:29
6 will falsify a police report about a ghost gun? 12:14:37
7     MR. IVIE: Objection; the question is compound; also 12:14:42
8 leading and suggestive; and no foundation. 12:14:44
9     MR. SWEENEY: You can answer. 12:14:47
10    THE WITNESS: I haven't seen one personally. 12:14:49
11 BY MR. SWEENEY: 12:14:51
12  Q   Okay. But how do you know that they do that? 12:14:51
13  A   Because I've been to calls or containments where 12:14:57
14 a gun was never recovered or the suspect was never 12:15:02
15 apprehended, but they'll put out over radio emergent 12:15:06
16 radio traffic saying that there is a person with a gun 12:15:11
17 running from them. 12:15:14
18  Q   Is that -- have you found that to be just a 12:15:15
19 pretext to stop them or arrest them? 12:15:18
20    MR. IVIE: Objection; leading; suggestive; calls for 12:15:21
21 speculation and conjecture; no foundation. 12:15:25
22    THE WITNESS: Personally, I've never done that. I 12:15:27
23 was always trained by both my training officers: If you 12:15:31
24 see it, put it out. If you don't see it, why are you 12:15:35
25 going to hurt your partners when they come out here? 12:15:39

18 (Pages 66 - 69)

| | |
|---|---|
| 1  BY MR. SWEENEY:                           12:15:42<br>2    Q  Have you seen any Executioner use this ghost gun  12:15:42<br>3  417 tactic?                                 12:15:47<br>4    A  Yes.                                   12:15:49<br>5    MR. IVIE:  Objection; leading and suggestive; and no  12:15:49<br>6  foundation.                                 12:15:52<br>7  BY MR. SWEENEY:                           12:15:52<br>8    Q  The answer is yes?                     12:15:53<br>9    A  Yes.                                   12:15:54<br>10   Q  And you've seen them, after they've put that  12:15:54<br>11  ghost 417 call out there, falsify in a police report  12:16:00<br>12  that they saw a gun?                         12:16:07<br>13   MR. IVIE:  Objection; leading; suggestive; no  12:16:08<br>14  foundation.                                 12:16:10<br>15   THE WITNESS:  I haven't seen a report personally.  12:16:10<br>16  BY MR. SWEENEY:                           12:16:13<br>17   Q  But you know it's done; is that correct?  12:16:14<br>18   MR. IVIE:  Objection.                   12:16:17<br>19   THE WITNESS:  I don't know about a report --  12:16:18<br>20   MR. IVIE:  Objection; no foundation.     12:16:20<br>21   THE WITNESS:  I don't know if it's reflected on a  12:16:21<br>22  report.  From personal experience and from what I've  12:16:24<br>23  heard and when we respond to those containments, it's  12:16:27<br>24  that they'll put out the 417 that a person with a gun is  12:16:32<br>25  running from them through emergent traffic, and at the  12:16:36<br>Page 70 | 1    Q  I don't want you to speculate, but based on your  12:18:11<br>2  observations, what is your belief as to why they don't  12:18:13<br>3  allow African-Americans?                     12:18:16<br>4    MR. IVIE:  Objection; calls for speculation and  12:18:19<br>5  conjecture on the part of the witness; no foundation for  12:18:22<br>6  this witness's testimony.                   12:18:25<br>7    MR. SWEENEY:  You can answer.           12:18:28<br>8    THE WITNESS:  I don't know other than to appear  12:18:29<br>9  tougher.  I wouldn't know.                   12:18:32<br>10  BY MR. SWEENEY:                           12:18:34<br>11   Q  Do you believe this is a racist gang?  12:18:34<br>12   MR. IVIE:  Objection; leading; suggestive; no  12:18:39<br>13  foundation.                                 12:18:41<br>14   THE WITNESS:  I don't.                  12:18:42<br>15  BY MR. SWEENEY:                           12:18:43<br>16   Q  Okay.  But you just know there's no     12:18:44<br>17  African-American or female members; correct?  12:18:45<br>18   A  Correct.                               12:18:48<br>19   Q  All right.  Let's move on.  You say that  12:18:49<br>20  "The Executioners recruit members at Compton based upon  12:19:03<br>21  a prospect's use of violence against a suspect or other  12:19:08<br>22  deputies."  Is that true?                   12:19:12<br>23   MR. IVIE:  Objection; calls for a conclusion on the  12:19:15<br>24  part of this witness; lacks foundation.      12:19:19<br>25   THE WITNESS:  Can you repeat that question and can  12:19:22<br>Page 72 |
