```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                       ---oOo---
 4   SHELDON LOCKETT; MICHELLE
     DAVIS; AND CLYDE DAVIS,
 5
                 PLAINTIFFS,
 6
                    VS.            NO. 18-CV-5838-PJW
 7
     COUNTY OF LOS ANGELES, A
 8   PUBLIC ENTITY; LOS ANGELES
     COUNTY SHERIFF'S DEPARTMENT,
 9   A LAW ENFORCEMENT AGENCY;
     SHERIFF JIM MCDONNELL;
10   MIZRAIN ORREGO, A DEPUTY LOS
     ANGELES COUNTY SHERIFF; AND
11   DOES 1 THROUGH 100,
     INCLUSIVE,
12
                 DEFENDANTS.
13   _____/
14
15
16          REMOTE VIDEOTAPED DEPOSITION OF
17                  MIZRAIN ORREGO
18        _____
19              FRIDAY, MAY 8, 2020
20
21
22   JOB NO. 4082830
23   REPORTED BY:
24   HOLLY THUMAN, CSR NO. 6834, RMR, CRR
25   PAGES 1-236
```

Page 1

```
 1              MR. HURRELL:  What's the question again?     11:15:05
 2       BY MR. SWEENEY:                                     11:15:08
 3           Q.  Tell me about all tattoos on your body.     11:15:10
 4       That's my question.                                 11:15:12
 5              MR. HURRELL:  Well, no.  I don't think       11:15:14
 6       you're allowed to ask that question.                11:15:15
 7              MR. SWEENEY:  Why?                           11:15:19
 8              MR. HURRELL:  Well, I think you first have   11:15:20
 9       to ask whether he has any other tattoos on his body 11:15:22
10       because the question assumes a fact not             11:15:25
11       established.                                        11:15:27
12              MR. SWEENEY:  Okay.  All right.              11:15:29
13           Q.  So do you have -- let me rephrase the       11:15:32
14       question.                                           11:15:38
15              How many tattoos do you have on your body?   11:15:40
16           A.  One.                                        11:15:44
17              MR. SWEENEY:  That answers the question.     11:15:46
18              See, Mr. Hurrell?  Okay.                     11:15:48
19           Q.  So we know that tattoo is on your leg.      11:15:57
20       Correct?                                            11:16:02
21           A.  Yes.                                        11:16:02
22           Q.  Is it on your right leg or your left leg?   11:16:02
23           A.  My right leg.                               11:16:05
24           Q.  And that tattoo is the one that your        11:16:08
25       counsel sent over to Mr. Glickman this morning.     11:16:17
```

Personal Court Reporters, A Veritext Company
818-988-1900

| | | |
|---|---|---|
| 1 | Correct? | 11:16:19 |
| 2 | A. Yes. | 11:16:20 |
| 3 | Q. It's the same tattoo as your former | 11:16:22 |
| 4 | partner, Samuel Aldama. Correct? | 11:16:27 |
| 5 | A. Yes. | 11:16:30 |
| 6 | Q. And does it have a helmet with the "CPT" | 11:16:32 |
| 7 | inscription on it like Mr. Aldama's? | 11:16:45 |
| 8 | A. Yes. | 11:16:49 |
| 9 | Q. Does it have a skeleton with -- surrounded | 11:16:50 |
| 10 | by flames? | 11:16:53 |
| 11 | A. Yes. | 11:16:55 |
| 12 | Q. Is the skeleton holding a | 11:16:57 |
| 13 | Kalashnikov-style rifle? | 11:17:02 |
| 14 | A. Yes. | 11:17:05 |
| 15 | Q. On the magazine of the rifle, is there a | 11:17:07 |
| 16 | Roman numeral inscription "XXVIII"? | 11:17:15 |
| 17 | A. I believe so, sir. I need to -- I would | 11:17:24 |
| 18 | have to look at it; but yes, I would say yes. | 11:17:26 |
| 19 | Q. Yeah, well, that's 28 in Roman numerals. | 11:17:29 |
| 20 | Correct? | 11:17:32 |
| 21 | A. Correct. | 11:17:33 |
| 22 | Q. And do you know what substation Compton is | 11:17:33 |
| 23 | designated as in the County of Los Angeles, what | 11:17:39 |
| 24 | number? | 11:17:43 |
| 25 | A. 28, sir. | 11:17:44 |

