```
 1                  UNITED STATES DISTRICT COURT
 2              FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    SHELDON LOCKETT; MICHELLE       )  CASE NO.
      DAVIS; AND CLYDE DAVIS,         )  2:18-CV-5838-PJW
 5                                    )
                        PLAINTIFFS,   )
 6                                    )
                  VS.                 )
 7                                    )
                                      )
 8    COUNTY OF LOS ANGELES, A        )
      PUBLIC ENTITY; LOS ANGELES      )
 9    COUNTY SHERIFF'S                )
      DEPARTMENT, A LAW ENFORCEMENT   )
10    AGENCY; SHERIFF JIM             )
      MCDONNELL; MIZRAIN ORREGO, A    )
11    DEPUTY LOS ANGELES COUNTY SHERIFF; )
      SAMUEL ALDAMA, A DEPUTY LOS     )
12    ANGELES COUNTY SHERIFF; AND DOES 1 )
      THROUGH 100, INCLUSIVE,         )
13                                    )
                        DEFENDANTS.   )
14    _____)
15
16          *** TRANSCRIPT SEALED PER COURT ORDER ***
17          VIDEOTAPED DEPOSITION OF DEPUTY ROGELIO BENZOR
18                   LOS ANGELES, CALIFORNIA
19                   MONDAY, MARCH 2, 2020
20
21    JOB NO. 3983123-1
22    REPORTED STENOGRAPHICALLY BY:
23    ELIZABETH SCHMIDT
24    CSR NO. 13598
25    PAGES 1 - 125
```

Page 1

```
1                   UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    SHELDON LOCKETT; MICHELLE        )  CASE NO.
     DAVIS; AND CLYDE DAVIS,          )  18-CV-5838-PJW
5                                     )
                         PLAINTIFFS,  )
6                                     )
                    VS.               )
7                                     )
                                      )
8    COUNTY OF LOS ANGELES, A         )
     PUBLIC ENTITY; LOS ANGELES       )
9    COUNTY SHERIFF'S                 )
     DEPARTMENT, A LAW ENFORCEMENT    )
10   AGENCY; SHERIFF JIM              )
     MCDONNELL; MIZRAIN ORREGO, A     )
11   DEPUTY LOS ANGELES COUNTY SHERIFF; )
     SAMUEL ALDAMA, A DEPUTY LOS      )
12   ANGELES COUNTY SHERIFF; AND DOES 1 )
     THROUGH 100, INCLUSIVE,          )
13                                    )
                         DEFENDANTS.  )
14   _____)

15

16

17

18

19        VIDEOTAPED DEPOSITION OF DEPUTY ROGELIO

20   BENZOR, TAKEN ON BEHALF OF PLAINTIFF, AT 444 SOUTH

21   FLOWER STREET, SUITE 1800, LOS ANGELES, CALIFORNIA,

22   BEGINNING AT 10:20 A.M. AND ENDING AT 3:33 P.M., ON

23   MARCH 2, 2020, BEFORE ELIZABETH SCHMIDT, CERTIFIED

24   SHORTHAND REPORTER NO. 13598.

25
```

Page  2

1        Q    You've never seen it since that day?

2        A    No.  I -- I've seen the design, but I've

3   never seen the tattoo.

4        Q    Okay.  Do you have a tattoo like that?

5        A    I have a tattoo similar to this.                    11:30

6        Q    Okay.  All right.  Where is that tattoo?

7        A    On my right leg.

8        Q    Is it on your right calf?

9        A    Yeah.  Kind of the same area.

10        Q    When did you get that tattoo?                       11:30

11        A    Either late January or early February of

12   2016.

13        Q    Around 2016?

14        A    Yes.

15        Q    How many persons have that tattoo at the           11:30

16   Compton Station?

17             MR. ALTURA:  I'll just object to the

18   extent that the answer to the question calls for the

19   disclosure of attorney-client information.

20   BY MR. SWEENEY:                                              11:31

21        Q    How many persons that you know of have

22   that tatoo at Compton Station?

