John E. Sweeney, Esq. (State Bar No. 116285)
**THE SWEENEY FIRM**
315 S. Beverly Drive, Suite 200
Beverly Hills, CA 90212
Tel. No.: (310) 277-9595
Fax No.: (310) 277-0177
E-Mail: jes@thesweeneyfirm.com

Steven C. Glickman, Esq. (State Bar No. 105436)
**GLICKMAN & GLICKMAN,
A LAW CORPORATION**
15233 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel. No.: (310) 273-4040
Fax No.: (310) 273-0829
E-Mail: scg@glickman-law.com

Attorneys for Plaintiff SHELDON LOCKETT

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| SHELDON LOCKETT, | Case No.: 2:18-cv-5838-DSF-JPR |
|---|---|
| Plaintiff, | **DECLARATION OF JOHN E. SWEENEY IN SUPPORT OF MOTION *IN LIMINE* NUMBER 3 TO EXCLUDE DEFENDANTS' EXPERT WITNESS DARRYL ZENGLER** |
| v. | |
| COUNTY OF LOS ANGELES, et al., | *Filed concurrently with the Notice of Motion and Memorandum of Points and Authorities; lodged concurrently with Proposed Order* |
| Defendants. | |
|  | Pre-Trial Conference: Nov. 15, 2021<br>Time: 3:00 p.m. |
|  | Trial: December 14, 2021<br>Time: 8:30 a.m. |
|  | Judge: Hon. Dale S. Fischer<br>Courtroom: 7D<br>First Street Courthouse<br>350 West 1st Street<br>Los Angeles, CA |

1

**DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE NO. 3**

I, John E. Sweeney, declare as follows:

1. I am an attorney admitted to the United States District Court for the Central District of California, and duly licensed to practice law in California. I am a principal at The Sweeney Firm, co-counsel of record for Plaintiff Sheldon Lockett.

2. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief, and as to those, I am informed and believe them to be true. If called as a witness, I could and would testify to the contents of this declaration.

3. I am informed and believe that each and every fact set forth in Plaintiff's Motion *in Limine* Number 3 To Exclude Defendants' Expert Witness Darryl Zengler is true and correct and based on my review of the evidence as adduced during discovery in this case. As set forth in the memorandum of points and authorities, I consulted with Marianne Inouye in late May, 2020 regarding my strategy in the litigation, the experts I intended to retain, a candid assessment of the strengths and weaknesses of Plaintiff's case, and the expected defenses from the defendants—the kind of confidential information that I would consider to be attorney work product.

4. I had also worked with Ms. Inouye before on other cases. Based on my work-product discussions with her, I believe that she had a basic understanding of my *modus operandi*, patterns of operations, decision-making process, and the like. Based on my prior work with her, I felt comfortable sharing my thought process, strategy and my plan for demonstrating how biased defendant Aldama was, never imagining that the defendants would subsequently engage her partner.

5. Attached hereto as Exhibit 1 is a true and correct copy of pertinent portions of the transcript of the deposition of Defendants' expert witness Darryl Zengler, taken on October 14, 2021.

6. We elected to retain another forensic economist, Ed Garcia, and timely designated Mr. Garcia in our initial expert designation on June 10, 2020. When Mr. Zengler was designated by the defense as a rebuttal expert on July 29, 2020, Steven

Glickman, co-counsel for plaintiff, and I had an email exchange with defendants' counsel Rickey Ivie on July 29, 2020 and July 30, 2020. A true and correct copy of this email exchange is attached as Exhibit 2. Among other things, without disclosing the content of my work product conversation with her, I had advised that my discussion with Ms. Inouye was hardly "insignificant". In that email, we put defendants on notice that we intended to move to exclude Mr. Zengler

7. Plaintiff met and conferred with opposing counsel pursuant to Local Rules 7-3 and 16-2 via a Zoom video conference on October 20, 2021 following Plaintiff's letter of October 15, 2021 setting forth the grounds for Plaintiff's anticipated motions *in limine*. The parties were unable to reach an agreement and, accordingly, Plaintiff now brings this motion.

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 26th day of October 2021, at Beverly Hills, California.

