John E. Sweeney, Esq. (State Bar No. 116285)
**THE SWEENEY FIRM**
315 S. Beverly Drive, Suite 200
Beverly Hills, CA 90212
Tel. No.: (310) 277-9595
Fax No.: (310) 277-0177
E-Mail: jes@thesweeneyfirm.com

Steven C. Glickman, Esq. (State Bar No. 105436)
**GLICKMAN & GLICKMAN,**
**A LAW CORPORATION**
15233 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel. No.: (310) 273-4040
Fax No.: (310) 273-0829
E-Mail: scg@glickman-law.com

Attorneys for Plaintiff SHELDON LOCKETT

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELDON LOCKETT, | Case No.:  18-CV-5838-DSF-JPR |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| v. | Pre-Trial Conference: November 15, 2021<br>Time:          3:00 p.m. |
| COUNTY OF LOS ANGELES, et al., | |
| Defendants. | Trial:          December 14, 2021<br>Time:          8:30 a.m. |
| | Judge:          Hon. Dale S. Fischer<br>Courtroom: 7D<br>Courthouse: First Street Courthouse<br>350 West 1st Street<br>Los Angeles, CA |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to Local Rule 16-4, Plaintiff SHELDON LOCKETT hereby submits the following Memorandum of Contentions of Fact and Law:

## I.    INTRODUCTION

This civil rights case arises out of excessive force used on plaintiff Sheldon Lockett, a young African American man, by Deputy Samuel Aldama ("**Deputy Aldama**") of the Los Angeles County Sheriff's Department ("**LASD**"). The parties have stipulated that Sheldon Lockett was arrested on January 15, 2016 and that at all relevant times, Deputy Aldama was employed by the LASD and acting under color of law.

This case also presents a much broader *Monell* claim stemming not just from Deputy Aldama's actions, but also from the entire group of deputies involved with Mr. Lockett's arrest, focusing on the entire excessive force used, the false reporting, and the interaction of all these facts with the Executioners deputy gang at the Compton Sheriff Station.

## II.   SUMMARY OF KEY FACTS

### A.    INFILTRATION OF A VIOLENT DEPUTY GANG WITHIN THE COMPTON STATION OF THE LOS ANGELES SHERIFF'S DEPARTMENT

Underlying this excessive force and *Monell* case is a history of more than forty years of violent deputy gangs in the Los Angeles Sheriff's Department.[1]  A deputy gang is an internal LASD subgroup that engages in criminal gang-like behavior. A brief history of these deputy gangs puts the metastasized cancer these gangs represent – especially the Compton Executioners deputy gang (largely exposed through this case) – into perspective.

In 1971, a secret society developed at the East Los Angeles Sheriff's Station

---

[1] Rand Corporation Research Report "Understanding Subgroups Within the Los Angeles County Sheriff's Department: Community and Department Perceptions with Recommendations for Change" (marked for trial as Exhibit 223).

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

called the Little Devils. This group of white deputies were responsible for wreaking havoc with the aggressive policing of largely African American and Hispanic communities. In subsequent decades, deputy gangs such as the Pirates, Cavemen, Rattlesnakes, and Vikings were formed within the Department in stations servicing minority communities. In a federal lawsuit against the Sheriff's Department, U.S. District Court Judge Terry Hatter called the Vikings gang a "Neo-Nazi, white supremacist gang." *See Thomas v. County of Los Angeles,* 978 F.2d 504, 511 (9th Cir. 1992), *as amended* (Feb. 12, 1993).

While media coverage in the early 1990s focused on the Vikings, the media focused in the late 1990s and early 2000s on the Regulators.[2] Media in the early 2010s focused on deputy gangs in the jails, including the 3000 Boys, Jump Out Boys, and Operation Pandora's Box. More recently, the public has become aware of the Executioners and Banditos deputy gangs.[3]

A characteristic of deputy gangs is that they have an identifying tattoo. These tattoos are placed on the bodies of deputies who have "earned their ink" by committing violent acts against citizens. When a deputy gang member is attempting to join a gang, he is said to be "chasing ink." The Jump Out Boys' tattoo is a sinister-looking skeleton skull with piercing red eyes, pointing a gun. When a deputy has earned his ink with such a tattoo, as a further badge of honor, smoke coming out of the gun barrel is inked onto the tattoo, signifying that he has shot a citizen. Deputy gangs glorify shootings and encourage aggressive policing.