| 1  end of everything, no gun is recovered.      12:16:40<br>2  BY MR. SWEENEY:                           12:16:43<br>3    Q  Does that happen quite often with         12:16:45<br>4  The Executioners?                           12:16:47<br>5    MR. IVIE:  Objection; leading; suggestive; and no  12:16:48<br>6  foundation.                                 12:16:50<br>7  BY MR. SWEENEY:                           12:16:51<br>8    Q  What was your answer, sir?              12:16:51<br>9    A  Yes.                                   12:16:53<br>10   Q  You mentioned -- I wanted to get to this later  12:16:53<br>11  -- that there are no -- that African-Americans and  12:17:07<br>12  females are not allowed in The Executioners.  Is that  12:17:14<br>13  what your -- what you state in your claim?  12:17:19<br>14   A  Yes, yes.                              12:17:21<br>15   Q  Why is this?                           12:17:22<br>16   A  Oh, I don't know.  I don't know why they  12:17:26<br>17  wouldn't -- why they don't ink Blacks or females.  We've  12:17:31<br>18  always -- and I say "we", you know, deputies who are not  12:17:39<br>19  inked, we've always wondered, you know, why not?  You  12:17:43<br>20  know, if it's about work, hard work and, you know, doing  12:17:47<br>21  their job well, there's a lot of Black deputies who are  12:17:52<br>22  outstanding deputies.  There are a lot of female  12:17:57<br>23  deputies who, you know, can outshine a lot of male  12:17:59<br>24  deputies, so I don't know why.  I mean, I can leave that  12:18:05<br>25  up to --                                   12:18:10<br>Page 71 | 1  you repeat its source?                       12:19:25<br>2  BY MR. SWEENEY:                           12:19:27<br>3    Q  Yes.  The source is your claim that you filed,  12:19:27<br>4  and you said that "The Executioners recruit members at  12:19:32<br>5  Compton station based upon the prospect's use of  12:19:36<br>6  violence against suspects and other deputies."  Is that  12:19:41<br>7  true?                                       12:19:49<br>8    MR. IVIE:  Again, lacks foundation; calls for a  12:19:50<br>9  conclusion on the part of this witness.      12:19:53<br>10   THE WITNESS:  Yes.                      12:19:55<br>11  BY MR. SWEENEY:                           12:19:56<br>12   Q  Okay.  You say that "nearly all of the Compton  12:20:02<br>13  deputies who have been involved in high profile  12:20:06<br>14  shootings and out-of-policy beatings at Compton in  12:20:09<br>15  recent years have been inked members of      12:20:14<br>16  The Executioners."  Is that true?            12:20:17<br>17   MR. IVIE:  Objection -- excuse me, Mr. ▓▓▓▓▓▓.  I'm  12:20:20<br>18  trying to make an objection.                 12:20:25<br>19     Objection; lacks foundation; leading and  12:20:27<br>20  suggestive; and also calls for a conclusion on the part  12:20:32<br>21  of this witness.                            12:20:35<br>22   MR. SWEENEY:  You can answer.           12:20:36<br>23   THE WITNESS:  I'm sorry.  Can you repeat the  12:20:39<br>24  question?                                   12:20:40<br>25  ///                                        12:20:40<br>Page 73 |

```
                                                   Page 74
 1   BY MR. SWEENEY:                                  12:20:41
 2   Q   Sure.  "Nearly all Compton deputies who have  12:20:41
 3   been involved in high profile shootings and      12:20:46
 4   out-of-policy beatings at Compton station in recent 12:20:50
 5   years have been inked members of The Executioners."  Is  12:20:54
 6   that true?                                       12:20:57
 7   A   A vast majority and/or prospects.            12:20:57
 8   Q   How do you know that?                        12:21:02
 9   A   It's -- well, number one, common knowledge, and  12:21:04
10   it's, you know, what we've -- what we've seen at the  12:21:10
11   station.  You know, after deputies get into either force  12:21:15
12   or a number of forces, you know, force incidents  12:21:21
13   combined, you know, soon after they get inked.   12:21:25
14   Q   Okay.  So you say high profile shootings.  How  12:21:29
15   about the shooting of -- do you know of the shooting of  12:21:34
16   ▇▇▇▇▇▇▇▇▇?                                       12:21:42
17   A   I don't remember that shooting.              12:21:46
18   Q   Do you know a deputy by the name of          12:21:48
19   ▇▇▇▇▇?                                           12:21:58
20   A   No.                                          12:21:58
21   Q   Okay.  How about this latest shooting of     12:21:59
22   ▇▇▇▇▇▇▇, was that done by an inked member or a  12:22:06
23   prospect of The Executioners?                    12:22:09
24   A   A prospect.                                  12:22:11
25   Q   And who was that prospect; do you know?      12:22:13
```

```
                                                   Page 75
 1      MR. IVIE:  Lacks foundation; speculation and  12:22:16
 2   conjecture on the part of the witness.           12:22:20
 3      THE WITNESS:  Deputy ▇▇▇ and Deputy ▇▇▇▇▇▇.   12:22:22
 4   BY MR. SWEENEY:                                  12:22:27