Page 38

```
 1        Q.   Yeah.  That's why the 28 is on there.           11:17:45
 2   Correct?                                                  11:17:48
 3        A.   No, sir.                                        11:17:51
 4        Q.   No?                                             11:17:53
 5             Why is there "28" on there?                     11:17:54
 6             THE WITNESS:  Can I speak to you?               11:17:59
 7             (Witness and counsel confer briefly.)           11:18:00
 8             THE WITNESS:  Well, I'm sorry.                  11:18:06
 9             Can you repeat that last question again?        11:18:07
10   BY MR. SWEENEY:                                           11:18:09
11        Q.   Why is that Roman numeral 28 on the             11:18:09
12   magazine of the skeleton's rifle?                         11:18:12
13        A.   Yes, 'cause that's the number for Compton       11:18:16
14   station.                                                  11:18:18
15        Q.   Okay.  Now, on the stock of the gun, is         11:18:21
16   there a number?                                           11:18:31
17        A.   No.                                             11:18:35
18        Q.   When did you get that tattoo?                   11:18:38
19        A.   Approximately, I'll say, a year and a half      11:18:39
20   ago, two years ago.                                       11:18:45
21        Q.   Give me the month and the year.                 11:18:48
22        A.   It was --                                       11:18:51
23             MR. HURRELL:  You can certainly give him        11:18:57
24   the year.                                                 11:18:58
25             THE WITNESS:  It was 2018, sir.                 11:18:59
```

Page 39

```
 1    BY MR. SWEENEY:                                          11:19:01
 2         Q.  What month?                                     11:19:03
 3         A.  I believe it was a summer month, sir.           11:19:08
 4         Q.  I'm going to give you a chance to answer        11:19:13
 5    that question again.                                     11:19:15
 6             Here's the question, another question:          11:19:17
 7             Are you sure that you got that tattoo in        11:19:20
 8    2018?                                                    11:19:23
 9         A.  Yes.                                            11:19:27
10         Q.  You're under oath, sir.                         11:19:33
11             MR. HURRELL:  He realizes that.                 11:19:44
12             (Reporter requested clarification.)             11:19:49
13    BY MR. SWEENEY:                                          11:19:49
14         Q.  Are you telling the truth, sir?                 11:19:54
15         A.  Yes.                                            11:19:56
16         Q.  Before I get into the specifics of the --       11:20:02
17    well, when you got it, where, and all that, let me       11:20:07
18    ask you:  When you got the tattoo, was there a           11:20:13
19    number on the stock of the rifle?                        11:20:22
20         A.  No.                                             11:20:29
21         Q.  When -- subsequent to you getting that          11:20:35
22    tattoo placed on, did you get a number placed on         11:20:41
23    that stock after you got the tattoo on?                  11:20:47
24         A.  No.                                             11:20:52
25         Q.  At any time before this deposition -- that      11:21:01
```