23             MR. ALTURA:  I'll just object again on the

24   grounds that that answer may call for the disclosure

25   of attorney-client privileged information.                   11:31

Page 56

```
 1              THE WITNESS:  I can't say confidently.  I

 2     don't know, sir.

 3     BY MR. SWEENEY:

 4          Q    Give me your best estimate.

 5          A    I don't have a estimate.                    11:31

 6          Q    Were you aware that a United States

 7     District Court magistrate judge ruled that you must

 8     answer my questions about the tattoo that is

 9     presented before you in Exhibit 51 with truth?

10          A    Yes, sir.                                   11:31

11          Q    I'm going to ask you again.

12              MR. IVIE:  So Counsel, let me just

13     clarify.  How you instructed the witness I think is

14     inappropriate.  The judge did not make any

15     particular ruling on any particular question that   11:32

16     may be put to this witness.  He did not rule one way

17     or another on the question that you just asked,

18     which the witness I thought appropriately answered.

19              So I think your statement is an effort to

20     mislead and somewhat intimidate the witness.  The   11:32

21     witness answered the question.  So that's my

22     objection.

23              MR. SWEENEY:  Okay.  Thank you.  All

24     right.

25     ///                                                 11:32
```

Page 57

1     BY MR. SWEENEY:

2         Q    Do you know of any other deputy who has

3     this tattoo?

4         A    I know --

5             MR. IVIE:  Other than what you may have          11:32

6     learned from counsel.  Do you have any knowledge

7     independent of anything that you may have been told

8     by counsel.

9             THE WITNESS:  No.

10    BY MR. SWEENEY:                                          11:32

11        Q    Isn't it true that the name of the group

12    of deputies who had that tattoo that's sitting

13    before you in Exhibit 51 is the Executioners?

14            MR. IVIE:  Object to the question as

15    lacking foundation that there is a group, that that     11:33

16    group has a name.

17            THE WITNESS:  So I've never heard the term

18    "Executioner."

19    BY MR. SWEENEY:

20        Q    You've never heard of the term               11:33

21    "Executioners" in referring to a group of deputies

22    who have that tattoo?

23            MR. IVIE:  Objection.  No foundation that

24    there is a group, and there's no foundation that

25    there's a group specifically that is gathered around    11:33

Page 58

```
 1      this particular tattoo.

 2              But if you know the answer to the

 3      question, you can answer it.

 4              THE WITNESS:  No.  I've never heard that

 5      term, sir.                                              11:33

 6      BY MR. SWEENEY:

 7          Q    What is the name of the term -- strike

 8      that.

 9              What is the name that you know as being

10      connected with this tattoo?                             11:33

11              MR. IVIE:  Objection.  That assumes a fact

12      that has not been established.

13              THE WITNESS:  There's no term for my

14      tattoo.

15      BY MR. SWEENEY:                                         11:34

16          Q    No term for the group?

17              MR. IVIE:  Again, objection.  There's no

18      foundation that there's any group.

19      BY MR. SWEENEY:

20          Q    Now, are you familiar -- you need some         11:34

21      more water?

22          A    I got this one, sir.  Thank you.

23          Q    Are you familiar with the term sheriff --

24      Los Angeles County sheriff cliques?

25          A    I've read about it, yes.                       11:34
```

Page 59

```
 1          Q    What did you read about them?

 2          A    The news articles.

 3          Q    Okay.  In what paper?

 4          A    Several.  Whichever one pops up, sir.

 5          Q    Okay.  And you realize there have been        11:34

 6     several cliques that have existed within the Los

 7     Angeles County Sheriff's Department since the 1970s;

 8     correct?

 9              MR. IVIE:  Object to the question as -- as

10     lacking foundation and assumes a fact that has not      11:35

11     been established.

12              THE WITNESS:  Can you repeat the question.

13     BY MR. SWEENEY:

14          Q    Yes.  You've learned in reading the

15     articles that you mentioned that there have been        11:35

16     several cliques in the Los Angeles County Sheriff's

17     Department for many years going back to the '70s;

18     correct?

19              MR. IVIE:  So object to the question.  It

20     seeks to have the witness verify the truth of           11:35

21     articles that he may have read.  That lacks

22     foundation.

23     BY MR. SWEENEY:

24          Q    You can answer.

25          A    I vaguely remember reading articles           11:35
```