By   /s/ John E. Sweeney
         John E. Sweeney

# EXHIBIT 1

```
 1                  UNITED STATES DISTRICT COURT
 2              FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4       SHELDON LOCKETT; MICHELLE    )
         DAVIS; AND CLYDE DAVIS,      )
 5                                    )
                                      )
 6                    PLAINTIFFS,     )
                                      )
 7                                    )
         vs.                          )CASE NO.
 8                                    )18-CV-5838-DSF-JPR
                                      )
 9                                    )
         COUNTY OF LOS ANGELES, A     )
10       PUBLIC ENTITY; LOS ANGELES   )
         SHERIFF'S DEPARTMENT, A LAW  )
11       ENFORCEMENT AGENCY; SHERIFF  )
         JIM MCDONNELL; MIZRAIN ORREGO,)
12       A DEPUTY LOS ANGELES COUNTY  )
         SHERIFF; SAMUEL ALDAMA, A    )
13       DEPUTY LOS ANGELES COUNTY    )
         SHERIFF; AND DOES 1 THROUGH  )
14       100, INCLUSIVE,              )
                                      )
15                                    )
                                      )
16                    DEFENDANTS.     )
         _____)
17
18
19              VIDEOCONFERENCE DEPOSITION OF
20                 DARRYL ZANGLER, MA, CEA
21                THURSDAY, OCTOBER 14, 2021
22
23
24       JOB NO:  4834151
25       REPORTER: JESSICA N. NAVARRO, C.S.R. NO. 13512


                                                   Page 1
```

```
 1                    DARRYL R. ZANGLER,                      02:03
 2      having been duly administered an oath by the
 3      reporter, was examined and testified as follows:
 4
 5                       EXAMINATION                           02:03
 6    BY MR. GLICKMAN:
 7         Q    Would you please state your full name for
 8    us?
 9         A    Darryl Zengler.
10         Q    And Mr. Zengler, where do you work?           02:03
11         A    I work in Pasadena, California.
12         Q    What's the name of your company?
13         A    Zengler and Inouye.
14         Q    Who's Inouye?
15         A    Yes.                                           02:03
16         Q    Who is Inouye?
17         A    Oh, Marianne Inouye.
18         Q    What sort of procedures do you have to
19    avoid conflicts on cases?
20         A    We have Microsoft Access.                      02:03
21         Q    And tell me how the process works, how do
22    you avoid a conflict?
23         A    Yeah, when we accept a case, it is
24    inputted into a database.  And then if she were to
25    be called on that case, she would enter it into the     02:04
```

Page 7

```
 1    database to see if we've been retained by another      02:04
 2    party.
 3         Q    Let me give you this hypothetical.  A
 4    lawyer calls Ms. Inouye to inquire about working on
 5    a case, shares details about the case, including the   02:04
 6    lawyer's thoughts and impressions and ideas of how
 7    your company could be of use.  How is that inputted
 8    into your system?
 9         A    Well, it wouldn't be.  I don't know if
10    that would be memorialized in any fashion.            02:04
11         Q    And why is that?  After a lawyer calls,
12    shares his thoughts and opinions and ideas about the
13    case, why would that not be entered into your system
14    to prevent a situation where you are contacted on a
15    case where a lawyer has shared his thoughts,          02:05
16    impressions and work product ideas with Ms. Inouye?
17         A    Well, because usually an intake phone call
18    doesn't include very much detail.
19         Q    Okay.  So, the situation where a lawyer
20    calls, speaks with Ms. Inouye and discusses the case  02:05
21    and discusses the lawyer's thoughts, impressions and
22    ideas of how your firm can be of -- of good
23    utilization for the case, wouldn't you agree that
24    that creates a conflict then that if you were
25    retained on the case after Ms. Inouye had that sort   02:05
```

Page 8

```
 1     of conversation with the lawyer seeking to retain         02:05
 2     her on the very same case?
 3             MR. PONGRACZ:  Objection; calls for
 4     speculation, incomplete hypothetical, calls for a
 5     legal conclusion.                                          02:06
 6             THE WITNESS:  And it's vague and
 7     ambiguous.
 8             I don't know the degree of information
 9     that you're talking about.  If Ms. Inouye received
10     any information, she didn't share it with me.              02:06
11     BY MR. GLICKMAN:
12          Q   Okay.  Well, I understand that's what
13     you're telling us and you have an honest face,
14     despite the little beard thing there, but you still
15     have an honest face.                                       02:06
16             And I'm just trying to see because I'm
17     pretty sure that if somebody called a lawyer and
18     shared all their thoughts or shared thoughts about
19     the case and what the case was about and what they'd
20     like to retain the lawyer on and then the other side       02:06
21     called the same firm and retained a lawyer on the
22     same firm, then that firm would then be conflicted
23     out of the case because of that initial contact.
24             I'm just trying to see if there's some
25     difference in the forensic economist world?                02:07
```