_____

[2] Counsel for the County has previously admitted to the existence of the Regulators deputy gang within LASD. *See* "Defendants' Objection to and Motion to Strike Plaintiff's Motion in Limine to Exclude Reference to the Regulators" in the case of *Jaimes v. County of Los Angeles, et al.* (LASC Case No. BC 331903) (marked for trial as Exhibit 227).

[3] Rand Corporation Research Report "Understanding Subgroups Within the Los Angeles County Sheriff's Department: Community and Department Perceptions with Recommendations for Change" (marked for trial as Exhibit 223).

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1    The Compton Station Executioners' gang tattoo relevant to this case is a

2    sinister looking skeleton holding an assault rifle surrounded by flames; he wears a

3    World War II-era or Nazi-style helmet with the letters CPT, which stands for

4    Compton. There are the Roman numerals XXVIII (Sheriff's 28th Substation) on the

5    magazine of the rifle. Both inscriptions tie the tattoo to the LASD Compton Station.

6    A composite photograph of the tattoo on Deputy Aldama's calf as well as the calves

7    of two other deputies with the same tattoo—Deputy Orrego and Deputy Benzor—is

8    attached as **Exhibit "1."**

9    ## B.    DEPOSITION OF DEPUTY SAMUEL ALDAMA IN THE

10   ## *TAYLOR* CASE

11   This case follows a prior State Court case, *Taylor v. County of Los Angeles, et*

12   *al.*, in which Deputy Aldama was named as one of several defendants. A secret

13   Compton Station deputy gang was revealed during discovery in the *Taylor* case,

14   though the name of the group would not be made public until two years later. The

15   *Taylor* case arose from Deputy Aldama and his partner Mizrain Orrego's fatal

16   shooting of an unarmed African American man, Donta Taylor, on August 25, 2016

17   (approximately eight months after the incident involving Plaintiff Sheldon Lockett).

18   Both Deputy Aldama and Deputy Orrego claimed they saw a gun in Taylor's

19   waistband, but no gun was found.

20   On May 16, 2018, the *Taylor* plaintiffs took the deposition of Deputy

21   Aldama. Deputy Aldama made several shocking revelations during his testimony,

22   including the following statements:

23   • When Deputy Aldama was asked, "Do you have any ill feelings toward

24   African Americans?" he responded – after an incredible minute-long delay

25   – "I do."

26   • In 2016, two months before the shooting of Taylor, Deputy Aldama got a

27   tattoo on his leg of a skeleton wearing a helmet with the letters "CPT"

28

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Compton and holding a gun, surrounded by flames. *See* Exhibit "1."

- The tattoo was done by a 'guy' whose name Deputy Aldama claimed not to know, and who came to Deputy Aldama's house to tattoo him after Deputy Aldama was referred to the 'guy' by a male Hispanic friend at the Compton Station. Deputy Aldama claimed not to remember the identity of the friend who referred him to the tattooist artist.

- Between 10-20 of Deputy Aldama's "peers" at the Compton station have the same tattoo.

Deputy Aldama's revelation about the Compton Station deputy gang put into motion what was then hoped to be an unprecedented investigation of the LASD deputy gangs. In reaction to the worldwide call for investigation and reform spawned by the *Taylor* case, former Los Angeles County Sheriff Jim McDonnell announced to the Sheriff Civilian Oversight Commission a new study of deputy gangs (also referred to as "cliques" or secret societies), stating, "No one has undertaken a serious, comprehensive study of the issue; and I intend, on my watch, to get to the bottom of this."

Unfortunately, nothing happened during Sheriff McDonnell's tenure. His successor, Los Angeles County Sheriff Alex Villanueva, who replaced Sheriff McDonnell in the election that took place in the face of the public outcry over secret deputy gangs, also failed to tackle the issue.

## C.    A WHISTLEBLOWER DEPUTY, AUSTREBERTO GONZALEZ, COMES FORWARD IN JUNE 2020

Although Plaintiff was aware of Deputy Aldama's tattoo after the deposition in the *Taylor* case, all defendants denied that a deputy gang existed at the Compton Station or that the tattoo Deputy Aldama and his colleagues shared was a symbol of membership in a deputy gang. Attempts to conduct discovery into this area of inquiry were repeatedly stonewalled by the County and Department defendants.