 5   Q   Are you familiar with the case where         12:22:30
 6   Sheldon Lockett was accused of a 417, and he was chased  12:22:38
 7   and beaten; are you familiar with that case?     12:22:42
 8   A   A little bit.  I know it was a little while  12:22:47
 9   ago.                                             12:22:49
10   Q   Tell me what you know about that case.  Strike  12:22:49
11   that.  Strike that.  Hold on.  Strike that.      12:22:59
12      There was a 417 call, but no gun was found.  Had  12:23:02
13   you heard that that was one of those ghost 417 calls?  12:23:07
14      MR. IVIE:  Objection; leading; suggestive; no  12:23:11
15   foundation for the witness's testimony.          12:23:14
16      THE WITNESS:  I didn't know about that force incident  12:23:16
17   or about that incident itself until recently.  You have  12:23:20
18   to remember, we get so many incidents with force and,  12:23:24
19   you know, involving suspects with guns that, you know, a  12:23:31
20   lot of times it's hard to keep up.  So I heard about the  12:23:36
21   Lockett case, you know, not too long ago.        12:23:40
22   BY MR. SWEENEY:                                  12:23:43
23   Q   Okay.  Who did you hear about it from?  Anybody  12:23:43
24   but your lawyer.  I don't want to know about     12:23:51
25   communications between you and your lawyer.  Did you  12:23:53
```

```
                                                   Page 76
 1   hear about it from someone other than your lawyer?  12:23:56
 2   A   I had heard about it maybe about six months ago  12:23:58
 3   maybe and then -- but I didn't know anything about the  12:24:04
 4   case, and then my attorney gave me, you know --  12:24:08
 5   Q   Okay.  All right.  Let's move on.  What other  12:24:13
 6   high profile shootings that you can think of off the top  12:24:25
 7   of your head have The Executioners been involved in  12:24:28
 8   recently?                                        12:24:33
 9      MR. IVIE:  Objection; lacks foundation.       12:24:37
10      THE WITNESS:  Well, we have the Aldama and ▇▇▇▇ one  12:24:39
11   with ▇▇▇▇▇.  There was -- ▇▇▇▇▇▇ was involved in  12:24:50
12   one, and I can't remember who his partner was or exactly  12:25:03
13   when that happened.  And then there was -- it was  12:25:09
14   Deputy --                                        12:25:38
15   BY MR. SWEENEY:                                  12:25:39
16   Q   That's okay.                                 12:25:39
17   A   I can't remember, yeah.                      12:25:40
18   Q   That's okay.  Let's move on.  And we'll have to  12:25:41
19   take a break in about five minutes.  I think we're all  12:25:45
20   getting tired here.                              12:25:49
21      Okay.  You say in here in your claim:  "Deputies  12:26:25
22   involved in fatal shootings at Compton had immediately  12:26:29
23   been inked with the organization having inking parties  12:26:32
24   to celebrate Executioner-member-involved shootings as  12:26:37
25   well as the" --                                  12:26:43
```

```
                                                   Page 77
 1      THE COURT REPORTER:  I'm sorry.  Can you repeat that?  12:26:48
 2   BY MR. SWEENEY:                                  12:26:50
 3   Q   Yeah.  "Deputies involved."                  12:26:50
 4      MR. IVIE:  Counsel, can you cite the quote and the  12:26:59
 5   approximate location of the testimony that you're  12:27:05
 6   reading from?                                    12:27:07
 7      MR. GLICKMAN:  I'll put it up on the screen here.  12:27:11
 8      MR. IVIE:  Mr. Glickman, which page is that?  12:27:21
 9      MR. SWEENEY:  Page 1 of 10, last paragraph.  How's  12:27:26
10   that?                                            12:27:26
11      The dog was alerting.  Sorry.                 12:27:57
12   BY MR. SWEENEY:                                  12:28:04
13   Q   Do you see this where I'm reading,           12:28:05
14   Deputy ▇▇▇▇▇?                                    12:28:10
15   A   Yes.                                         12:28:12
16   Q   "Deputies involved in fatal shootings at Compton  12:28:12
17   have immediately been inked."  Is that true?     12:28:16
18      MR. IVIE:  Objection; it's leading; suggestive; calls  12:28:20
19   for a conclusion on the part of this witness and no  12:28:23
20   foundation for this witness's testimony.         12:28:25
21   BY MR. SWEENEY:                                  12:28:28
22   Q   Is that true, sir?                           12:28:28
23   A   Yes.                                         12:28:28
24   Q   Would the organization have inking parties?  We  12:28:29
25   talked about that.  That's true; correct?        12:28:36
```

20 (Pages 74 - 77)