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1    the exact timing, sir.                                    11:46:18
 2         Q.   Okay.  Where did you get your tattoo?           11:46:26
 3         A.   Vegas, sir.                                     11:46:37
 4         Q.   What's that?                                    11:46:38
 5         A.   In Vegas.                                       11:46:39
 6         Q.   In Las Vegas?                                   11:46:42
 7         A.   Yes.                                            11:46:43
 8         Q.   Is there a group of deputies -- or strike       11:46:43
 9    that.                                                     11:46:58
10              Was there, when you were a deputy there, a      11:47:00
11    group of deputies at the sheriff's station with           11:47:02
12    that tattoo?                                              11:47:05
13         A.   I'm sorry.  Can you repeat that question,       11:47:08
14    please, sir?                                              11:47:10
15         Q.   Yes.  Was there a group of deputies with        11:47:11
16    the same tattoo at the Compton station the same           11:47:15
17    time you were there?                                      11:47:19
18         A.   It's possible, sir.                             11:47:24
19         Q.   And so you knew there was a group.              11:47:29
20    Correct?                                                  11:47:31
21         A.   Can you explain -- a group of what, sir?        11:47:35
22         Q.   A group of deputies with a similar tattoo.      11:47:38
23         A.   Well, sir, there's a lot of -- I mean, are      11:47:46
24    you talking about the same tattoo Aldama has, or --       11:47:51
25    I'm not sure where you're going because in the            11:47:54
```

Page 48

| | | |
|---|---|---|
| 1 | we weren't specifically looking for the gun -- for | 14:13:34 |
| 2 | the shooter of -- the GSV.  We weren't there -- | 14:13:38 |
| 3 | that's what took us to the area, but that's not | 14:13:44 |
| 4 | exactly what we were doing. | 14:13:46 |
| 5 |     Q.  Oh, God. | 14:13:49 |
| 6 |     What were you exactly doing, then? | 14:13:49 |
| 7 |     A.  Patrolling the neighborhood. | 14:13:53 |
| 8 |     Q.  For the suspect.  Correct? | 14:13:55 |
| 9 |     You can't separate the two, sir.  You've | 14:14:00 |
| 10 | already said you heard the radio call, and you | 14:14:02 |
| 11 | decided to go to the rival gang area. | 14:14:04 |
| 12 |     MR. ALTURA:  This is Jack Altura. | 14:14:09 |
| 13 |     I'll object to that testimony by counsel. | 14:14:10 |
| 14 |     MR. HURRELL:  Yeah.  Is there a question, | 14:14:13 |
| 15 | John? | 14:14:14 |
| 16 |     MR. SWEENEY:  Yeah. | 14:14:14 |
| 17 | BY MR. SWEENEY: | 14:14:14 |
| 18 |     Q.  The question is:  You went to that area to | 14:14:15 |
| 19 | search for a suspect to the shooting.  Correct? | 14:14:19 |
| 20 |     A.  Yes, sir. | 14:14:25 |
| 21 |     Q.  Okay.  All right.  And so you had heard | 14:14:26 |
| 22 | that gunshots were involved.  Correct? | 14:14:30 |
| 23 |     A.  Yes, sir. | 14:14:36 |
| 24 |     Q.  And your -- that heightened your anxiety, | 14:14:38 |
| 25 | didn't it? | 14:14:43 |

Page 116

| | | |
|---|---|---|
| 1 | suspect in the shooting.  Correct? | 14:41:38 |
| 2 | MR. HURRELL:  This is Tom Hurrell. | 14:41:49 |
| 3 | I'm sorry, John, I don't understand your | 14:41:51 |
| 4 | question. | 14:41:53 |
| 5 | MR. SWEENEY:  I'm sorry, I didn't hear | 14:41:54 |
| 6 | you, Tom. | 14:41:55 |
| 7 | MR. HURRELL:  I don't understand your | 14:41:57 |
| 8 | question. | 14:41:58 |
| 9 | BY MR. SWEENEY: | 14:42:00 |
| 10 | Q.  The question is -- I mean, that may have, | 14:42:00 |
| 11 | as you say, been legal -- your legal reason for | 14:42:03 |
| 12 | getting out of the car, but your real reason -- | 14:42:07 |
| 13 | your legal reason to establish PC, probable | 14:42:13 |
| 14 | cause -- but the real reason you were there is | 14:42:16 |
| 15 | because you were looking for the suspects in this | 14:42:18 |
| 16 | shooting.  Correct? | 14:42:21 |
| 17 | A.  Yes -- yes, sir, but I wasn't going to | 14:42:26 |
| 18 | make a suspect happen if it's not there. | 14:42:28 |
| 19 | You know, I'm there, patrolling the | 14:42:31 |
| 20 | neighborhood of Compton that -- which is what I | 14:42:32 |
| 21 | did, and I just happened to stumble upon them. | 14:42:35 |
| 22 | Q.  Yeah, but, I mean -- yes, really, if | 14:42:38 |
| 23 | you're -- if you're in an anxious state, there had | 14:42:41 |
| 24 | been a shooting, you're trying to solve it, which a | 14:42:47 |
| 25 | good police officer does, you're not going to | 14:42:50 |

Page 133

| | | |
|---|---|---|
| 1 | A. Yes, sir. | 14:58:21 |
| 2 | Q. Was he walking at that point, Mr. Lockett? | 14:58:22 |
| 3 | A. There began -- the males began to | 14:58:27 |
| 4 | disassociate themselves from one another, and -- | 14:58:29 |
| 5 | yes. And then he, Mr. Lockett, started basically | 14:58:35 |
| 6 | walking away from the other male and away from | 14:58:38 |
| 7 | Deputy Aldama. | 14:58:44 |
| 8 | Q. Okay. What happened next? | 14:58:47 |
| 9 | A. Mr. Lockett turned around east and then | 14:58:55 |
| 10 | took off running, pulled out a weapon from his | 14:58:58 |
| 11 | waistband. | 14:59:03 |
| 12 | And then after that, he left northbound on | 14:59:03 |
| 13 | Tajauta toward Rosecrans. | 14:59:08 |
| 14 | Q. You said he took off running, and he | 14:59:11 |
| 15 | pulled a gun out of his waistband. Correct? | 14:59:13 |
| 16 | A. Correct, sir. | 14:59:17 |
| 17 | Q. So his back was to you when he pulled out | 14:59:17 |
| 18 | this gun. Correct? | 14:59:20 |
| 19 | A. Yes, sir. | 14:59:21 |
| 20 | Q. Now, did you actually see the gun, sir? | 14:59:36 |
| 21 | A. Yes, sir. | 14:59:39 |
| 22 | Q. As a matter of fact, in the stop and chase | 14:59:43 |
| 23 | of Dante Taylor, which you are familiar with, you | 14:59:51 |
| 24 | said that he had a gun. Same thing. Correct? | 14:59:56 |
| 25 | A. Correct, sir. | 15:00:00 |

Page 146