Page 60

```
 1       talking about sheriff department cliques.

 2          Q     Talking about what?

 3          A     Sheriff department cliques.

 4          Q     You've heard the names like Vikings;

 5       correct?                                        11:36

 6          A     I've heard that term.

 7          Q     Little Devils; correct?

 8          A     I've never heard that term.

 9          Q     Cavemen?

10          A     I've heard that term.                  11:36

11          Q     Jump Out Boys?

12          A     I've heard that term.

13          Q     Vikings?  I think you mentioned Vikings;

14       right?

15          A     Yes.  I've heard of most of those terms,  11:36

16       but I don't know anything about them.

17          Q     Sure.  I'm asking questions.  You've heard

18       of the one in your area where you grew up termed as

19       the Banditos?

20          A     I've recently heard about them.          11:36

21          Q     And it's your testimony that this Compton

22       tattoo, the group does not have a name?

23              MR. IVIE:  Object.  Counsel, there's been

24       no foundation that there is a group to which a name

25       could be attached.  That question has been asked and  11:37
```

Page 61

```
 1    answered previously.

 2    BY MR. SWEENEY:

 3         Q     You can answer the question.

 4         A     I don't know of any group.

 5         Q     Name.  You don't know of any name.  That's      11:37

 6    your testimony?

 7         A     I don't know of any group or any group

 8    that calls themselves the Executioners.

 9         Q     I'm going to represent to you -- strike

10    that.

11              Do you know Samuel Aldama?

12         A     Yes.

13         Q     When did you first meet Samuel Aldama?

14         A     At Compton Station.

15         Q     What year?                                       11:37

16         A     2015.

17         Q     2015?

18         A     Yeah.

19         Q     And I'm sure you know he testified there

20    are 10 to 20 deputies at the Compton Station that          11:37

21    had that tattoo.

22              MR. IVIE:  Object to the question as

23    lacking foundation, asserts a fact that has not been

24    established regarding what the witness's knowledge

25    is or where he may have obtained it.  So -- and I          11:38
```

Page 62

1   would further object on the grounds that the

2   question may seek attorney-client -- may seek to

3   intrude to attorney-client communications.

4            If you answer that question, please do not

5   reference any information you may have obtained from            11:38

6   communications with your counsel.  Do you understand

7   that?

8            THE WITNESS:  Yes.

9            Can you repeat the question.

10           MR. IVIE:  Can we have it read back,                   11:38

11  please.

12           (Record read as follows:

13               "Question:  And I'm sure you know

14               he testified there are 10 to 20

15               deputies at the Compton Station that

16               had that tattoo.")

17  BY MR. SWEENEY:

18       Q    Did you know that?

19       A    I read that in the article.

20       Q    Do you agree with that?                              11:39

21       A    No.

22       Q    Why don't you agree with that?

23       A    Because there's no -- while I was there,

24  there's no evidence to -- to prove that.

25       Q    Did you do a search?                                 11:39

Page 63

```
 1            A    No.

 2            Q    So it's you who's never seen anyone else

 3      with that tattoo; is that correct?

 4            A    Correct.

 5            Q    Where did you get that tattoo?                    11:39

 6            A    I got it in the city of Hollywood.

 7            Q    City of Hollywood?

 8            A    Yes.

 9            Q    What street?

10            A    Either on Hollywood Boulevard or Sunset          11:39

11      Boulevard.

12            Q    What's the name of the tattoo shop?

13            A    Sir, I don't recall the name.

14            Q    What's the name of the tattoo artist?

15            A    I didn't know him.  I was a walk-in.             11:40

16            Q    What's that?

17            A    I didn't know him.  I was a walk-in.

18            Q    You were a walk-in.  What month did you

19      get it?

20            A    Either January or February of 2016.              11:40

21            Q    You got it after you transported Immunique

22      Ross from Martin Luther King Hospital to the area

23      where she identified Sheldon Lockett; correct?

24            A    I believe so.

25            Q    How much did that tattoo cost you?               11:40
```

Page 64

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1          A    Roughly around $500.

 2          Q    You said you were a walk-in to this tattoo

 3     shop?