Page 9

```
1      A    Well, I don't know.                              02:07
2           MR. PONGRACZ:  Objection; assumes facts --
3      excuse me -- objection; lacks foundation, calls for
4      speculation.  Go ahead, sir.
5           THE WITNESS:  Yeah, I can't speak to what        02:07
6      you're talking about.
7                All I know is based on my general
8      experience from 36 years in this business when an
9      attorney inquires as to whether or not we would like
10     to work on a matter, that attorney presents the name  02:07
11     of the case and basically, you know, who the parties
12     are and what kind of valuation is being sought.
13     That means, you know, as you know most of our work
14     is broken bones and dead bodies.  So, you know, we
15     get a sense as to whether or not it's a personal      02:08
16     injury or a wrongful death case.
17     BY MR. GLICKMAN:
18     Q    What professional organizations do you
19     belong to?
20     A    I belong to the National Association of          02:08
21     Forensic Economist, the American Rehabilitation
22     Economics Association, the Collegium of Pecuniary
23     Damages Expert, American --
24     Q    American Board of Forensic Accounting?
25     A    No.  It's AAEFE, A-A-E-F-E.  It's the -- I       02:08
```

Page 10

| | | |
|---|---|---|
| 1 | think it's the American Association of Economic and | 02:09 |
| 2 | Financial Experts. | |
| 3 |     Q   Tell me if you subscribe to this, this | |
| 4 | ethical scripture that I'm going to quote for you | |
| 5 | that, quote, "I shall avoid conflict of advocacies." | 02:09 |
| 6 | Close quote.  Do you agree with that? | |
| 7 |        MS. FRIEMAN:  Objection; incomplete | |
| 8 | hypothetical, vague and ambiguous. | |
| 9 |        THE WITNESS:  I don't think you're | |
| 10 | interpreting that in the right context.  I think | 02:09 |
| 11 | that means -- | |
| 12 |        MR. GLICKMAN:  I'm not interpreting, I'm | |
| 13 | just reading it. | |
| 14 |        THE WITNESS:  I think from the | |
| 15 | professional associations I belong to, it just means | 02:09 |
| 16 | that you don't formulate a conclusion before you go | |
| 17 | through the necessary steps.  You don't advocate for | |
| 18 | one side versus another. | |
| 19 | BY MR. GLICKMAN: | |
| 20 |     Q   Okay.  So -- and then you know that | 02:10 |
| 21 | Ms. Inouye was contacted by Mr. Sweeney before you | |
| 22 | were contacted on this case; right? | |
| 23 |     A   I do now. | |
| 24 |     Q   How did you learn that? | |
| 25 |     A   I believe she indicated that to me. | 02:10 |

Page 11

```
 1      Q    When did she indicate that to you?              02:10
 2      A    I can't recall.
 3      Q    Before you were retained on this case?
 4      A    It's a possibility that it could have been
 5   before I was retained on this case.                     02:10
 6      Q    Because you've worked with me obviously
 7   over the years; right?
 8      A    Yes.
 9      Q    And you've worked with Mr. Sweeney, I
10   think, as well?                                         02:10
11      A    I have.
12      Q    And Ms. Inouye has also worked with
13   Mr. Sweeney, I believe?
14      A    True.
15      Q    And do you have a custom and practice of        02:10
16   discussing with Ms. Inouye cases that she's
17   contacted on or you're contacted on?
18      A    Not particularly.  I think your expert
19   could attest to the relationship that -- that
20   Ms. Inouye and I have within this firm.  It's not       02:11
21   one where we actively discuss things.
22      Q    Tell me, though, how did it come up that
23   Ms. Inouye discussed with you that she had been
24   contacted by Mr. Sweeney regarding this case?
25      A    That -- boy.  Well, she obviously               02:11
```