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

In June 2020, LASD deputy sheriff Austreberto Gonzalez, who worked at the Compton Station, filed a claim against the County detailing his knowledge of the secretive deputy gang at the station called the "Executioners." Deputy Gonzalez was deposed on August 11, 2020. He worked for five years as a deputy at Compton Station, from 2015-2020, and provided the names of deputies who were either members of the group (sharing the same tattoo as Deputy Aldama) or who were "prospects" that were "chasing ink," i.e., attempting to get permission to join the group and receive the tattoo. Deputy Gonzalez testified that the Executioners do not allow African American or female deputies to join the group. He further testified that Captain Michael Thatcher (now a Commander) and other supervisors at the station knew about and tolerated the Executioners, and the members of the group openly displayed the tattoo insignia on, for example, their desktop computer workstations at the station.

The systematic misconduct carried out by Executioners or prospects included all of the following: calling in a "ghost gun" or "ghost 417," in which deputies falsely reported over the shared radio system that a suspect had a gun in order to get other deputies to the scene to "contain" the suspect; purposefully carrying out excessive force including fatal shootings; inflating the arrest statistics in Compton as a way to curry favor with the station's leadership; and carrying out an arrest quota on the orders of Captain Thatcher (then captain at the Compton Station).

## D.   DEPUTY ALDAMA'S HISTORY OF PROBLEMATIC BEHAVIOR ON AND OFF DUTY

In July 2016, seven months after the subject incident involving Plaintiff, Deputies Aldama and Orrego were profiled by the *New York Times* in an article about policing in America. The reporter participated in a ride-along with the deputies while they patrolled Compton. The reporter described the following scene:

"[A] young man at the end of the block takes off running. He ducks

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

into the shadows behind an abandoned house, and he's gone. Deputy Samuel Aldama, 29, hits the gas. The cruiser flies to the end of the dead-end street, and in an instant both he and Deputy Orrego are out of their car, yelling at a group of black men to put their hands in the air. Each deputy keeps a finger on his weapon…. Deputy Orrego is convinced that there is a gun here – or, at least, that there was one. '**Every time you get three of these guys together, you know they have a gun somewhere**,' Deputy Orrego says."[4]

As will be described below, this case arose from a false radio call by Deputy Aldama and Deputy Orrego that Plaintiff was brandishing a gun – a "ghost gun" call. The facts of this case demonstrate a pattern and practice of Deputy Aldama in stopping, pursuing, and using force against unarmed African Americans. Specifically, in the *Taylor* case, Deputy Aldama acted eerily similar in the stop, pursuit, and eventual fatal shooting of a young man named Donta Taylor. Taylor was falsely accused of brandishing a weapon, chased down like a dog, and shot dead, unarmed. No gun was ever recovered from the scene.

Another disturbing incident involving Deputy Aldama and his then-domestic partner (now wife) Ivett Silva calls into question Deputy Aldama's truthfulness. On February 19, 2017, Ms. Silva called 911 and said that Deputy Aldama, "hit" and "slapped" her, and that alcohol was involved. At the first session of his deposition on December 19, 2019, Deputy Aldama denied slapping Ms. Silva. At his previous deposition in the *Taylor* case, taken on May 6, 2018, Deputy Aldama had testified that Ms. Silva accused him of "being loud" when she made the 911 call and claimed he did not know if she accused him of hitting her; he denied hitting her at that time as well.

---

[4] *Patrolling an Anxious America*, The New York Times, July 23, 2016 (emphasis added) (marked for trial as Exhibit 30).

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1       **E.      THE LOCKETT INCIDENT**

2       Against this backdrop – both the history of deputy gangs within the

3   Department as well as the personal history of Deputy Aldama and his partner

4   Deputy Orrego – Sheldon Lockett was stopped, chased, and beaten for a crime he

5   never committed on January 15, 2016.

6       Around 3:00 p.m. that day, Mr. Lockett and two friends were standing in front

7   of a house in the City of Compton on a residential sidewalk. Mr. Lockett had been

8   working that day and met with friends in broad daylight.

9       Unbeknownst to Mr. Lockett, there had been a drive-by shooting relatively

10  close by a short time before this subject incident occurred. Deputies Orrego and

11  Aldama heard the call regarding the incident and the description of the shooter: a

12  Black male wearing a "beanie" hat. Mr. Lockett did not match the description of the

13  shooter, other than being a Black male. When Deputies Orrego and Aldama saw Mr.