```
 1        A.   I don't remember if I did it or not, but a      15:35:12
 2   containment was set.                                      15:35:15
 3             I remember walking the path.  I remember        15:35:18
 4   us calling the gun dog so he could come and sniff         15:35:23
 5   the path of Mr. Lockett.                                  15:35:27
 6             That's -- that's all I recall at this           15:35:35
 7   time.                                                     15:35:37
 8             (Reporter requested clarification.)             15:35:49
 9   BY MR. SWEENEY:                                           15:35:49
10        Q.   The gun dog never alerted along the path,       15:35:50
11   did he?                                                   15:35:54
12        A.   I don't recall his findings.                    15:35:55
13        Q.   You never found a gun, did you?                 15:35:59
14        A.   No, sir.                                        15:36:01
15        Q.   No one in the sheriff department found a        15:36:02
16   gun, did they?                                            15:36:07
17        A.   No, sir.                                        15:36:08
18             MR. SWEENEY:  Let's -- at this point,           15:36:14
19   Mr. Glickman, can we play the broadcast?                  15:36:16
20        Q.   And before -- while he's cueing that up,        15:36:21
21   who was it who made the 417 call?                         15:36:24
22             Was that you?                                   15:36:27
23        A.   I don't recall, sir.                            15:36:30
24        Q.   Well, we're going to play a tape for you.       15:36:31
25             MR. GLICKMAN:  So just for the record,          15:36:37
```

| | | |
|---|---|---|
| 1 | MR. HURRELL: You misspoke, John. | 16:55:13 |
| 2 | THE WITNESS: You said "throughout the | 16:55:15 |
| 3 | arrest." | 16:55:16 |
| 4 | BY MR. SWEENEY: | 16:55:17 |
| 5 | Q. I'm sorry. Throughout the investigation. | 16:55:18 |
| 6 | A. I believe that that's a question that you | 16:55:20 |
| 7 | need to ask Aldama because I'm not sure -- to me, | 16:55:21 |
| 8 | "throughout the investigation" can be from point -- | 16:55:24 |
| 9 | from the time the suspect gets -- you know, you | 16:55:27 |
| 10 | have contact with the suspect to the time that the | 16:55:31 |
| 11 | detective -- you know, the case gets turned over to | 16:55:35 |
| 12 | detectives, you know. | 16:55:38 |
| 13 | So I -- it could be anywhere from five | 16:55:40 |
| 14 | minutes to a full month of -- | 16:55:42 |
| 15 | Q. Okay. So at the time -- you said the | 16:55:44 |
| 16 | starting point theoretically he could be talking | 16:55:47 |
| 17 | about is from the time of the contact. | 16:55:51 |
| 18 | At the time of the contact, did you feel | 16:55:54 |
| 19 | that he fit the suspect of the shooting's | 16:55:58 |
| 20 | description? | 16:56:01 |
| 21 | A. Yes, sir. | 16:56:03 |
| 22 | Q. Thank you. All right. | 16:56:05 |
| 23 | You had limited information that we just | 16:56:14 |
| 24 | heard an hour or so ago that was broadcast over the | 16:56:17 |
| 25 | dispatch; that is, black, male, blue beanie, silver | 16:56:21 |

Page 219