 4          A    I was a walk-in.

 5          Q    A walk-in?                                    11:41

 6          A    Yes.  No appointment.

 7          Q    How did you find out about it?  Were you

 8     just driving down Hollywood or Sunset Boulevard and

 9     just decided I'll choose that?  How did you find out

10     about it?                                               11:41

11          A    I didn't find out about it.  It was a -- I

12     was thinking of getting a piece of art that

13     signified and represented my time at Compton

14     Station.  So I was thinking about it for a while,

15     and I wasn't just set on this tattoo.  I was         11:41

16     thinking -- I was thinking of a lot of different

17     designs.  I was thinking of the thin blue flag, the

18     St. Michael.

19               But as far as to answer your question,

20     sir --                                                  11:42

21          Q    By the way, I'm going to object as being

22     nonresponsive.  Please answer my question.  Thank

23     you.

24          A    Okay.

25               MR. IVIE:  Well, let's have the             11:42
```

Page 65

1     question -- do you remember the question?

2              THE WITNESS:  Can I have it repeated back

3     to me?

4              MR. IVIE:  Let's have the question read

5     back, please.                                          11:42

6              MR. SWEENEY:  I'll rephrase it.

7     BY MR. SWEENEY:

8        Q    How did you choose that shop?

9        A    It presented itself in front of me.  It

10    was the closest shop.                                  11:42

11       Q    Okay.  You weren't referred to that shop?

12       A    No.

13       Q    Okay.  No one said go to the shop on

14    Sunset or Hollywood Boulevard to get this tattoo?

15       A    No.                                            11:42

16       Q    Your tattoo is similar to the one in 51?

17       A    Yes.

18       Q    Pretty much the same; correct?

19       A    The shades may be different, but yeah.

20       Q    Do you know how the tattoo artist knew     11:43

21    what to draw on your leg?

22       A    Yes.

23       Q    How?

24       A    I showed him a picture.

25       Q    A picture of the tattoo?                       11:43

Page 66

Personal Court Reporters, A Veritext Company
818-988-1900

1        A     I showed him a picture of a sticker.

2        Q     Of a what?

3        A     Of a sticker.

4        Q     Of a sticker?

5        A     Yes.                                          11:43

6        Q     Okay.  Where did you get that sticker?

7        A     The sticker was located in the men's

8    locker room of Compton Station.

9        Q     And that sticker was that tattoo?

10       A     Yes.                                          11:43

11       Q     How many stickers have you seen at the

12   Compton Station?

13       A     Just that one.

14       Q     So let me make sure I have this correct.

15   You saw one sticker in a locker room or on a locker.    11:44

16   Was it inside the locker or --

17       A     Outside.

18       Q     On the outside of a locker.

19       A     Yeah.

20       Q     And did you peel that sticker off?           11:44

21       A     No.  I took a picture of it.

22       Q     Okay.  On your phone?  On your cell phone?

23       A     Yes.

24       Q     Okay.  You took a picture of that.

25       A     Yes.                                          11:44

                                                  Page 67

```
 1          Q     And what did that -- strike that.

 2                And your testimony is you've never seen

 3     that sticker before?

 4                MR. ALTURA:  Objection.  Vague as to time.

 5     BY MR. SWEENEY:                                          11:44

 6          Q     Before you saw the one on the outside of

 7     the locker room?

 8                MR. ALTURA:  Objection.  Vague as to time.

 9                THE WITNESS:  I'm unclear, sir.  Can you

10     rephrase.                                                11:44

11     BY MR. SWEENEY:

12          Q     Sure.  Had you ever seen that sticker --

13     strike that.

14                How many times have you seen that sticker

15     on a locker at Compton Station?                          11:45

16          A     One sticker.

17          Q     And you go in that locker room every day

18     when you were at Compton?

19          A     Not every day.

20          Q     How many days a week?                         11:45

21          A     Two times a week, three times a week.

22          Q     For five years; correct?

23          A     Yes.

24          Q     And you saw that sticker one time;

25     correct?                                                 11:45
```

Page 68

```
 1        A    No.  There is one sticker.  And it has

 2    been there.

 3        Q    Okay.  When did you first notice that

 4    sticker?