Page 12

```
 1      mentioned it to me, but I don't know the detail.  I      02:11
 2      can't remember the details.
 3           Q   Do you remember anything that Ms. Inouye
 4      told you about her contact with Mr. Sweeney?
 5           A   She told me that Mr. Sweeney contacted her    02:11
 6      with respect to participating as an expert in this
 7      case.  She indicated to me at that time she turned
 8      him down, but she indicated to him that she would
 9      contact me and ask me if I would participate as his
10      expert in this case.                                   02:12
11           Q   Okay.  And so did that -- that's what she
12      was doing then, she was following up and contacting
13      you to see if you would be an expert for
14      Mr. Sweeney?
15           A   She attempted to contact me, but I don't      02:12
16      believe that we spoke.  And then Mr. Sweeney called
17      her back, she indicated to him based on her
18      recollection that she didn't have any news to tell
19      him whether I'm in or out of the case because she
20      and I hadn't spoken.  Then he indicated to her never   02:12
21      mind and that's when I suppose he retained
22      Mr. Garcia.
23           Q   So you were retained in this case after
24      Mr. Garcia's deposition was noticed, I believe?
25           A   If you say so.  I'm not familiar --           02:13
```

Page 13

```
 1        Q    Well --                                              02:13
 2        A    I'm not familiar with the dates.
 3        Q    Are you able to tell us when you were
 4   retained in this case?
 5        A    Did you receive my file?                              02:13
 6        Q    I did, but too much stuff for me to look
 7   through.  Are you able to tell?
 8        A    Not without looking at it.  I'm sure it
 9   would be --
10        Q    Well, the first billing I saw was that you            02:13
11   reviewed Mr. Garcia's Rule 26 report and you
12   formulated questions for Mr. Altura for the
13   deposition?
14        A    Yeah, but that doesn't mean that's the
15   date in which I was retained.                                   02:13
16        Q    Right.  But do you think was your first --
17   your first real work on the case was reviewing
18   Mr. Garcia's Rule 26 report?
19        A    Yeah, that would be the first real work I
20   did on the case, correct.                                       02:14
21        Q    Okay.  Do you recall that you were
22   retained sometime in advance of that?  I'm not sure
23   that the County knew that we had retained anybody --
24   a forensic economist until we designated Mr. Garcia.
25        A    Well, if you say so.  That's outside my               02:14
```

Page 14

```
 1    conclusions and opinions.                              02:18
 2         Q    Okay.  So if I ask do you anticipate
 3    testifying about anything at the time of trial
 4    that's not within your report, is there anything
 5    else?                                                   02:18
 6         A    No.
 7         Q    And what did you discuss with Ms. Frieman
 8    the other day?
 9         A    She discussed with me securing my file so
10    that she could forward it to you.                       02:18
11         Q    Anything of substance?
12         A    No.
13         Q    What about with Mr. Ivie?
14         A    I discussed things of substance with him.
15         Q    And tell me what you discussed of             02:19
16    substance with Mr. Ivie?
17         A    I discussed the conclusions that were in
18    my report.
19         Q    Okay.  Have you worked more with me or
20    more with Mr. Ivie's firm?                              02:19
21         A    That's a great question.  I don't have my
22    outlet -- I mean, my QuickBooks here.
23         Q    What's your best guess?
24         A    Probably with Mr. Ivie's firm because it's
25    so many attorneys there.  I mean, I've worked with      02:19
```

Page 18

```
 1    all the partners there.                                02:19
 2         Q    Okay.  Is your clock wrong that's over
 3    your shoulder?
 4         A    It is.  You're not supposed to see that.
 5         Q    No, I was thinking that I've gone negative   02:19
 6    an hour on the deposition here or something.
 7              Okay.  Is there anything else you think I
 8    should know before we conclude the deposition?
 9         A    I don't think so.
10         Q    Do you think Davida is thinking that this    02:20
11    was like a goofy deposition or what?
12         A    I honestly was thinking "I wonder why he
13    is taking my deposition."
14         Q    I haven't seen you since the pandemic.
15    Come on.                                               02:20
16         A    That's not true.  I did a deposition for
17    you.
18         Q    Did we see each other?
19         A    Yeah.
20         Q    We did, on the Soto case.                    02:20
21         A    Yes.
22         Q    Great.  That was supposed to be -- by the
23    way, that was going to be the first civil jury trial
24    during the pandemic and then we settled on the day
25    we were going to set out.                              02:20
```

Page 19