14  Lockett and his friends, they drove their patrol car in a rapid and aggressive manner

15  towards Mr. Lockett. They exited their patrol car with their guns already drawn and

16  trained on Lockett and his friends, shouting commands in loud voices. Mr. Lockett

17  was scared and in a classic fight or flight reaction—not uncommon for young

18  African American men in Compton—he instinctively ran from the aggressive

19  sheriff's deputies pointing a gun at him.

20      Even though Lockett was unarmed and had been doing nothing wrong, simply

21  standing on a sidewalk with some friends, Deputy Orrego transmitted a false

22  Department-wide radio broadcast stating that Mr. Lockett had produced a gun from

23  his waistband and was fleeing the scene. Importantly, Deputy Aldama knew this

24  claim to be false, but proceeded to chase Mr. Lockett anyway.

25      This false radio broadcast was a substantial factor in causing the events that

26  occurred thereafter, in part because it summoned other deputies to the scene to assist

27  in Mr. Lockett's apprehension, all with the false thought that Mr. Lockett was armed

28

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

and dangerous, stemming from the classic "ghost gun" radio broadcast.

Mr. Lockett ran and attempted to hide in the enclosed patio of a nearby home. When he was found by the deputies, he attempted to surrender to them. Among other things, they fired an electronic taser twice on Mr. Lockett while he was face down and attempting to surrender. Deputy Aldama severely battered Mr. Lockett, striking him with his fist and his baton or flashlight. In addition, during this vicious attack, the deputies were yelling vile racial epithets at Mr. Lockett, including calling him "nigger" repeatedly.

Following his arrest and after being viciously beaten (as well as tased and hit with pepper spray) Lockett was handcuffed and then presented – without any exigent circumstances – in a field show-up while surrounded by numerous deputies, handcuffed and battered, to a potential eyewitness to the drive-by shooting. Violating standard police practices and procedures, the witness was told before she was taken to where Mr. Lockett was that they were taking her to where they had "the guy," referring to the shooter. Additionally, the witness claims that she was never read the standard field identification card. With this unduly suggestive field identification placed in motion, she identified Mr. Lockett as the shooter.

As it turns out, the deputy who presented the witness for the field identification Deputy Rogelio Benzor, was a fellow tattooed member of the Executioners deputy gang. Deputies Aldama, Orrego, and Benzor all denied at their depositions that the tattoos they share in common were related or were tattooed by the same person. Plaintiff's retained expert witness in tattoos will refute this claim.

## F. THE COUNTY AND DEPARTMENT TOLERATED DEPUTY ALDAMA AND FELLOW EXECUTIONERS' USE OF EXCESSIVE FORCE AND FALSE REPORTING

Based on this series of events, Mr. Lockett was arrested for brandishing a weapon and resisting arrest, then charged with attempted murder. In Deputy

1  Aldama's written report, he claimed that he stopped Mr. Lockett because he
2  matched the description of the drive-by shooter—a demonstrably false claim given
3  the only similarity was that both were Black males. Deputy Aldama then amended
4  his report falsely claiming he stopped Mr. Lockett because Mr. Lockett was
5  violating a Compton Municipal Code section by drinking a beer on the sidewalk.

6      Mr. Lockett was held in jail for eight months before he was eventually
7  released with all charges against him dropped. At his preliminary hearing, the
8  witness, this time not subjected to the unduly suggestive field identification events,
9  clearly and unambiguously testified that Mr. Lockett was not the shooter.

10      Though Mr. Lockett was eventually released, he spent eight months in jail for
11  a crime he never committed, facing two life sentences in prison, all stemming from
12  the initial false "ghost gun" radio call and the unnecessary, aggressive confrontation
13  spearheaded by Deputy Aldama. The County tolerated and condoned the violation
14  of Mr. Lockett's rights by failing to investigate the drive-by shooting: for example,
15  the gunshot residue ("GSR") found at the scene of the shooting on spent bullet
16  casings was never chemically compared to GSR found on Mr. Lockett's hands (after
17  he was beaten and touched by deputies who had been holding guns, likely
18  transferring the GSR to him) to confirm a match. In another example, the friends
19  with whom Mr. Lockett was standing on the sidewalk were never interviewed by
20  investigators. From the involved officers to their supervisors to the highest levels of
21  LASD leadership, Defendants were complicit in all of the ongoing consequences
22  stemming from Deputy Aldama's use of force against Mr. Lockett and the cover up
23  that followed.