```
 1    Pontiac.                                                  16:56:33
 2            What in those -- in that description fit           16:56:38
 3    the suspect, or fit Mr. Lockett?                           16:56:43
 4        A.   Well, sir, I think that you're forgetting         16:56:49
 5    our initial contact was not over anything related          16:56:53
 6    to the 245, you know, other than that's the reason         16:56:56
 7    why we were in that area, you know.                        16:57:01
 8            And "throughout the investigation,"                16:57:07
 9    meaning okay, now we arrested the guy that we saw          16:57:08
10    holding a gun, we have him detained, and then              16:57:12
11    the -- the victim gets brought, and then she               16:57:18
12    positively identifies Mr. Lockett as the suspect of        16:57:21
13    the shooting, that's -- you know, that's the               16:57:26
14    totality of that, of his arrest.  That is the              16:57:30
15    reason why we arrested him.                                16:57:34
16        Q.   Thank you.                                        16:57:37
17            MR. SWEENEY:  If we go on to your actual           16:57:40
18    report -- can we go to page 1 of 2 of Mr. Orrego's         16:57:43
19    report; put it up there?                                   16:57:48
20            MR. GLICKMAN:  I'm looking at it, but you          16:58:00
21    guys don't see it.                                         16:58:01
22            MR. SWEENEY:  What's that?                         16:58:03
23            MR. GLICKMAN:  I was looking at it, but I          16:58:05
24    didn't have it on screen share.                            16:58:07
25    //
```

Page 220

```
 1                  UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4     SHELDON LOCKETT; MICHELLE    )
       DAVIS; AND CLYDE DAVIS,      )
 5                                  )
               PLAINTIFFS,          )
 6                                  ) CASE NO. 18-CV-5838-PJW
           VS.                      )
 7                                  )
       COUNTY OF LOS ANGELES, A     )
 8     PUBLIC ENTITY; LOS ANGELES   )
       COUNTY SHERIFF'S DEPARTMENT, A)
 9     LAW ENFORCEMENT AGENCY;      )
       SHERIFF JIM MCDONNELL; MIZRAIN)
10     ORREGO, A DEPUTY LOS ANGELES )
       COUNTY SHERIFF; AND DOES 1   )
11     THROUGH 100, INCLUSIVE,      )
                                    )
12             DEFENDANTS.          )
13     _____)
14         PORTIONS OF THIS TRANSCRIPT ARE CONFIDENTIAL
15
16      REMOTE VIDEOTAPED VIDEOCONFERENCED DEPOSITION OF
17                       MIZRAIN ORREGO
18                    FRIDAY, MAY 22, 2020
19                         VOLUME II
20     JOB NO. 4116350-1
21     REPORTED BY:  TAMARA L. CARLSON
22     CSR NO. 12555
23
24     PAGES 237 - 293
25     PAGES 277 - 289 ARE CONFIDENTIAL AND ARE BOUND SEPARATELY
```

Page 237