 5        A    Early 2015.                                11:45

 6        Q    Did you ask anybody about that sticker

 7    once you saw it?

 8        A    No.

 9        Q    Did you want to know -- were you curious

10    about what that sticker stood for?             11:46

11        MR. ALTURA:  Objection.  Assumes facts.

12        THE WITNESS:  I assumed it was a design

13    affiliated with Compton Station.  There's many

14    designs.

15    BY MR. SWEENEY:                                11:46

16        Q    There are many designs?

17        A    Yeah, at Compton Station --

18        Q    At Compton Station?

19        A    -- there's a lot of art.  There's the CPT

20    logo.  I saw this, this sticker.  I saw the CPT on    11:46

21    the helmet.  I saw the skeleton with the helmet with

22    the flames.  I thought it looked cool.

23        Q    You notice in picture No. 3 in Exhibit 51,

24    take a close look at the stock of that AK-47.  Do

25    you see that?                                   11:47
```

Page 69

```
1          A    Uh-huh.

2          Q    Number 38.  Does yours have the number 38

3     on it?

4          A    No.

5          Q    Okay.  What does 38 stand for if you know?        11:47

6          A    I don't know, sir.

7          Q    Do you know if that 38 is encrypted to

8     mean something?

9          A    I don't know that.

10         Q    That sticker did not have 38 on it;           11:47

11    correct?

12         A    No.

13         Q    Did you ask anybody when you first saw

14    that sticker, hey, what does this mean?

15         A    No.  Because I assumed myself that it had     11:48

16    to do something with -- it was just art.  Art

17    from -- that was specific to Compton Station.

18         Q    Did you have to be awarded this to wear

19    this tattoo by anyone?

20         A    No.  I got it myself.                         11:48

21         Q    Do you know if this is a group that is

22    known by captains, let's say, at the Compton

23    Station?  If you know.  If you know.

24              MR. IVIE:  Objection.  Assumes a fact not

25    established, and that is that there is some group.       11:49
```

Page 70

```
 1        The witness certainly hasn't testified that there
 2    was a group.
 3             MR. SWEENEY:  I don't know how much more I
 4    can establish.  We have sworn testimony that there
 5    are 10 to 15 -- 10 to 20 people in this group with        11:49
 6    the same tattoo.
 7             MR. IVIE:  So this witness hasn't
 8    confirmed that testimony as being part of his
 9    knowledge.
10             MR. SWEENEY:  You said that it was not        11:49
11    established.
12             MR. IVIE:  It's not established.
13             MR. SWEENEY:  Not by him, but by Aldama.
14             MR. IVIE:  Well, there can be argument
15    about that.  I'm not going to argue what you think        11:49
16    you may or may not have established with Aldama.
17    But with this witness and in your examination of
18    this witness, that fact has not been established
19    that there is a group, that there is a group that --
20             MR. SWEENEY:  He hasn't admitted to a        11:50
21    group, Mr. Ivie, but it has been established there
22    is a group.
23             MR. IVIE:  I disagree with you.  But I'm
24    not going to go outside of the scope of this
25    testimony.  With this witness you have not        11:50
```

Page 71

```
 1    established that fact.  You have to establish a fact

 2    that --

 3              MR. SWEENEY:  Those are my words, "a

 4    group."  I don't care what he calls it.  Those are

 5    my words.                                          11:50

 6              MR. IVIE:  Okay.  So he does not have to

 7    accept that in responding to your questions as being

 8    a fact.

 9              MR. SWEENEY:  I'm not asking --

10              MR. IVIE:  But you're asking that question  11:50

11    as though it were a fact.

12              MR. SWEENEY:  All right.  Let's move on.

13    Let's move on, Mr. Ivie.

14    BY MR. SWEENEY:

15         Q    Okay.  So did you ever ask a captain       11:50

16    whether or not it was okay for you to get this

17    tattoo?

18         A    No.

19         Q    Did you ever ask anyone at the Compton

20    Station what this symbolism means in this tattoo?    11:51

21         A    No, I didn't.

22         Q    I bet you paid cash for your tattoo,

23    didn't you?

24              MR. IVIE:  When you say "I bet," what does

25    that mean?  You bet who?                             11:51
```

Page 72

```
 1      sure, that's all I know.