24      Along with compensating Mr. Lockett for his injuries, this case presents the
25  perfect opportunity for the Court to intervene and take some action to address the
26  secret deputy gangs within the Sheriff's Department, something that the upper
27  echelon of the Sheriff's Department has refused to do, with Sheriff Villanueva

28

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

fighting all efforts being taken by the County Board of Supervisors and the Los Angeles County Sheriff Civilian Oversight Commission.

## III.   CLAIMS AND DEFENSES

### A.   SUMMARY OF PLAINTIFF'S CLAIMS

**Claim 1:** <u>Excessive Force</u>. Defendant Aldama used excessive force against Plaintiff in violation of Plaintiff's Fourth Amendment rights and 42 U.S.C. § 1983. Plaintiff seeks all compensatory damages as well as punitive damages and attorneys' fees.

**i.   Elements.**

1.   Defendant Aldama acted under the color of law;

2.   Defendant Aldama used excessive force against Plaintiff;

3.   The excessive force was a cause of injury, damage, loss, or harm to Plaintiff.

The jury may consider:

a.   The severity of the crime or other circumstances to which Deputy Aldama was responding;

b.   Whether Plaintiff posed an immediate threat to the safety of Deputy Aldama or to others;

c.   Whether Plaintiff was actively resisting arrest;

d.   The amount of time and any changing circumstances during which Deputy Aldama had to determine the type and amount of force that appeared to be necessary;

e.   The type and amount of force used; and

f.   The availability of alternative methods to subdue Plaintiff.

*See* Ninth Circuit Manual of Model Jury Instructions, No. 9.22.

**ii.   Key Evidence in Support**

Plaintiff's key evidence will include (1) the testimony of witnesses present at

the scene when excessive force was used against Plaintiff including Plaintiff; his friends Timothy, Gary, and Eboni Campbell; Deputy Aldama; Deputy Orrego; Deputy Embleton; and Deputy Feria; (2) testimony of witnesses involved in the drive-by shooting investigation including Deputy Benzor; Imunique Ross, who identified Lockett in the improper field show-up; criminalist Kristina Fritz; and GSR forensic expert Kenton S. Wong; (3) witnesses knowledgeable of the County's use of force policies, including LASD Commander Michael Thatcher and Captain William Jaeger; (4) various witnesses with knowledge of the Banditos deputy gang, as well as Aldama's activities with the Banditos after being transferred to the East Los Angeles Station; (5) various expert witnesses, including Plaintiff's police practices expert Roger Clark; witness identification expert Mitchell Eisen; cell phone data expert Matthew Gabler; forensic analyst regarding arrest statistics Ed Garcia; GSR forensic expert Bryan Burnett; and tattoo expert Charles Shinn. Other key evidence includes the various LASD incident reports and investigatory reports relating to the incident; transcripts of relevant radio calls that went out regarding the drive-by shooting and the allegation Plaintiff had a gun; photographs of the scene; and Plaintiff's medical records, along with testimony by the treating physicians who prepared said records.

### iii.    Key Facts To Be Established By Evidence

The key facts expected to be established by the aforementioned evidence include the following:

a.  Officers had no prior knowledge of Mr. Lockett;

b.  Mr. Lockett was not committing any crimes when he was approached by Deputy Aldama and Deputy Orrego;

c.  Mr. Lockett did not match the description of the drive-by shooting suspect;

d.  Deputy Aldama and Deputy Orrego aggressively confronted Mr. Lockett with guns drawn and pointed at him;