```
 1   BY MR. SWEENEY:                                          10:59
 2      Q.   Tell me -- go through the checklist.  You
 3   had started it and you stopped.  Go through the
 4   checklist.
 5      A.   I'm extremely confused by your question          11:00
 6   because the -- I didn't know I had the suspect.  The
 7   reason why we initiated contact with him was for
 8   other reasons and based on the totality of the case.
 9   I don't know how long the case -- the case took or
10   how we determined that he was possibly involved in      11:00
11   this crime.  I just don't recall, sir.
12      Q.   That's your answer?
13      A.   Yes, sir.
14      Q.   Final answer?
15           MR. HURRELL:  That's his answer.                 11:00
16           MR. SWEENEY:  Okay.
17   BY MR. SWEENEY:
18      Q.   Okay.  Were you ever contacted by anyone
19   within the Sheriff's Department about your
20   involvement in a group of tattooed deputies at the      11:01
21   Compton Station?
22           MR. HURRELL:  John, I'm going to object
23   because that assumes a fact not established that he
24   is involved or was involved.
25           MR. SWEENEY:  Okay.  That's fine.                11:01
```

Page 267

```
 1              MR. ALTURA:  I'll join that objection, and      11:01
 2     I'll just also object that it assumes that there is
 3     a group of tattooed deputies at the Compton Station.
 4     BY MR. SWEENEY:
 5          Q.   You may answer.                                11:02
 6          A.   No, I was never contacted by the
 7     Department.
 8          Q.   You were never contacted by the Department;
 9     is that correct?
10          A.   Yes.                                           11:02
11          Q.   Were you ever contacted by the Department
12     to be asked about your partner Aldama's involvement
13     in such a group?
14              MR. ALTURA:  Objection.  That assumes facts
15     and lacks foundation.                                    11:02
16              MR. HURRELL:  You can answer.
17              THE WITNESS:  I was never contacted.
18     BY MR. SWEENEY:
19          Q.   You were never contacted by Captain
20     Thatcher asking you questions about a group of           11:02
21     tattooed deputies?
22          A.   I was never contacted by anyone in the
23     Sheriff's Department.
24          Q.   Were you ever contacted by anyone in the
25     Sheriff's Department questioning you about your          11:03
```

Page 268

| | | |
|---|---|---|
| 1 | spike in arrests of African Americans in the year | 11:03 |
| 2 | 2017? | |
| 3 | MR. HURRELL: I'm going to object it's | |
| 4 | asking a fact not established. But he can answer, | |
| 5 | was he ever contacted regarding arrests of African | 11:03 |
| 6 | Americans. | |
| 7 | MR. ALTURA: I'll join. | |
| 8 | BY MR. SWEENEY: | |
| 9 | Q. You can answer. | |
| 10 | A. No. | 11:03 |
| 11 | MR. SWEENEY: Can you, Mr. Glickman, put up | |
| 12 | the exhibit of captain Thatcher's memo. | |
| 13 | MR. GLICKMAN: Yeah, just give me a second. | |
| 14 | Just give me a second. | |
| 15 | BY MR. SWEENEY: | 11:04 |
| 16 | Q. While he's looking for that, Mr. Orrego, | |
| 17 | were you ever contacted by the Sheriff's Department | |
| 18 | Internal Affairs Bureau about the issue of a | |
| 19 | tattooed group? | |
| 20 | A. No, sir. | 11:05 |
| 21 | Q. Do you know anyone who was contacted, if | |
| 22 | you have personal knowledge that they were | |
| 23 | contacted? | |
| 24 | A. No, sir. | |
| 25 | Q. Were you told by your former partner, | 11:05 |

Page 269

```
1              MR. SWEENEY:  I'm not going to tell you.      11:24
2              MR. ALTURA:  Okay.
3    BY MR. SWEENEY:
4         Q.   One final question, I just want to clear up
5    the record.  Did you at any time on January 15,          11:24
6    2016, see a blue beanie that was associated with
7    Sheldon Lockett?
8         A.   I don't recall, sir.
9         Q.   Well, you didn't put in your report that
10   there was a beanie associated with Mr. Lockett, did      11:25
11   you?
12        A.   If I could refer to my report, I would be
13   able to answer that question.
14        Q.   You can refer to your report.
15        A.   No, sir.                                       11:26
16             MR. SWEENEY:  Thank you.
17             I have no further questions.
18             MR. ALTURA:  This is Jack Altura for the
19   County.  I have a few very, very brief questions for
20   you, Mr. Orrego.                                          11:26
21             I just want to confirm that we're still --
22   that this portion is still being designated
23   confidential, Madam Court Reporter?
24             THE REPORTER:  Yes.
25   ///
```

Page 284