 2          Q    You refreshed your recollection, you said,

 3      yesterday with your report?

 4          A    Correct.

 5          Q    Okay.  Let me show you -- next in order is      02:25

 6      55.

 7               THE COURT REPORTER:  54.

 8               MR. SWEENEY:  54.

 9          (Exhibit 54 was marked for identification.)

10      BY MR. SWEENEY:                                          02:26

11          Q    Let me show you Exhibit 54.  And before I

12      get to this document, let me ask you something.

13          A    Yes.

14          Q    Have you ever had any meetings with a

15      group of deputies who have that similar tatoo that     02:27

16      you have?

17          A    No.

18          Q    Have you ever socialized with a group of

19      deputies with that same tatoo?

20          A    No.                                             02:27

21          Q    Were you ever told that you had to do

22      something meritorious to get that tatoo?

23          A    Can you define "meritorious."

24          Q    Something that's good in your work like

25      making arrests, aggressive policing, anything like     02:28
```

Page 86

1    that?

2         A    No.

3         Q    Were you told anything about what the

4    qualifications were to get that tatoo?

5         A    No.                                          02:28

6         Q    Captain Thatcher was your captain for a

7    while at Compton; correct?

8         A    Yes.

9         Q    Did you ever tell him that you had that

10   tatoo?                                                 02:28

11        A    I never told him.

12        Q    You never told him?

13        A    No.

14        Q    Did you ever ask him whether or not this

15   was a sanctioned club within the Compton Station?      02:28

16             MR. IVIE:  If what was a sanctioned club,

17   Counsel?

18             MR. SWEENEY:  What's that?

19             MR. IVIE:  Objection.  Lacks foundation,

20   vague and ambiguous.  You said have you ever told      02:29

21   him that --

22             MR. SWEENEY:  You made your objection.

23             MR. IVIE:  -- this was a sanctioned club.

24   What was a sanctioned club?

25             MR. SWEENEY:  The persons who got that       02:29

Page 87

1      tatoo was a sanctioned club within the sheriff's

2      department.

3                  THE WITNESS:  I never asked Captain

4      Thatcher anything.

5      BY MR. SWEENEY:                                      02:29

6          Q    Did you ask anybody about that tatoo?

7          A    No.

8          Q    When you saw it?  You just saw it on the

9      locker and said I like that?

10         A    If I could explain, sir.                    02:29

11         Q    Yes.

12         A    Working Compton, I realized what

13     dedication and sacrifice entails working that

14     station.  And my time there, I became very proud in

15     the difference that I was making, the positive role  02:30

16     model that I was becoming.  So I was actually

17     looking in the market of getting something that

18     represented my hard work, my accomplishments there.

19              So I wasn't set on the tatoo design that I

20     got.  I was thinking of getting the Compton diamond. 02:30

21     I was thinking of getting a quotation.  In the

22     briefing room, there's a Latin term and it's in

23     quotes.  I was thinking about getting that.  I was

24     thinking about getting something much more specific

25     to what I do and where I do it than just a thin blue  02:30

                                                    Page 88

1   flag or a St. Michael, which is a very, very common

2   generic law enforcement tatoo.

3           Q    So you decided to get a skeleton coming

4   out of flames; correct?

5           A    Yes.  I saw the sticker, I saw that they          02:31

6   had CPT on the helmet, and, I mean, I thought it

7   looked cool.  It's cooler than any other art that I

8   saw.

9           Q    Okay.  You think it looked cool that that

10  was a symbol of the station; is that your testimony?         02:31

11          MR. IVIE:  Well, he didn't testify as a

12  symbol of the station, Counsel.  Object to that.

13  It's lacking foundation.  He said it was something

14  that was affiliated with.

15  BY MR. SWEENEY:                                              02:31

16          Q    You can answer.  Did you feel proud that

17  that is a symbol of the station?

18          A    I felt -- I felt that's the art piece that

19  I went with.  And whatever art piece that I did go

20  with, I was going to feel proud about.                       02:32

21          Q    How do you feel about African-Americans in

22  general?

23          A    The same as I feel about

24  Hispanic-Americans and Caucasians.

25          Q    How many African-American friends do you        02:32

                                                    Page 89

```
 1          A    To the best of my recollection, sir.