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

e.  Deputies falsely reported that Mr. Lockett had a gun in his waistband;

f.  Deputy Aldama knew the report that Mr. Lockett had a gun was false;

g.  Deputies chased Mr. Lockett after her ran;

h.  Mr. Lockett was found hiding in the patio of a nearby home;

i.  Mr. Lockett was severely beaten by Deputy Aldama with fists and/or baton;

j.  Mr. Lockett was attempting to surrender while deputies beat him;

k.  Deputies used the racial epithet "nigger" while beating Mr. Lockett;

l.  No gun was ever recovered from Mr. Lockett's person or the scene;

m. Mr. Lockett never attacked any of the deputies;

n.  Deputy Aldama was a member of the Executioners deputy gang based out of the Compton Station;

o.  Deputy Aldama had a pattern and practice of confronting apparently unarmed citizens, calling in a "ghost gun," and using excessive force against the citizen;

p.  Deputy Aldama had ill feelings toward African Americans in general;

q.  Mr. Lockett was injured by the force used against him by Deputy Aldama;

r.  Deputy Aldama's tactics were not in conformity with appropriate policing standards;

s.  The identification procedure to identify Mr. Lockett as the shooter was not in conformity with appropriate policing standards; and

t.  Plaintiff was not armed with a gun at any time on January 15, 2016.

**Claim 2:** _Monell_ Claim. Defendants County of Los Angeles and the Los Angeles Sheriff's Department had official policies, practices, or customs that failed to prevent violations of law by their employees, and/or were the known or obvious consequences of their failure to train their deputy sheriffs adequately, and/or

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1   resulted in the ratification of unlawful actions of their employees by their
2   employees' superiors.

3       **i.**        **Elements**

4       1.       Defendant Aldama acted under the color of law;

5       2.       Defendant Aldama deprived Plaintiff of his particular rights under the
6   United States and the United States Constitution;

7       3.       Defendant Aldama acted pursuant to a widespread or longstanding
8   practice or custom of defendants County of Los Angeles and the Los
9   Angeles County Sheriff's Department;

10       4.       Defendants County of Los Angeles and the Los Angeles County
11   Sheriff's Department's widespread or longstanding practice or custom
12   caused deprivation of Plaintiff's rights by defendant Aldama;

13       5.       Defendants County of Los Angeles and the Los Angeles County
14   Sheriff's Department's widespread or longstanding practice or custom
15   is so closely related to the deprivation of Plaintiff's rights as to be the
16   moving force that caused the ultimate injury;

17       6.       As to ratification, Defendants County of Los Angeles and the Los
18   Angeles County Sheriff's Department knew of defendant Aldama's
19   actions and made a deliberate choice to approve of these actions and
20   the basis for them;

21       7.       That the training policies of Defendants County of Los Angeles and the
22   Los Angeles County Sheriff's Department were not adequate to prevent
23   violations of law by its employees or to train its police officers to
24   handle the usual and recurring situations with which they must deal;
25   and

26       8.       Defendants County of Los Angeles and the Los Angeles County
27   Sheriff's Department were deliberately indifferent to the substantial

28

1   risk that its policies were inadequate to prevent violations of law by its
2   employees or the known or obvious consequences to train its police
3   officers and sheriff deputies adequately.

4   *See* Ninth Circuit Manual of Model Jury Instructions, No. 9.5, 9.7, and 9.8.

5   **ii.    Key Evidence in Support**

6   Plaintiff's key evidence includes the testimony of Plaintiff; Deputy Aldama;
Deputy Orrego; Timothy, Gary, and Eboni Campbell; Deputy Benzor; Deputy
Embleton; Deputy Feria; Imunique Ross; Commander Michael Thatcher; Captain
William Jaeger; retired LASD deputy sheriff Neal Tyler; whistleblower Deputy
Austreberto Gonzalez and others who have since come forward; various witnesses
identified as being "Executioners" or prospects to join the Executioners group;
litigants involved in pending cases which have uncovered information about the
Executioners through discovery; various witnesses with knowledge of the Banditos
deputy gang, as well as Aldama's activities with the Banditos after being transferred
to the East Los Angeles Station; and various expert witnesses including Plaintiff's
experts named above. Plaintiff also expects to call various witnesses engaged in the
investigation into deputy gangs in the Los Angeles County Sheriff's Department
including Sheriff Villanueva; Supervisors Sheila Kuehl and Hilda Solis; the authors
of the Rand Corporation study commissioned by the County in 2019
(*Understanding Subgroups Within the Los Angeles County Sheriff's Department*);
members of the Los Angeles County Sheriff Civilian Oversight Commission
including Inspector General Max Huntsman; and Professor Sean Kennedy, the
author of *Fifty Years of "Deputy Gangs" in the Los Angeles County Sheriff's
Department: Identifying Root Causes and Effects to Advocate for Meaningful
Reform*.