```
1                    EXAMINATION                           11:26
2   BY MR. ALTURA:
3       Q.   Mr. Orrego, were you aware that
4   Deputy Aldama was diagnosed with an illness in 2018?
5       A.   Yes, sir.                                     11:27
6       Q.   And do you know what that illness was?
7       A.   Yes, sir.
8            MR. PONGRACZ:  Objection.  Third party
9   privacy.
10           Go ahead.                                     11:27
11           (The reporter requested clarification.)
12           MR. PONGRACZ:  Andrew Pongracz for
13  Deputy Aldama, whose privacy and private medical
14  conditions we're discussing.
15  BY MR. ALTURA:                                         11:27
16      Q.   And I don't want you to get into the
17  specifics, but very broadly can you tell us what
18  that illness is?
19           MR. PONGRACZ:  Objection.  Third party
20  privacy and medical privacy.  HIPAA.                   11:27
21           Go ahead.
22           THE WITNESS:  Cancer.
23  BY MR. ALTURA:
24      Q.   In your mind was that diagnosis of --
25  diagnosis of cancer a serious illness?                 11:27
```

Page 285

| | | |
|---|---|---|
| 1 | A. Very serious. | 11:27 |
| 2 | Q. And when did you find out that Mr. -- | |
| 3 | excuse me, that Deputy Aldama had this diagnosis? | |
| 4 | A. I believe it was -- I'm sorry, summertime | |
| 5 | of 2018, sir. | 11:28 |
| 6 | Q. So summertime, does that mean June, July, | |
| 7 | or August of 2017? | |
| 8 | A. Yes, sir. | |
| 9 | Q. All right. You -- | |
| 10 | MR. HURRELL: 2018. | 11:28 |
| 11 | MR. ALTURA: Thank you, Mr. Hurrell. | |
| 12 | BY MR. ALTURA: | |
| 13 | Q. So that would be -- just to correct the | |
| 14 | record, Mr. Orrego, it would be June, July, or | |
| 15 | August of 2018? | 11:28 |
| 16 | A. Yes, sir, I believe so. | |
| 17 | Q. And can you narrow that down any further to | |
| 18 | one or two months? | |
| 19 | A. I don't remember the exact months. | |
| 20 | Q. I understand, sir. | 11:28 |
| 21 | How did you found -- how did you find out | |
| 22 | about Mr. -- excuse me, Deputy Aldama's illness? | |
| 23 | A. I don't recall. He may have called me or | |
| 24 | we may have found out through his family. | |
| 25 | Q. And did your getting the tattoo on your | 11:29 |

```
1    calf have anything to do with the fact that Deputy        11:29
2    Aldama was diagnosed with this serious illness?
3         A.    100 percent.
4         Q.    And can you explain in what way that
5    diagnosis affected you -- your getting the tattoo?        11:29
6         A.    Well, sir, we both gave our life, you know,
7    for -- to serve the community in Compton; and,
8    you know, I was no longer part of doing what I love
9    to do.  You know, I was like jobless at home and my
10   partner was going through a very hard time, and I         11:29
11   believed that there was a possibility that he was
12   not going to make it anymore, so I wanted to have
13   something that I shared with him, and that was it,
14   sir.
15        Q.    How long were you Deputy Aldama's partner      11:29
16   for?
17        A.    I have known Deputy Aldama for a long time,
18   but partners in the same patrol vehicle, I'll say
19   approximately two years.
20        Q.    And how long did you know Deputy Aldama        11:30
21   before that, as a deputy?
22        A.    About ten years, sir.
23              (The nonconfidential portion of this
24              deposition continues on page 290.)
25
```

Page 287