 2          Q    Okay.  All right.  So how far was it from

 3    MLK out to the shooting scene -- out to the scene

 4    where the identification was to take place?

 5          A    As far as distance?                          02:48

 6          Q    Yes.

 7          A    Three miles.

 8          Q    I'm sorry.  What?

 9          A    Three miles.

10          Q    Okay.  What did you talk about?              02:48

11               MR. IVIE:  Objection.  You assume that

12    there was a conversation, Counsel.

13               MR. SWEENEY:  I'm asking him.

14               THE WITNESS:  What did I talk about with

15    who?                                                    02:48

16    BY MR. SWEENEY:

17          Q    With -- you were the only person in the

18    car with Immunique; right?

19               MR. IVIE:  He has a radio.  But again,

20    you're assuming that there was a conversation.          02:48

21    BY MR. SWEENEY:

22          Q    What did you talk to about with Immunique

23    Ross in that conversation from King Hospital out to

24    the scene where she was to identify someone?

25          A    Okay.  I understand now.  Nothing.           02:48
```

Page 102

1      Q    No small talk?

2      A    We had a conversation in the emergency

3  room.  She agreed to come with us.  We got in the

4  car and I drove.  It's a short drive.

5      Q    Did you ask her any preliminary questions          02:49

6  about what the guy had on, what he looked like?

7      A    No.  I know the field pos-ID procedures

8  are real touchy, and I just didn't, you know, want

9  to participate other than transport.

10     Q    Your report goes on to say:                        02:49

11          "During the field showup, victim

12          Ross positively identified suspect

13          Lockett as the person who shot at

14          victim Cole and herself."

15         You wrote that?                                     02:49

16     A    Yes.

17     Q    And then it goes on to say:

18          "Victim Ross stated 'Hell yeah,

19          that's him.  I put that on everything

20          that's him.'"                                      02:49

21         She said that?

22     A    Yes.

23     Q    Tell me her demeanor.  Was she angry that

24  she was shot at?

25     A    Her demeanor at the emergency room?               02:50

                                                    Page 103

1    BY MR. SWEENEY:

2        Q    But you were trained on how to document

3    and what you needed to document in the academy;

4    correct?

5        A    Yes.                                        03:32

6        Q    Do you feel that you lived up to your

7    teachings -- strike that.

8            Do you feel that you followed your

9    teachings that you learned in the academy on that

10   day?                                                 03:32

11       A    Yes.  Absolutely.

12       Q    Thank you.  I have nothing further.

13           MR. IVIE:  I have nothing further.  Same

14   stipulation?

15           MR. SWEENEY:  Same stip.  Okay.             03:32

16           THE COURT REPORTER:  So we'll handle the

17   transcript per the Federal Rules of Procedure.  And

18   copy for the County?

19           MR. IVIE:  Yes.

20           MR. ALTURA:  Yes, please.                    03:32

21           THE VIDEOGRAPHER:  This completes today's

22   deposition.  We're going off the record.  The time

23   is 3:33 p.m.

24

25           (The deposition concluded at 3:33 p.m.)

Page 123

1          I declare under penalty of perjury that the

2     foregoing is true and correct.  Subscribed at

3     _____, California, this_____day of

4     _____, 2020.

5

6

7

8

9                  _____

10                 DEPUTY ROGELIO BENZOR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                       Page 124

```
 1                Certification of Court Reporter

 2                       Federal Jurat

 3

 4        I, the undersigned, Certified Shorthand Reporter

 5   of the State of California, do hereby certify:

 6        That the foregoing proceedings were taken before

 7   me at the time and place herein set forth; that any

 8   witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14        That before completion of the deposition, a

15   review of the transcript [ ] was [ ] was not requested.

16        I further certify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney of any of the parties.

19        IN WITNESS WHEREOF I have hereunto subscribed my

20   name on March 16, 2020.

21

22

23

                       Elizabeth Schmidt

24                     CSR No. 13598

25
```

Page 125

Personal Court Reporters, A Veritext Company
818-988-1900