26   **iii.   Key Facts To Be Established By Evidence**

27   The key facts expected to be established by the aforementioned evidence

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

include the following:

   a. The problem of violent deputy gangs in the Los Angeles Sheriff's Department has existed for at least 40 years;

   b. Despite this longstanding problem, the County and LASD have repeatedly failed to investigate or discipline deputy gangs and their members;

   c. The County and LASD have repeatedly denied the existence of any deputy gangs;

   d. The Compton Station has been permeated by a violent deputy gang called the Executioners;

   e. The Executioners operated at Compton Station with impunity;

   f. Members of the Executioners used violence against members of the public in order to increase their standing within the gang;

   g. Deputies seeking to join the gang are called "prospects" and purposefully carry excessive force as a means of "chasing ink," i.e., gaining admission into the gang;

   h. "Inking" refers to the act of tattooing the newly made member of the Executioners with the common station tattoo;

   i. Deputy Aldama, Deputy Orrego, and Deputy Benzor are all "inked" members of the Executioners;

   j. Approximately 15-20 deputy sheriffs at the Compton Station are inked members of the Executioners;

   k. Approximately 20 other deputies were "prospects";

   l. The leadership at Compton Station including then-Captain Michael Thatcher knew of the existence of the Executioners;

   m. The leadership at Compton Station including Captain Thatcher tolerated and ratified the Executioners' actions at Compton Station;

   n. The County and Department could implement policies to end deputy

gangs, but have failed to do so;

   o.  Deputy Aldama targeted Mr. Lockett for excessive force as part of "chasing ink" to join the Executioners;

   p.  Deputy Aldama falsely claimed in his written report that Mr. Lockett matched the description of the drive-by shooter;

   q.  Deputy Aldama falsely claimed in his written report that Mr. Lockett was stopped because he was drinking beer on the sidewalk;

   r.  Deputy Aldama was encouraged by his supervisor to write false reports;

   s.  The County and LASD tolerated and ratified the practice of making false claims on the shared internal radio, and failed to discipline deputies who engaged in such practices;

   t.  The County and LASD tolerated and ratified the practice of writing false police reports, and failed to discipline deputies who engaged in such practices;

   u.  The County could have compared the gunshot residue found on Mr. Lockett with the gunshot residue found at the scene of the drive-by shooting, but did not; and

   v.  The investigation into the crime of which Mr. Lockett was accused did not meet police investigatory or prosecutorial standards.

**Claim 3:** <u>Punitive Damages Against Defendant Aldama</u>.

**i.**    **Elements**

      1.    Deputy Aldama's conduct was malicious, oppressive or in reckless disregard of Plaintiff's rights.

*See* Ninth Circuit Manual of Model Jury Instructions, No. 5.5.

**ii.**    **Key Evidence in Support**

Plaintiff anticipates much of the above-referenced evidence in support of the

excessive force and *Monell* claims will also support the punitive damages claim. In addition, Plaintiff expects to offer subpoenaed records about Deputy Aldama's net worth.

**iii.     Key Facts To Be Established By Evidence**

a. Deputy Aldama acted with malice, oppression, and reckless disregard of Plaintiff's rights throughout the January 15, 2016 incident.

**B.     DEFENDANTS' COUNTERCLAIMS AND DEFENSES**

Plaintiff anticipates that Defendants will assert the following affirmative defenses:

**Defense 1**: Deputy Aldama's use of force was reasonable under the circumstances.

Elements: See above (Ninth Circuit Manual of Model Jury Instructions, No. 9.22).

**Defense 2:** Members of the alleged deputy gang did not engage in a pattern of constitutional violations.

Elements: See above (Ninth Circuit Manual of Model Jury Instructions, No. 9.5, 9.7, and 9.8).

**Defense 3:** The County/LASD do not have a custom or practice of failing to investigate or discipline deputy gangs or their members.

Elements: See above (Ninth Circuit Manual of Model Jury Instructions, No. 9.5, 9.7, and 9.8).

**Defense 4:** The County/LASD's failure to investigate deputy gangs or their members was not the "moving force" behind Plaintiff's injuries.

Elements: See above (Ninth Circuit Manual of Model Jury Instructions, No. 9.5, 9.7, and 9.8).

**Defense 5:** The County/LASD were not deliberately indifferent in its policies about investigating and disciplining deputy gangs or their members.

1    <u>Elements:</u> See above (Ninth Circuit Manual of Model Jury Instructions, No.

2    9.5, 9.7, and 9.8).

3    **<u>Defense 6:</u>** The County/LASD did not ratify deputy misconduct.

4    <u>Elements:</u> See above (Ninth Circuit Manual of Model Jury Instructions, No.

5    9.5, 9.7, and 9.8).

6    **IV.     <u>ANTICIPATED EVIDENTIARY ISSUES</u>**

7    Plaintiff has filed the following motions *in limine*:

8          1.   Motion *in Limine* No. 1 to Exclude Prejudicial Evidence Under Federal

9              Rule of Evidence 403:

10              A. Any argument or evidence regarding Plaintiff's tattoos;

11              B.  Any argument or evidence relating to the failure to criminally

12                 charge Deputy Aldama, Deputy Orrego, or any other police officers

13                 involved in Plaintiff's arrest in connection with the subject incident

14                 upon which this action is based;

15              C.  Any argument or evidence relating to the failure to criminally

16                 charge Deputy Aldama or Deputy Orrego in connection with the

17                 *Taylor v. County of Los Angeles* matter (Los Angeles Superior

18                 Court Case No. TC028803);

19              D.  Any argument or evidence relating to any commendations or

20                 equivalent recognition that Deputy Aldama received prior or

21                 subsequent to the subject incident;

22              E.  Any argument or evidence relating to the video of Plaintiff taken in

23                 the course of a traffic stop after the subject incident (attached as

24                 Exhibit 5 to the transcript of the first session of deposition of

25                 Plaintiff's expert Dr. Michele Cooley-Strickland); and

26              F.  Any argument or evidence during the liability phase of trial relating

27                 to Plaintiff's criminal history prior to the subject incident.

28

2. Motion *in Limine* No. 2 to Exclude Hearsay Evidence that Witness 'Heard" Plaintiff Had Drugs on Him at Time of Subject Incident; and

3. Motion *in Limine* No. 3 to Exclude Defendants' Expert Witness Darryl Zenger From Testifying Due to Conflict of Interest.

Plaintiff anticipates the following evidentiary disputes:

1. <u>Plaintiff's Criminal Convictions</u>. Plaintiff has several misdemeanor convictions which should be excluded from the liability phase of trial, as any probative value of such evidence is outweighed by the dangers of prejudice and inflaming the jury's passion.

2. <u>Plaintiff's Expert Dr. Michele Cooley-Strickland</u>. Plaintiff anticipates that Defendants will seek to disqualify Dr. Cooley-Strickland, Plaintiff's treating psychotherapist.

## V.  **BIFURCATION OF ISSUES**

Plaintiff has brought a motion to bifurcate trial into a Phase One covering liability followed by a Phase Two covering damages or, alternatively, to trifurcate trial into a 1) liability phase, 2) compensatory damages phase, and 3) punitive damages phase.

Defendants have brought a competing motion to bifurcate trial into a Phase One covering Defendant Aldama's liability for excessive force and Plaintiff's damages and a Phase Two covering the public entity defendants' liability under *Monell* and punitive damages against Deputy Aldama.

## VI.  **THE TRIAL IS BY JURY**

The issues herein are triable to a jury as a matter of right. The parties made a timely demand for trial by jury.

## VII.  **ATTORNEYS' FEES**

If Plaintiff prevails, reasonable attorney fees are recoverable pursuant to 42 U.S.C. § 1983.

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## VIII.  **ABANDONMENT OF ISSUES**

Plaintiff has previously abandoned his claim for excessive force only as to former defendant Mizrain Orrego. The Court has denied Plaintiff's motion to amend the complaint to add a cause of action for fabrication of evidence as to defendant Aldama.[5]

DATED:  October 26, 2021                  Respectfully submitted,

                                                    THE SWEENEY FIRM

                                                    and

                                                    GLICKMAN & GLICKMAN,
                                                    A LAW CORPORATION

                                                    By    /s/ Steven C. Glickman
                                                         John E. Sweeney
                                                         Steven C. Glickman
                                                         Attorneys for Plaintiff
                                                         SHELDON LOCKETT

---

[5] Plaintiff maintains that this fabrication of evidence claim as to Deputies Aldama and Orrego has been part of the action since the beginning as set forth in Plaintiff's briefing on the motion to amend. The fabrication of evidence claim remains fully at issue as part of the *Monell* claim.

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**